UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
DEL RIO DIVISION

| | |
|---|---|
| STATE OF TEXAS<br>    *Plaintiff,*<br><br>v.<br><br>ALEJANDRO MAYORKAS, in his official capacity as Secretary of Department of Homeland Security; UNITED STATES DEPARTMENT OF HOMELAND SECURITY; MERRICK GARLAND, in his official capacity as Attorney General of the United States, UNITED STATES DEPARTMENT OF JUSTICE,<br>    *Defendants.* | No. 2:23-cv-00024 |

## STATE OF TEXAS'S ORIGINAL COMPLAINT

In a farcical attempt to address the invasion of illegal aliens across the southern border following the end of Title 42, the Biden Administration published a new Final Rule inviting migrants to download an app to schedule a convenient time and place to cross the border illegally. Neither the app nor the border patrol officers at the southern border ask if the illegal aliens are seeking asylum, nor do they validate any claim for protection. The Biden Administration is inviting tens of thousands of aliens into Texas, releasing them into the country, and inflicting serious costs on the State of Texas. The Biden Administration's attempt to manage the southern border by app does not meet even the lowest expectation of competency and runs afoul of the laws Congress passed to regulate immigration, and the Final Rule should be enjoined.

## I.   PARTIES

1.      The State of Texas is a sovereign State of the United States of America.

2.      Defendant United States Department of Homeland Security is a federal cabinet agency responsible for implementing and enforcing certain immigration-related statutes, policies, and directives. DHS is a Department of the Executive Branch of the United States government. DHS oversees the United States Citizenship and Immigration Services, United States Customs and Border Protection, and United States Immigration and Customs Enforcement.

3.      Defendant Alejandro N. Mayorkas is the Secretary of Homeland Security and the head of DHS. He is sued in his official capacity.

4.      Defendant Merrick Garland is the United States Attorney General. Attorney General Garland oversees the Department of Justice. He is sued in his official capacity.

5.      Defendant the United States Department of Justice is a Department of the Executive Branch of the United States government.

## II.   JURISDICTION & VENUE

6.      The Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, and 2201(a). This action arises under 5 U.S.C. §§ 702–03 and 28 U.S.C. §§ 1331, 1346, and 1361.

7.      Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b)(2) and 1391(e). Defendants are United States agencies and officers sued in their official capacities. The State of Texas is a resident of this judicial district and a substantial part of the events or omissions giving rise to this complaint occurred and continue to occur within the Western District of Texas, Del Rio Division.

8.      The Court is authorized to award the requested declaratory and injunctive relief

under 5 U.S.C. § 706 and 28 U.S.C. §§ 1361, 2201, and 2202, and its inherent equitable powers.

### III.   BACKGROUND

9.      In March 2020, under the Trump Administration, the Centers for Disease Control and Prevention invoked Title 42, to address public health concerns about COVID-19. The Title 42 Order allowed immigration officials to turn arriving aliens away at the border without placing them in immigration proceedings or considering their asylum claims.

10.     On January 30, 2023, the Biden Administration announced it would terminate the Title 42 Order on May 11, 2023.[1]

11.     Since then, Defendants have anticipated a surge in illegal immigration at the Southwest Border of the United States as a result of that termination.[2]

12.     President Biden warned that the Southwest Border is going to be "chaos for a while" after the expiration of the Title 42 Order and he acknowledged there has been "chaos at the border for a number of years."[3]

---

[1] OMB, *Statement of Administration Policy: H.R. 382 and H.J. Res. 7* (Jan. 30, 2023), https://www.whitehouse.gov/wp-content/uploads/2023/01/SAP-H.R.-382-H.J.-Res.-7.pdf (announcing White House plan to let public health emergency expire on May 11).

[2] *See* Press Release, DHS Continues to Prepare for End of Title 42; Announces New Border Enforcement Measures and Additional Safe and Orderly Processes (Jan. 5, 2023), https://www.dhs.gov/news/2023/01/05/dhs-continues-prepare-end-title-42-announces-new-border-enforcement-measures-and (last accessed May 23, 2023).

[3] *Biden quietly admits the border has been in chaos 'for a number of years' ahead of Title 42 expiration*, Fox News (May 11, 2023), https://www.foxnews.com/politics/biden-quietly-admits-border-been-chaos-number-years-ahead-title-42-expiration (last accessed May 23, 2023).

A.    **Legal Background**

13.    Upon the expiration of the Title 42 Order, the United States returned to normal immigration operations governed by Title 8 of the United States Code.

14.    Section 1225 of Title 8 of the United States Code establishes procedures for DHS to process aliens "present in the United States" and deems them "applicant[s] for admission" to the United States. 8 U.S.C. § 1225(a)(1).[4] Aliens who lack valid entry documents "at the time of application for admission" are "inadmissible" and therefore "removable." *Dep't of Homeland Sec. v. Thuraissigam*, 140 S. Ct. 1959, 1964 (2020) (citing 8 U.S.C. § 1182(a)(7)(A)(i)(I)).

15.    Aliens seeking admission to the United States must be inspected by immigration officers. 8 U.S.C. §1225(a)(3); *see Jennings v. Rodriguez*, 138 S. Ct. 830, 836–37 (2018).

16.    Aliens must be detained until their immigration proceedings are concluded. 8 U.S.C. § 1225(b).

17.    An alien is subject to *expedited* removal when an officer determines that the alien lacks valid entry documents. 8 U.S.C. § 1225(b)(1)(A)(i); *see* 8 U.S.C. § 1182(a)(6)(C), (7).

18.    Aliens may avoid removal by seeking asylum, indicating a fear of persecution, or by being paroled into the United States. 8 U.S.C. § 1182(a)(7)(i); *id.* at (d)(5)(A); 8 U.S.C. § 1225(b)(1)(A)(i); *see* 8 C.F.R. § 235.3(b)(4)

19.    Even if an alien raises an asylum claim, the alien is not entitled to immediate release. Applicants "*shall* be detained pending a final determination of credible fear of persecution and, if found not to have such a fear, until removed." 8 U.S.C. § 1225(b)(1)(B)(iii)(IV) (emphasis added).

---

[4] Section 1225 refers to the Attorney General, but those functions have been transferred to the Secretary of Homeland Security. *See Dep't of Homeland Sec. v. Thuraissigam*, 140 S. Ct. 1959, 1965 n.3 (2020).

20.     "Most asylum claims . . . ultimately fail, and some are fraudulent." *Thuraissigiam*, 140 S. Ct. at 1963.

21.     Aliens may also be allowed to remain in the country by being released on parole. The Attorney General may parole aliens into the United States "on a case-by-case basis for urgent humanitarian reasons or significant public benefit." 8 U.S.C. § 1182(d)(5)(A). In April 2023 alone, at least 28,738 migrants were paroled into the country.[5]

22.     The Biden Administration has a history of paroling aliens *en masse*. The Biden Administration unveiled one such policy this month[6], which was recently enjoined.[7]

**B.     The Circumvention of Lawful Pathways Rule**

23.     On February 23, 2023, the Department of Homeland Security (DHS) and the Department of Justice (DOJ) jointly issued a notice of proposed rulemaking previewing the federal government's change in immigration policy after expiration of the Title 42 Order. 88 Fed. Reg. 11,704.

24.     On May 16, 2023, Defendants jointly issued the Final Rule, the Circumvention of Lawful Pathways, with an effective date of May 11, 2023. 88 Fed. Reg. 31,314.

25.     This Final Rule represents a significant change in asylum and border policy. Under

---

[5] U.S. Customs and Border Protection, *CBP Releases April 2023 Monthly Operational Update* (May 17, 2023), https://www.cbp.gov/newsroom/national-media-release/cbp-releases-april-2023-monthly-operational-update (last accessed May 23, 2023).

[6] *Biden admin to allow for the release of some migrants into the U.S. with no way to track them*, NBC NEWS, https://www.nbcnews.com/politics/biden-admin-plans-order-release-migrants-us-no-way-trackrcna83704 (May 10, 2023 8:44 a.m. CDT) (last accessed May 23, 2023).

[7] *Florida v. Mayorkas, et al.*, case no. 3:23-cv-9962-TKW-ZCB, (Preliminary Injunction, May 16, 2023, Dkt. 30).

the Final Rule, migrants are presumed ineligible for asylum unless they have "presented at a port of entry at a pre-scheduled time using the CBP One app" or satisfy some other exception.[8] *See* 88 Fed. Reg. 31,317, 31,325.

26.     CBP One is a free mobile application that "enables noncitizens without appropriate documents for admission who seek to travel to the United States through certain southwest border land ports of entry (POEs) the ability to submit information through a module within the application instead of coming directly to wait at a POE."

27.     Defendants intend that the CBP One app will "significantly increase the number of individuals, including those who *may* be seeking asylum, that CBP can process at land border ports of entry." 88 Fed. Reg. 11,719 (emphasis added); *see also* 88 Fed. Reg. 31,331 ("[T]he expanded use of the CBP One app is expected to . . . enable CBP to . . . expand its ability to process noncitizens at POEs, including those who *may* be seeking asylum[.]") (emphasis added).

28.     The CBP One app is "broadly available to migrants in central and northern Mexico" and available for download through the Apple App Store or Google Play Store. 88 Fed. Reg. 11,707 n.25.

29.     Aliens are invited to download the CBP One app and select a time and place to cross the border.

30.     The use of the CBP One app is intended to "streamline[]" illegal aliens' experience at the port of entry. 88 Fed. Reg. 11,727; *see also* 88 Fed. Reg. 31,376.

---

[8]   Fact Sheet: Circumvention of Lawful Pathways (May 11, 2023), https://www.dhs.gov/news/2023/05/11/fact-sheet-circumvention-lawful-pathways-final-rule (last accessed May 23, 2023).

31.     The CBP One app asks "undocumented travelers" to identify if they are arriving by land, air, or sea. *See* CBP One Mobile Application Traveler User Guide: Submit Advance Information Capability for Non-Citizens (Exh. 1).

32.     It then prompts them to input their names and allow CBP One access to their location. *See* Exh. 1.

33.     The app prompts the user to submit a photo and submit their contact and family information. *See* Exh. 1.

34.     Next, the app prompts the user to select their preferred port of entry to the United States. The user can then request an appointment to cross the border and appear at their preferred port of entry.  *See* Exh. 1.

35.     A migrant must be in central or northern Mexico to request an appointment through the CBP One app. Exh. 1 at 19, 25, 32.

36.     The CBP One app allows them to choose between 8 ports of entry, 5 of which are in Texas.

37.     The CBP One app does not ask migrants whether they intend to seek asylum. *See generally* Exh. 1. Nor do the Border Patrol agents ask whether the migrants intend to seek asylum. "The app is not a method of seeking asylum in the United States, and CBP officers do not determine the validity of any claims for protection." 88 Fed. Reg. 31,358.

38.     The Rule dictates that once the migrants present at the border at their scheduled time and place, they may seek asylum or other forms of protection from removal. 88 Fed. Reg. 31,316.

39.     The Final Rule is intended to "encourage[] migrants to avail themselves" of this

method of coming to the United States. 88 Fed. Reg. 31,314. It does so by establishing a rebuttable presumption of asylum ineligibility for illegal aliens who cross the border *without* using the CBP One app. 88 Fed. Reg. 31,314.[9]

40.    To be allowed to remain in the United States after crossing the border, users of the CBP One app must satisfy some exception from removal. Use of the app alone does not authorize an alien to stay in the country after presenting at the port of entry. *See* 88 Fed. Reg. 31,318 ("Once present in the United States, those who use [the CBP One app] can make claims for asylum and other forms of protection" from removal.).

41.    Defendants are encouraging aliens to illegally cross the border without establishing that they meet some exception from removal or have a legal basis to remain in the country.

42.    On information and belief, the Final Rule works in conjunction with the Administration's expanded parole policies and processes to expedite and streamline the processing of aliens at the border and move them into the country more quickly. *See, e.g.*, 88 Fed. Reg. 31,329; *id.* at 31,331 (The Final Rule "does not . . . set any policy regarding DHS's discretionary authority to make parole determinations for those who use the CBP One app" but the use of the CBP One app is "expected to . . . enable CBP to . . . expand its ability to process noncitizens . . . .").

43.    Should a migrant fail to qualify for asylum or other protection from removal, Defendants have abetted the aliens' violation of federal law—and affirmatively invited them to do so.

---

[9] This presumption does not apply to unaccompanied children. 88 Fed. Reg. 31,318.

C.      **Effects of the Final Rule on Texas**

44.     The Biden Administration's reckless and unlawful open border policies are overwhelming Texas's border communities. Texas contains more than half of the border between the United States and Mexico, and a large share of aliens crossing into the United States arrive through the Texas-Mexico border. Through the CBP One app, the Biden Administration is inviting illegal aliens to cross the border at five ports of entry in the State of Texas: Brownsville, El Paso, Eagle Pass, Hidalgo, and Laredo.

45.     By inviting illegal aliens into Texas, Defendants will inflict costs on the State for public education, law enforcement and incarceration, unreimbursed health care, and other public services for illegal aliens. For example, the Final Rule will cause Texas to "incur significant costs in issuing driver's licenses." *Texas v. United States*, 809 F.3d 134, 155 (5th Cir. 2015). Texas law subsidizes driver's licenses, including for noncitizens who have "documentation issued by the appropriate United States agency that authorizes [them] to be in the United States." *Id.* (quoting Tex. Transp. Code § 521.142(a)). Aliens paroled into the United States will be eligible for subsidized driver's licenses.[10] By enabling more aliens to secure subsidized licenses, the Final Rule will impose significant financial harm on the State of Texas. *See Texas*, 809 F.3d at 155.

46.     Defendants acknowledge that "a substantial proportion of migrants who cross the [southern] border ultimately are not found to have a valid asylum claim." 88 Fed. Reg. 11,729. Yet, Defendants are encouraging the influx of migrants with meritless—if any—claims of asylum that will result in additional migrants entering and remaining in Texas, thus forcing the State to expend

---

[10]     Tex.   Dep't   of   Pub.   Safety,   *Verifying   Lawful   Presence*, https://www.dps.texas.gov/sites/default/files/documents/driverlicense/documents/verifyingla wfulpresence.pdf (listing "Parolees" as eligible for driver's licenses).

taxpayer resources on health care, education, social services, and similar services for such migrants. The Final Rule creates incentives to increase the amount of illegal immigration, which also facilitates, for example, the depressing of wages resulting from adding tens of thousands of new persons to the workforce per month. These harms will be substantial, both to Texas's sovereignty and to the public fisc, and cannot be undone through monetary remedies and thus they constitute irreparable harm to the State of Texas and its taxpayers.

47.     The State funds multiple healthcare programs that cover illegal aliens. The provision of these services—utilized by illegal aliens—results in millions of dollars of expenditures per year. These services include the Emergency Medicaid program, the Texas Family Violence Program, and the Texas Children's Health Insurance Program.

48.     The Emergency Medicaid program provides health coverage for low-income children, families, seniors, and the disabled. Federal law requires Texas to include illegal aliens in its Emergency Medicaid program. The program costs the State tens of millions of dollars annually.

49.     The Texas Family Violence Program provides emergency shelter and supportive services to victims and their children in the State of Texas. Texas spends over a million dollars per year on the Texas Family Violence Program for services to illegal aliens.

50.     The Texas Children's Health Insurance Program offers low-cost health coverage for children from birth through age 18. Texas spends tens of millions of dollars each year on CHIP expenditures for illegal aliens.

51.     Further, Texas faces the costs of uncompensated care provided by state public hospital districts to illegal aliens which results in expenditures of hundreds of millions of dollars per year.

52. Aliens and the children of those aliens receive education benefits from the State at significant taxpayer expense. Defendants' failure to detain criminal aliens increases education expenditures by the State of Texas each year for children of those aliens.

53. Because the Final Rule is invalid and unlawful, it must be enjoined in its entirety. *See, e.g.*, *United Steel v. Mine Safety & Health Admin.*, 925 F.3d 1279, 1287 (D.C. Cir. 2019) ("The ordinary practice is to vacate unlawful agency action."); *Nat'l Min. Ass'n v. U.S. Army Corps of Engineers*, 145 F.3d 1399, 1409 (D.C. Cir. 1998) (unlawful agency regulations are vacated); *Gen Chem. Corp. v. United States*, 817 F.2d 844, 848 (D.C. Cir. 1987) ("The APA requires us to vacate the agency's decision if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]'").

### IV.    CLAIMS FOR RELIEF

### COUNT 1: The Final Rule Exceeds Statutory Authority and Is Not in Accordance with Law (5 U.S.C. § 706(2)(A), (C))

54. The APA prohibits agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (C).

55. Secretary Mayorkas is charged with overseeing all functions of the Border Patrol program and the detention and removal program. 6 U.S.C. § 251.

56. Under Section 1103, Secretary Mayorkas is required to "guard the boundaries and borders of the United States against the illegal entry of aliens." 8 U.S.C. § 1103(a)(5).

57. In the Final Rule, Defendants invoke 8 U.S.C. § 1103(g)(2) as the basis for the Attorney General's authority to promulgate the rule. Under that statute, the Attorney General is authorized to "establish such regulations, issue such instructions, . . . and perform such other acts

as the Attorney General determines to be necessary for carrying out this section." 8 U.S.C. § 1103(g)(2); *see also* 88 Fed. Reg. 31,323 (citing 8 U.S.C. § 1103(g)(2) as a basis for the Attorney General's authority to promulgate the Final Rule).

58.    Nothing in Title 8 authorizes either the Attorney General or the Secretary of Homeland Security to encourage and incentivize illegal immigration. 8 U.S.C. § 1103(g)(2).

59.    Yet, the Final Rule acknowledges that illegal aliens "who lack documents appropriate for admission to the United States are ***encouraged and incentivized*** . . . to make an appointment using the CBP One app to present themselves at a POE for inspection." 88 Fed. Reg. 31342 (emphasis added).

60.    Defendants expect that use of the CBP One app will increase immigration at these ports of entry and allow them to "process significantly more" migrants into the United States. 88 Fed. Reg. 31,326.

61.    Far from guarding against the illegal entry of aliens, through the Final Rule, Secretary Mayorkas is proactively inviting and encouraging aliens to cross the border unlawfully. This is contrary to his statutory authority.

62.    The Attorney General's authority under 8 U.S.C. § 1103 is limited to establishing regulations that are necessary to carrying out the requirements of that section—one of which is to guard against the illegally entry of aliens. *Compare* 8 U.S.C. § 1103(g)(2), *with* 8 U.S.C. § 1103(a)(5). By promulgating the Final Rule, the Attorney General is undermining the purposes of section 1103.

63.    Defendants lack statutory authority to encourage and incentivize aliens to cross the border without a legal basis to be in the United States.

64.     Accordingly, both Secretary Mayorkas and the Attorney General exceeded their authority by promulgating the Final Rule.

### COUNT 2: The Final Rule is Arbitrary and Capricious
### (5 U.S.C. § 706(2)(A))

65.     "Federal administrative agencies are required to engage in reasoned decisionmaking." *Michigan v. EPA*, 576 U.S. 743, 750 (2015) (internal quotation marks omitted). "Not only must an agency's decreed result be within the scope of its lawful authority, but the process by which it reaches that result must logical and rational." *Id.*

66.     Although agencies are entitled to deference, "the arbitrary and capricious standard of review . . . is by no means a rubber stamp." *Texas v. United States*, 524 F. Supp. 3d 598, 653 (S.D. Tex. 2021) (quoting *United States v. Garner*, 767 F.2d 104, 116 (5th Cir. 1985)).

67.     The Final Rule is arbitrary and capricious for multiple reasons.

68.     First, while the Final Rule purports to reduce illegal immigration, the Final Rule is rife with concessions that this rule will operate to increase the number of illegal aliens processed at the border. *E.g.*, 88 Fed. Reg. 31,326 & 31,396 ("CBP intends to increase the number of available appointments in the CBP One app and is committed to processing as many noncitizens as is operationally feasible.").

69.     Second, the Final Rule fails to consider the effects of this rule on Texas. While the rule says the "Departments expect that this rule will result in decreased strain on border states, local communities, and NGOs," the rule cites no data supporting this assertion and includes no analysis of costs to Texas as a result of this Final Rule. 88 Fed. Reg. 31,325.

70.     States "bear[] many of the consequences of unlawful immigration," and "[t]he problems posed to the State by illegal immigration must not be underestimated." *Arizona v. United*

*States*, 567 U.S. 387, 397, 398 (2012).

71.    Defendants have a "clear and obvious responsibility to consider . . . Texas's expenses and costs," *Texas*, 524 F. Supp. at 655, and they failed to do so.

72.    Defendants' failure to consider this factor is independently sufficient to set aside the Final Rule. *See, e.g.*, *DHS v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1913 (2020).

73.    Even if the Departments could have decided that other policy considerations outweighed the costs to the States, the Departments did not in fact make such a decision. Considering such policy concerns "was the agency's job, but the agency failed to do it." *Regents of the Univ. of Cal.*, 140 S. Ct. at 1914.

74.    For this additional reason, the Final Rule does not "rest[] on a consideration of the relevant factors." *Michigan*, 576 U.S. at 750 (internal quotation marks omitted). Because the Final Rule reflects no consideration of the States' interests in the enforcement of the federal statutes governing immigration, it is arbitrary and capricious.

75.    But even if the Administration had considered the State's costs as well—and it did not—it failed to consider whether it could achieve its goals through a less-burdensome or less-sweeping means. This too renders its resulting decision arbitrary and capricious.

76.    While Defendants contend the Final Rule will "reduce the level of irregular migration to the United States," 88 Fed. Reg. 31,329, they also anticipate that the Final Rule will allow them to process "significantly more" migrants than they could before the Title 42 Order was issued. 88 Fed. Reg. 31,326; *see also id.* at 31,343 ("The use of the CBP One app will contribute to CBP's efforts to expand its SWB POE migrant processing capacity *well beyond* the 2010–2016 daily POE average, resulting in increased access for noncitizens to POEs." (emphasis added)).

77.     Defendants contend the Final Rule is intended to "encourage migrants to avail themselves" of the CBP One app process by "reducing reliance on human smuggling networks." 88 Fed. Reg. 31,314. In other words, to reduce the influence of smugglers, Defendants are promoting one version of illegal immigration over another.

78.     Moreover, Defendants' stated intent to reduce migrants' reliance on smugglers is belied by the fact that unaccompanied children are exempted from the Final Rule's presumption of ineligibility for asylum. *See* 88 Fed. Reg. 31,318 ("With the ability to schedule a time and place to arrive at POEs . . ., this system is designed to . . . reduce the role of exploitative transnational criminal organizations and smugglers").

79.     The Final Rule "establishes a rebuttable presumption that. . . noncitizens who enter the United States without documents sufficient for lawful admission are ineligible for asylum, if" they do not "present[] at a POE at a pre-scheduled time" through the CBP One app. 88 Fed. Reg. 31,318. Yet, the Final Rule exempts unaccompanied children from this presumption. *Id.* By exempting unaccompanied children from this presumption, Defendants are incentivizing individuals to employ smugglers to transport unaccompanied children across the border, contrary to the Final Rule's stated intent.[11]

80.     The Final Rule failed to consider alternative approaches that would disincentivize aliens using cartels or smugglers to cross the border without encouraging other illegal crossings.

---

[11] *See, e.g.*, *As Migrant Children Were Put to Work, U.S. Ignored Warnings*, THE NEW YORK TIMES (Apr. 17, 2023), https://www.nytimes.com/2023/04/17/us/politics/migrant-child-labor-biden.html?smid=nytcore-ios-share&referringSource=articleShare (last accessed May 23, 2023); *Heartbreaking video shows moment 1-year-old boy is dumped at border*, THE NEW YORK POST (Mar. 26, 2023), https://nypost.com/2023/03/26/heartbreaking-video-shows-moment-1yo-boy-is-dumped-at-border/ (last accessed May 23, 2023).

*Cf.* 88 Fed. Reg. 31,399 ("[T]he Departments reiterate that the CBP One app is a method of *facilitating entry* into the United States" for "noncitizens without appropriate documents for admission." (emphasis added)).

81.     The Supreme Court has held that a DHS immigration action was arbitrary and capricious because it was issued "'without any consideration whatsoever' of a [more limited] policy." *Regents of the Univ. of Cal.*, 140 S. Ct. at 1912 (quoting *State* Farm, 463 U.S. at 51).

82.     On information and belief, Defendants did not give any meaningful consideration to other policies that would have enforced the United States' immigration laws without incentivizing any kind of illegal immigration.

83.     For these reasons, the Final Rule is arbitrary and capricious should be set aside.

### DECLARATORY JUDGMENT

The Declaratory Judgment Act authorizes federal courts to declare the rights of litigants. 28 U.S.C. § 2201. The issuance of a declaratory judgment can serve as the basis for an injunction to give effect to the declaratory judgment. *Steffel v. Thompson*, 415 U.S. 452, 461 n.11 (1974).

### V.     CONCLUSION

For the reasons described above, the State of Texas is entitled to a declaration that Defendants are violating the law and the Final Rule is unlawful, unconstitutional, and unenforceable.

### VI.     REQUEST FOR RELIEF

The State of Texas respectfully requests that the Court:

a.   Hold unlawful and set aside the Final Rule;

b.   Declare Defendants' actions unlawful;

    c.   Issue a preliminary and permanent injunction prohibiting Defendants from implementing the Final Rule;

    d.   Award the State of Texas costs and reasonable attorneys' fees;

    e.   Award such other relief as the Court deems equitable and just.

Dated May 23, 2023.

Respectfully submitted.

**KEN PAXTON**
Attorney General of Texas

**BRENT WEBSTER**
First Assistant Attorney General

**GRANT DORFMAN**
Deputy First Assistant Attorney General

**SHAWN E. COWLES**
Deputy Attorney General for Civil Litigation

Office of the Attorney General of Texas
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
(512) 463-2100

**CHRISTOPHER D. HILTON**
Chief, General Litigation Division
Texas Bar No. 24087727
Christopher.Hilton@oag.texas.gov

*/s/ Amy Snow Hilton*
**AMY SNOW HILTON**
Assistant Attorney General
Texas Bar No. 24097834
Amy.Hilton@oag.texas.gov

**COUNSEL FOR THE STATE OF TEXAS**