UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
DEL RIO DIVISION

| | |
|---|---|
| STATE OF TEXAS, § <br> § <br> Plaintiff, § <br> v. § <br> § Case No. 2:23-CV-00024-AM <br> ALEJANDRO MAYORKAS, § <br> Secretary of Homeland Security, *et al.*, § <br> § <br> Defendants. § | |

**APPENDIX TO DEFENDANTS' MOTION TO DISMISS COMPLAINT**

Dated:      August 24, 2023           Respectfully submitted,

BRIAN M. BOYNTON
*Principal Deputy Assistant Attorney General*

WILLIAM C. PEACHEY
*Director*

EREZ REUVENI
*Assistant Director*

By: /s/ *Katherine J. Shinners*
KATHERINE J. SHINNERS
*Senior Litigation Counsel*
D.C. Bar No. 978141
U.S. Department of Justice, Civil Division
Office of Immigration Litigation – DCS
P.O. Box 868, Ben Franklin Station
Washington, DC 20044
Tel: (202) 598-8259
Fax: (202) 305-7000
Email: katherine.j.shinners@usdoj.gov

CHRISTINA P. GREER
*Senior Litigation Counsel*

*Attorneys for Defendants*

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
DEL RIO DIVISION

| | |
|---|---|
| State of Texas,<br><br>　　　　　　Plaintiff,<br><br>v.<br><br>Alejandro Mayorkas, *et al.*,<br><br>　　　　　　Defendants. | Case No. 2:23-cv-00024-AM |

**DECLARATION OF BLAS NUÑEZ-NETO**

I, Blas Nuñez-Neto, pursuant to 28 U.S.C. § 1746, and based upon my personal knowledge and documents and information made known or available to me from official records and reasonably relied upon in the course of my employment, hereby declare as follows:

1.　I am the Assistant Secretary for Border and Immigration Policy for the U.S. Department of Homeland Security (DHS) and have served in this role since March 26, 2023. I am also the Acting Assistant Secretary for International Affairs and have served in this role since June 26, 2023. I previously served as the Acting Assistant Secretary for Border and Immigration Policy since October 1, 2021. Prior to this acting role, I served as the Chief Operating Officer for U.S. Customs and Border Protection (CBP), a DHS component, since March 5, 2021. In a prior administration, I served DHS as Senior Advisor to then-CBP Commissioner Richard Gil Kerlikowske, from January 12, 2015 to January 16, 2017.

**The challenged rule is critical to DHS's plan to effectively manage irregular migration.**

2.　On May 12, 2023, after a robust regulatory process that included responding to more than 50,000 comments from the public, DHS and the Department of Justice (DOJ)

1

implemented the Circumvention of Lawful Pathways rule. The rule is designed to incentivize noncitizens to use new and existing lawful, safe, and orderly processes that DHS has established and expanded, and disincentivize dangerous and irregular border crossings by placing a condition on asylum eligibility for those noncitizens who fail to do so, and who do not otherwise qualify for an exception. Critically, the rule fits into a broader strategy to address historic migratory challenges impacting the entire Western Hemisphere. Through a variety of actions, the United States and its foreign partners are seeking to incentivize migrants to use lawful, safe, and orderly pathways and to disincentivize irregular migration. As such, this rule is a critical component of the United States' regional strategy and aims to discourage noncitizens from putting their lives in the hands of smugglers and crossing the Southwest Border (SWB) unlawfully between ports of entry, or without authorization at ports of entry.[1]

3.  Imposing consequences for unlawfully, or irregularly, crossing the border is, by itself, not sufficient to deter irregular migration. Migrants have, time and time again, shown that they are willing to endure unfathomable suffering for an opportunity to come to the United States, even if their chances of success are small. To be effective, the consequences DHS applies must be paired with incentives for migrants to use lawful processes. DHS and the U.S. Department of State have been working with our foreign partners in the Western Hemisphere to enhance enforcement efforts along national borders and expand lawful pathways in countries throughout the region—including protection programs—to address the current migratory challenges all of our countries are facing. DHS has, over the past two years, undertaken a series of measures designed to increase access to processes and pathways for noncitizens to come to the

---

[1] U.S. Dep't of Homeland Sec., *Fact Sheet: Department of State and Department of Homeland Security Announce Additional Sweeping Measures to Humanely Manage Border through Deterrence, Enforcement, and Diplomacy* (May 10, 2023), https://www.dhs.gov/news/2023/05/10/fact-sheet-additional-sweeping-measures-humanely-manage-border

United States in a safe, orderly, and lawful manner. But similarly, incentives without consequences are insufficient to deter irregular migration—they must go hand-in-hand. In concert with the increase in lawful means for migrants to come to the United States in a safe and orderly manner, the rule imposes strengthened consequences on noncitizens who do not avail themselves of the wide range of lawful pathways the U.S. Government has made available for entering the United States, do not seek protection from countries they travel through, and do not merit an exception or otherwise overcome the rule's presumption. In this way, the rule follows the successful model of the Cuban, Haitian, Nicaraguan, and Venezuelan (CHNV) processes, which significantly reduced encounters from those countries after their implementation: it creates a viable lawful, safe, and orderly option for noncitizens, and imposes consequences for failing to follow that process.

4. The rule's condition on asylum eligibility is a temporary measure intended to respond to a time of heightened irregular migration throughout the Western Hemisphere. Importantly, and as detailed further below, the rule is working as intended and has already significantly reduced encounters at the border. In the absence of the rule, DHS planning models suggest that irregular migration could meet or exceed the levels that DHS recently experienced in the days leading up to the end of the Centers for Disease Control and Prevention's (CDC) Title 42 public health Order. These levels of irregular migration would severely stress DHS and DOJ's continued ability to safely, effectively, and humanely enforce and administer U.S. immigration law, including the asylum system. Further, these levels of irregular migration would quickly overwhelm shelter capacity in border communities and interior cities.

**Hemispheric conditions are driving encounter levels that strain DHS resources.**

5. Violence, food insecurity, severe poverty, corruption, climate change, the continuing effects of the COVID-19 pandemic, and dire economic conditions have all

contributed to a significant increase in irregular migration around the globe, fueling the highest levels of irregular migration since the end of World War II.  This wave of global migration is challenging many nations' immigration systems, including that of the United States.  In the Western Hemisphere, failing authoritarian regimes in Venezuela, Cuba, and Nicaragua, along with ongoing humanitarian issues in Haiti, have driven millions of people from those countries to leave their homes.  Additionally, violence, corruption, and the lack of economic opportunity—challenges that are endemic throughout the region—are driving noncitizens from countries such as Brazil, Colombia, Ecuador, and Peru to make the dangerous journey to the United States.  This is in addition to the continuing economic headwinds and rule of law concerns in traditional sending countries, such as Guatemala, Honduras, and El Salvador.

6. In the early 2010s, after three decades of bipartisan investments in border security and strategy, encounters along the SWB reached modern lows, averaging fewer than 400,000 per year from 2011 to 2017.  This followed decades during which annual encounters routinely numbered in the millions.  However, even during this period of relatively low encounter levels at the SWB, DHS faced significant challenges in 2014 due to an unprecedented surge in migration of unaccompanied children, and in 2016 due to a surge in family units at the border—demographics that presented unique challenges due to the vulnerability of these populations.  Between 2017 and 2019, however, encounters along the SWB more than doubled, and—following a significant drop during the beginning of the COVID-19 pandemic, which shut down travel across the world—continued to increase in 2021 and 2022.  In fiscal year (FY) 2021, encounters at the SWB reached levels not seen since the early 2000s, with U.S. Border Patrol (USBP) making 1.7 million encounters.  In FY 2022, DHS reached a new high-water mark for encounters at the SWB, with total USBP encounters exceeding 2.2 million.  As a result of the

hemispheric conditions described above, much of this growth in encounters was driven by nationalities that DHS has historically not encountered in large numbers at the SWB—including countries that make it difficult for DHS to repatriate their nationals who do not establish a legal basis to remain in the United States.

7.  From March 20, 2020 to May 11, 2023, DHS implemented the CDC's Title 42 public health Order, under which noncitizens encountered by DHS personnel could be quickly expelled to Mexico or to their home country—but only if Mexico or their home country accepted their return.[2]  Importantly, an expulsion under the Title 42 public health Order did not carry with it any lasting immigration consequences for noncitizens, aside from their expulsion.  It was, however, a relatively quick process for frontline personnel.  By contrast, a removal under DHS's traditional Title 8 authorities carries with it significant and lasting immigration consequences, including a minimum 5-year ban on admission and the potential to be criminally prosecuted for illegal re-entry.  Title 8 processes, however, are substantially longer than Title 42 processes.

8.  In preparation for the return to Title 8 processing of all noncitizens, DHS led a comprehensive, all of government planning effort that lasted more than 18 months.  This included record deployments of personnel, infrastructure, and resources to support DHS's frontline personnel at a substantial cost to other DHS operations.  This effort also included the development and implementation of policy measures, including the rule and its associated lawful pathways and processes, that were critically important components of DHS's preparations to

---

[2] The Title 42 public health Order applied to certain noncitizens arriving from Canada or Mexico who would otherwise be held in a "congregate setting" at a port of entry or U.S. Border Patrol station at or near the U.S. land and adjacent coastal borders.  Public Health Reassessment and Order Suspending the Right To Introduce Certain Persons From Countries Where a Quarantinable Communicable Disease Exists 86 Fed. Reg. 42,828, 42,841 (Aug 5, 2021).  Under the Title 42 public health Order, "covered noncitizens apprehended at or near U.S. borders" were "expelled" to Mexico, Canada, or their country of origin.  *Id.* at 42,836.  As a result, they could be processed much faster—in "roughly 15 minutes," as compared to "approximately an hour and a half to two hours" for noncitizens who are processed and issued a notice to appear for removal proceedings under Title 8.  *Id.*

manage the significant influx of migrants anticipated at the SWB with the end of Title 42's application at the border.

9. In the days leading up to the end of the Title 42 public health Order on May 12, 2023, DHS saw a historic surge in migration. This surge culminated with the highest recorded encounter levels in U.S. history over the days immediately preceding May 11, which placed significant strain on DHS's operational capacity at the border. Encounters between ports of entry (which excludes arrivals scheduled through the CBP One mobile application, who appear at ports of entry) almost doubled from an average of approximately 4,900 per day the week ending April 11, 2023, to an average of approximately 9,500 per day the week ending May 11, 2023, including an average of approximately 10,000 encounters immediately preceding the termination of the Title 42 public health Order (from May 8 to May 11). The sharp increase in encounters during the 30 days preceding May 11 represents the largest month over month increase in almost two decades—since January 2004.

10. In the days leading up to the end of the Title 42 public health Order, USBP saw a steady increase in the numbers of noncitizens in custody, leading to significant operational challenges. From May 8 to 11, 2023, USBP's daily in-custody average was approximately 27,000, with a single-day peak of approximately 28,500 on May 10, 2023—well above its holding capacity at that time of approximately 18,500. During this same timeframe, eight out of nine SWB sectors were over their holding capacity—with four sectors (El Centro, El Paso, RGV, and Yuma) more than 50 percent over their holding capacity and one sector (Tucson) more than two-and-a-half times its holding capacity.

**Implementation of the rule has significantly reduced encounters at the U.S. border and migration throughout the Western Hemisphere.**

11. In the weeks since May 12, 2023, DHS has executed on its more than 18-month post-Title 42 planning effort by leading a whole-of-government effort to ensure the safe, orderly, and humane management of the nation's borders and the continued enforcement of U.S. immigration laws. The rule plays an integral role in this effort. These efforts, and in particular the disincentives to irregular migration put in place through the new rule, have produced significant results. From May 12 to July 31, 2023, encounters between ports of entry at the SWB decreased by 61 percent from their peak of an average of 9,740 in the seven-day period just before the end of the Title 42 public health Order (May 4 to May 11, 2023), compared to an average of 3,773 per day for all of May 12 to July 31 and an average of 5,109 per day from July 25 to July 31, 2023. As a result of this swift and sustained decline in encounters, the number of noncitizens in USBP holding facilities has decreased from a high of more than 28,500 on May 10, 2023—or 153 percent of its rated holding capacity at that time—to approximately 17,100 on July 31, 2023 or 92 percent of its holding capacity.

12. Consequently, conditional releases[3] have similarly decreased. In the six-plus months prior to the implementation of the rule, CBP conditionally released an average of 2,804 noncitizens encountered between ports of entry, or at ports of entry not using CBP One per day.

---

[3] For the purpose of this declaration, a "conditional release" refers to the fact that noncitizens released from DHS custody are subject to strict conditions, with limited exceptions. Noncitizens who are released from DHS custody and issued a Notice to Appear are required to appear before an immigration judge for their removal proceedings. Noncitizens who were encountered between ports of entry and released via parole are required to request a charging document by mail or to report to an U.S. Immigration and Customs Enforcement facility in order to be issued a charging document, as appropriate, with limited exceptions. The discussion of conditional release numbers in this document refers to noncitizens who were encountered after crossing unlawfully between ports of entry, or without authorization at a port of entry.

In the nearly three months following implementation of the rule, CBP conditionally released an average of just 1,705 per day, a 39 percent reduction.[4]

13.     The strengthened consequences in place at the SWB under Title 8 authorities, including use of the rule, has reduced migration throughout the Western Hemisphere as intending migrants and the smuggling networks that move them assess the new policies.  It is clear that actions taken by the U.S. Government to provide both legal pathways and consequences for irregular migration—actions that have also spurred regional foreign partners to undertake their own measures seeking to address irregular movements of migrants within their territories—were critical factors in reducing migratory flows throughout the Western Hemisphere.

14.     Significantly, the rule has strengthened the consequences for noncitizens who fail to avail themselves of the available lawful and orderly pathways.  Overall, since the rule was first implemented on May 12 to July 31, 2023, 56 percent of single adults processed under the rule[5] making credible fear claims have been screened-in,[6] compared to an 83 percent screen-in rate in the pre-pandemic period of 2014 to 2019.  As intended, the rule has significantly reduced screen-in rates for noncitizens encountered along the SWB.  The decline in encounters at the SWB, and entries into the Darién Gap, show that the application of consequences as a result of the rule's

---

[4] As a result of the measures taken by DHS, arrivals of noncitizens have decreased significantly.  As noted above, conditional releases of noncitizens crossing unlawfully between ports of entry, or at ports of entry not using CBP One, fell from 2,804 per day in the months before the rule was implemented to 1,705 per day in the months following implementation, a 39 percent reduction.  Accounting for noncitizens who came to the United States after making an appointment through the CBP One application (1,218 per day), total releases fell to approximately 2,923 per day in the months following implementation of the rule from 3,257 in the six plus months prior to implementation, a 10 percent reduction (Note that these numbers may not add due to rounding).
[5] This includes all categories of noncitizens processed under the rule, including those who establish an exception or rebut the presumption.
[6] The screen-in rate refers to the percentage of cases with a positive fear determination calculated by dividing the number of cases that receive a positive fear determination by the total number of determinations made (i.e. positive and negative fear determinations).

implementation is disincentivizing noncitizens from pursuing irregular migration and incentivizing them to use safe and orderly pathways.

15. Between May 12 through July 31, 2023, U.S. Citizenship and Immigration Services (USCIS) has processed approximately 31,332 noncitizens who have been subject to the rule. Out of these noncitizens, 890 (3 percent) were able to establish an exception to the rule; 3,456 (11 percent) were able to rebut the presumption; and 26,986 (86 percent) were subject to the presumption. Of the noncitizens who were able to establish an exception to the rule, 672 (76 percent) were able to establish a credible fear of persecution or torture under the "significant possibility" standard. Of the noncitizens who were able to rebut the presumption, 2,958 (87 percent) were able to establish a credible fear of persecution or torture under the "significant possibility" standard. Of the noncitizens who were subject to the rule's presumption, 13,967 (52 percent) were able to establish a credible fear of persecution or torture under the "reasonable possibility" standard. Additionally, thousands more are currently in CBP or U.S. Immigration and Customs Enforcement (ICE) custody going through the expedited removal process.

16. The rebuttable presumption established by the rule has allowed DHS to significantly increase its use of expedited removal, including by applying it to more nationalities than it otherwise would have. This is because, prior to the rule's implementation, the screen-in rates for noncitizens from some key countries—including Venezuela, Cuba, and Nicaragua—were sufficiently high as to make it ineffective to refer nationals of those countries into expedited removal, given the significant, multiagency resources required to process them. Absent the rule's impact on screen-in rates, it is likely that DHS would not devote the resources to process noncitizens from those countries for expedited removal as it would generally result in issuing a Notice to Appear before an immigration judge for the vast majority of individuals while

unnecessarily increasing time in custody.  This, in turn, may lead to increased encounter levels and all the attendant challenges.

17. In preparing for the end of the Title 42 public health Order, DHS made improvements to the technology and processes at the border that are now allowing DHS to process credible fear cases more quickly than ever before—enhancing its ability to quickly deliver consequences to noncitizens who do not establish a legal basis to remain in the United States.  DHS has reduced the median time for USCIS to complete fear claim cases for single adults encountered since May 12 to July 31, 2023 by 53 percent, to 14 days from CBP apprehension compared to 30 days in the pre-pandemic period (2014–2019).  These process enhancements and the rule work together to more quickly and effectively, impose consequences on those who do not establish a legal basis to remain in the United States.  The rule allows DHS to place more noncitizens into the expedited removal process, and the process enhancements help ensure that the increased use of expedited removal does not result in unhelpful backlogs or increased holding times.  Without the rule, these process enhancements would be substantially less effective given significantly higher screen in rates that would, as noted above, make it largely impractical for DHS to apply expedited removal to key nationalities encountered at the border.

18. The rule's implementation has generated widespread understanding that DHS has strengthened consequences at the border for those who enter without authorization even as DHS has significantly increased access to lawful pathways and processes for noncitizens to come to the United States in a safe and orderly manner. The effect of these developments is that there has been an immediate reduction in encounters at the border.

19. As part of these efforts, DHS has repatriated approximately 126,000 noncitizens under Title 8 authorities, including single adults and family units to more than 100 countries between May 12 and July 31, 2023. This includes more than 5,400 noncitizens from Cuba, Haiti, Nicaragua, and Venezuela who were returned or removed to Mexico under Title 8 authorities during this time-frame—the first time in the United States' bilateral history with the Government of Mexico that the Government of Mexico has accepted third country nationals under Title 8 authorities at the border at scale.

20. The ability to quickly apply consequences at the border is important because DHS must contend with callous human smuggling networks that weaponize misinformation and look for any opportunity to put intending migrants' lives at risk for profit. These criminal organizations intentionally twist information about U.S. immigration policy for the express purposes of encouraging would-be migrants to use their services—services that regularly result in tragedy. Because profit is the motivating factor, criminal organizations have no qualms when it comes to exploiting migrants through false promises—particularly when there are changes in the United States' immigration policy or border operations. This familiar pattern was seen in the weeks leading up to the lifting of Title 42.

21. In the days immediately following the rule's effective date, media reporting confirmed internal DHS analyses that the rule and accompanying messaging were ultimately effective in communicating that there would be stricter consequences for crossing the SWB unlawfully between ports of entry, or without authorization at ports of entry, after the end of the Title 42 public health Order. For example, a *Washington Post* article states that in interviews with migrants waiting on the Mexican side of the SWB, U.S. messaging relating to stricter penalties under Title 8 authorities were a factor in many intending migrants' decisions to attempt

to cross the border "before—not after—Title 42's expiration."[7] Similarly, the article further describes migrants' understanding that there would be consequences associated with irregularly crossing the SWB or presenting at a port of entry without scheduling an appointment at a port of entry through the CBP One app.[8]

22. As part of its preparations for the end of the Title 42 public health Order and the implementation of the rule, DHS significantly expanded access to land border ports of entry for individuals who may wish to claim asylum. The CBP One mobile app, which is available to download for free to a mobile device, and is available in English, Spanish, and Haitian Creole, allows noncitizens of any nationality who are in Central or Northern Mexico to schedule an appointment to present at a port of entry along the SWB in a safe and orderly manner. The advance biographic and biometric information captured by the app allows CBP to significantly improve the efficiency of its processes at the border—even as it aids CBP in ensuring that every individual processed is thoroughly vetted against national security and public safety systems. This, in turn, has allowed CBP to greatly increase its ability to process inadmissible noncitizens at land border ports of entry compared to its 2014-2019 pre-pandemic average. On June 1, 2023, CBP expanded the number of available daily appointments from 1,000 to 1,250 per day, and on July 1, 2023, CBP expanded the number of available daily appointments from 1,250 to 1,450 per day. This is more than 4.5 times the average number of noncitizens that CBP was able to process per day at ports of entry in the years preceding the pandemic. This expansion has allowed a

---

[7] *See* Mary Beth Sheridan, Reyes Mata III, Maria Sacchetti & Nick Miroff, *End of Title 42 Pandemic Border Policy Brings Reset, But No Sudden Rush*, Wash. Post (May 12, 2023).
https://www.washingtonpost.com/nation/2023/05/12/title-42-pandemic-ends-border-migrants/
[8] *See also* Valerie Gonzalez, *Migrants Rush Across U.S. Border in Final Hours Before Title 42 Asylum Restrictions are Lifted*, Associated Press: PBS (May 11, 2023), https://www.pbs.org/newshour/politics/migrants-rush-across-u-s-border-in-final-hours-before-title-42-asylum-restrictions-are-lifted.

greater number of noncitizens to present themselves in a safe and orderly manner at ports of entry each day during their scheduled appointment time.

23. The use of the app has allowed CBP to streamline processing and more effectively manage the flow into ports of entry of migrants without documents sufficient for admission and more efficiently allocate border enforcement resources. This app effectively cuts out the smugglers, decreases migrant exploitation, and improves safety and security in addition to making the process more efficient. DHS has also made a series of software updates to the app that have significantly improved access to appointments and provided greater predictability to migrants about the process.

24. Noncitizens, regardless of whether they use the CBP One app, are inspected and processed, on a case-by-case basis, for appropriate immigration proceedings upon their inspection at a port of entry, which may include expedited removal (or, as applicable, referral for a credible fear interview before expedited removal) or removal proceedings before an immigration judge. During this process, officers also assess whether parole may be appropriate, on a case-by-case basis.

25. The rule's combination of strengthened consequences at the U.S. land border, enhanced regional partnership efforts to share the responsibilities of managing migration and providing asylum, and increased access to lawful pathways and processes for noncitizens has had an immediate impact on encounters at the U.S. border and migration throughout the region.

**Conclusion**

26. This rule is a foundational component of the comprehensive, all of government approach that DHS implemented to prepare for the end of Title 42 and respond to the unprecedented movement of people in our hemisphere. This approach provides incentives for

intending migrants to use safe and orderly pathways and processes that have been expanded to come to the United States, even as it seeks to disincentivize noncitizens from crossing unlawfully between ports of entry or without authorization at ports of entry.  The rule is a critical component of this measured and thoughtful approach to managing migratory flows, by imposing strengthened consequences at the border in order to change the calculus of intending migrants.

27.     This approach is working as intended, rapidly and significantly reducing encounters at the border while providing record numbers of noncitizens with access to lawful pathways and processes to seek protection in the region or come to the United States.  The more than 18-month long planning effort that DHS undertook, which included making key, ongoing enhancements to the expedited removal process, has allowed it to deliver the rule's strengthened consequences under Title 8 processes that are operating at a higher scale and more quickly than ever before.

28.     Should the rule no longer be in effect, DHS anticipates a return to elevated encounter levels that would place significant strain on DHS components, border communities, and interior cities, despite the careful planning and significant investments that have been made. Border communities, and the NGOs that support them, will once again receive large scale releases of noncitizens that will overwhelm their ability to coordinate safe temporary shelter and quick onward transportation.  And interior destination cities will, once again, see their resources strained.

29.     DHS does not have to imagine what the impacts of a surge in migration of the anticipated scale would look like; we just experienced it.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.  Executed on this 24th day of August, 2023.

_____
Blas Nuñez-Neto
Assistant Secretary
Border and Immigration Policy
U.S. Department of Homeland Security