# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
### DEL RIO DIVISION

| | | |
|---|---|---|
| STATE OF TEXAS, | § | |
| | § | |
|     Plaintiff, | § | |
|  v. | § | |
| | § | Case No. 2:23-CV-00024-AM |
| ALEJANDRO MAYORKAS, | § | |
| Secretary of Homeland Security, *et al.*, | § | |
| | § | |
|     Defendants. | § | |

## DEFENDANTS' MOTION TO DISMISS COMPLAINT

Dated:      August 24, 2023

Respectfully submitted,

BRIAN M. BOYNTON
*Principal Deputy Assistant Attorney General*

WILLIAM C. PEACHEY
*Director*

EREZ REUVENI
*Assistant Director*

By: /s/ *Katherine J. Shinners*
KATHERINE J. SHINNERS
*Senior Litigation Counsel*
DC Bar No. 978141
U.S. Department of Justice, Civil Division
Office of Immigration Litigation – DCS
P.O. Box 868, Ben Franklin Station
Washington, DC 20044
Tel: (202) 598-8259
Fax: (202) 305-7000
Email: katherine.j.shinners@usdoj.gov

CHRISTINA P. GREER
*Senior Litigation Counsel*

*Attorneys for Defendants*

The State of Texas challenges a critical new rule promulgated by the Departments of Homeland Security (DHS) and Justice (DOJ) (collectively, "the Departments") to address an anticipated influx of migrants at the southwest border by incentivizing the use of safe, orderly, and lawful pathways to enter the United States or seek protection in third countries. *See* Circumvention of Lawful Pathways, 88 Fed. Reg. 31,314 (May 16, 2013) (the "Rule"); Circumvention of Lawful Pathways, 88 Fed. Reg. 11,704, 11,708 (Feb. 23, 2023) (notice of proposed rulemaking (NPRM)). The Rule—adopted after notice and opportunity to comment—implements a carefully calibrated condition on asylum eligibility that applies to certain noncitizens without documents sufficient for admission who cross the southwest border after traveling through a third country, subject to certain exceptions and means of rebuttal. The Rule took effect on May 11, 2023, the same day the Centers for Disease Control and Prevention (CDC)'s Title 42 public health Order ended. Under that Order, noncitizens without documents sufficient for admission were generally not processed into the United States under the immigration authorities in Title 8 of the U.S. Code, but were instead expelled to Mexico or their home countries. Absent any policy change, the Order's expiration was expected to cause the number of migrants seeking to enter the United States without authorization or documents sufficient for admission to increase to or remain at record-high numbers.

To address this urgent situation, and in coordination with actions by other countries to jointly address irregular migration in the Western hemisphere, the Departments adopted a balanced approach. They adopted a Rule that at once encourages migrants to seek protection in countries through which they travel or to avail themselves of lawful, safe, and orderly pathways to enter the United States, and discourages them from entering irregularly by imposing a presumption of asylum ineligibility on those who decline to use such pathways or to seek protection in a third country. The lawful, safe, and orderly pathways include expanded refugee processing (which

allows individuals who would qualify as a refugee to obtain protection from abroad) and parole processes for individuals from certain countries to obtain advance authorization to travel by air to the United States to be considered for parole upon arrival. Those migrants who have already traveled to Mexico may avoid the presumption of asylum ineligibility by using an orderly process implemented through the CBP One mobile application ("CBP One") to schedule an appointment to present at a Port of Entry (POE) along the southwest border.

Since the Rule went into effect, it has worked as intended. Immediately before the Title 42 Order's end, more than 10,000 migrants crossed the southwest border each day, threatening to overwhelm the immigration system and impair the government's ability to effectively and humanely apprehend, process, detain, and remove, as appropriate, the migrants encountered. As soon as the Rule was implemented, irregular crossings fell dramatically, and overall DHS encounters with noncitizens without documents sufficient for admission thus also decreased.

Even though the Rule operates to reduce illegal migration and to reduce the anticipated burden on immigration enforcement and thus if anything should *benefit* border states like Plaintiff who claim harms from unlawful immigration, Plaintiff seeks to vacate or enjoin the Rule in its entirety. Plaintiff's Complaint must be dismissed for lack of Article III standing, however, because its theory that the Rule harms Texas by increasing "illegal immigration" through the use of CBP One appointments (Compl. (ECF No. 1) ¶¶ 39-41, 46) is speculative, unfounded in fact, and based on several misconceptions. First, as discussed, the Rule aims to decrease irregular migration from what would have otherwise occurred after the Title 42 Order's end. Since the Rule's inception, encounters at the southwest border have decreased, as has the percentage of noncitizens who pass their screening to pursue asylum. Second, the Rule itself incentivizes use of appointments, but does not create an appointment system or dictate how many individuals are processed at POEs per

day. Nor do the Rule or CBP One "invite" migrants without valid asylum claims to the United States. Instead, by imposing a presumption of asylum ineligibility on those who do not schedule their arrival at a POE or pursue another lawful pathway, the Rule incentivizes migrants who have already traveled to Mexico to enter the United States in an orderly manner at a pre-scheduled time at a POE—after which they will be inspected and either removed or referred for assessment of their protection claim, as applicable and in accordance with the Immigration and Nationality Act (INA)—*rather than* enter illegally between POEs or present themselves at POEs without an appointment. Third, even if an orderly appointment system allows more individuals to be processed at POEs per day, that does not mean there will be an overall increase in noncitizens entering and remaining in the country. There will likely be (and there has been) a concomitant decrease in irregular entries. Further, post-Rule expedited removal data indicates that the percentage of individuals passing credible fear screenings has decreased since implementation of the Rule, achieving the goal of more expeditious processing and removal of those without meritorious protection claims. Fourth, just because more individuals are "processed" at POEs does not mean more individuals are released into the United States. Those who are "processed" at POEs may be expeditiously removed or detained pending expedited removal procedures or removal proceedings. Neither the Rule nor the use of CBP One dictates processing or detention outcomes or sets policies for the use of discretionary parole. Fifth, even if Plaintiff's theories of injury and liability were correct (they are not), Plaintiff is mistaken that an injunction of the Rule would redress any alleged harm. An injunction would not eliminate the ability of noncitizens to use CBP One to schedule appointments, but would only serve to increase irregular migration by removing an incentive for those already in Mexico to use this and other orderly pathways and processes.

Plaintiff's APA claims also fail at the outset because Plaintiff is not within the zone of

interests protected by the relevant immigration statute, and any challenge to CBP One would not be not actionable because it would challenge nonfinal and discretionary action. The Complaint also fails to state a claim because the Rule on its face is a considered, reasonable approach to addressing irregular migration that is well within the Departments' statutory authority and duties.

## BACKGROUND

Processing Under Title 42 and Title 8. From March 20, 2020, until May 11, 2023, most noncitizens without documents sufficient for admission who sought to enter the United States at its southwest land and adjacent coastal borders—whether or not at a designated POE—were subject to expulsion under a series of public health orders in effect to combat the COVID-19 pandemic (Title 42 Orders). Public Health Reassessment and Order Suspending the Right to Introduce Certain Persons from Countries Where a Quarantinable Communicable Disease Exists, 86 Fed. Reg. 42,828 (Aug. 5, 2021). Under these Title 42 Orders, covered noncitizens encountered in the United States were generally expelled to Mexico or their home countries without processing under the immigration authorities at Title 8, including processing for asylum and related protection. *See id.*; *see also* Compl. ¶ 9.

In the absence of the Title 42 Orders, noncitizens in the United States without documents sufficient for admission may not be promptly expelled but are required to be processed under the substantially more resource-intensive procedures in the INA, Title 8 of the U.S. Code. *See* 8 U.S.C. § 1101 *et seq.* Such noncitizens, whether they present at a POE or are encountered after crossing irregularly between POEs, are applicants for admission and must be inspected by immigration officers. *See* 8 U.S.C. § 1225(a)(1), (3). Applicants for admission who upon inspection are determined to be inadmissible because they are not in possession of a valid travel document may be subject to expedited removal procedures. *See* 8 U.S.C. § 1225(b)(1)(A).

Congress has provided that noncitizens who are in the United States may generally apply for asylum, a form of discretionary relief from removal based on a fear of persecution on account of a protected ground. 8 U.S.C. § 1158(a), (b)(1)(A); *see also id.* § 1101(a)(42). Congress has also mandated that noncitizens may not be removed to a country where they are likely to be persecuted on account of a protected ground or tortured. 8 U.S.C. § 1231(b)(3) (statutory withholding of removal); Pub. L. No. 105-277, div. G, § 2242 (Oct. 21, 1998) (codified at 8 U.S.C. § 1231 note), 8 C.F.R. §§ 208.16(c), 208.17(a), 208.18, 1208.16(c), 1208.17(a), 1208.18 (protection under the Convention Against Torture (CAT)). Thus, if a U.S. Customs and Border Protection (CBP) officer or agent determines that a noncitizen is subject to expedited removal procedures, the noncitizen may be removed without further hearing or review, unless they indicate an intent to apply for asylum or a fear of persecution, in which case CBP refers them to asylum officers for a credible fear interview to assess any persecution and torture claims. 8 U.S.C. § 1225(b)(1)(A)(ii); 8 C.F.R. § 208.30. If the noncitizen demonstrates at the interview an adequate possibility that they could establish eligibility for asylum, statutory withholding of removal, or CAT protection, they are either referred to an asylum officer for adjudication of their persecution or torture claim or placed in removal proceedings under 8 U.S.C. § 1229a before an immigration judge of the Executive Office for Immigration Review (EOIR), where they may apply for asylum or other protection as a defense to removal. 8 U.S.C. § 1225(b)(1)(B)(ii), (v); 8 C.F.R. §§ 208.30(f), 1208.2(b). CBP officers also have discretion to process inadmissible noncitizens for other appropriate dispositions, including placing them in removal proceedings before EOIR, and have discretion to parole noncitizens into the United States under the discretionary authority at 8 U.S.C. § 1182(d)(5). Under these pre-existing Title 8 procedures, many noncitizens who assert a fear of persecution or torture are entitled to remain

in the United States pending resolution of their asylum claims. 88 Fed. Reg. at 31,337 (citing 83% positive credible-fear screening rate for expedited removal). This may incentivize irregular migration. *Id.* at 31,326, 31,337-38; *see also* 88 Fed. Reg. at 11,716.

The Rule. In early 2023, the President announced that the Administration expected to end the public health emergency on May 11, 2023, which would cause the then-operative Title 42 Order to end. Compl. ¶ 10; 88 Fed. Reg. at 11,708. Absent further action, the end of the Title 42 Order was expected to cause the number of migrants seeking to irregularly enter the United States at the southwest border to surge to or remain at all-time highs—an estimated 11,000 migrants daily. 88 Fed. Reg. at 31,331. And, as discussed, many of these individuals would be entitled to remain in the United States pending resolution of their asylum claims. The Departments thus faced a looming urgent situation: absent policy change, the end of the Title 42 Order would result in many more migrants crossing the border and asserting protection claims, which would in turn overwhelm the government's ability to process migrants in a safe, expeditious, and orderly way and lead to an increase in the number of noncitizens released into the country. To prevent this expected increase in the number of migrants at the southwest border seeking to enter the United States without authorization, the Departments promulgated the Rule, following an NPRM, a 33-day comment period, and review of 51,952 comments. 88 Fed. Reg. at 31,314, 31,324; *see also* 88 Fed. Reg. at 11,704; Compl. ¶¶ 11, 23-24. The Rule was effective as of May 11, 2023, and provides that most noncitizens who enter the United States during the next two years at the southwest land border or adjacent coastal borders after traveling through a country other than their country of citizenship or nationality are subject to a rebuttable presumption of ineligibility for asylum unless they avail themselves of certain orderly processes for entry into the United States or seek and are denied protection in that third country. 88 Fed.

Reg. at 31,321-23. The presumption of asylum ineligibility applies to asylum determinations in any context, including in removal proceedings and in credible-fear screenings. 8 C.F.R. §§ 208.13(f), 1208.13(f), 208.33(b), 1208.33(b). The Rule was enacted under the Departments' authority to "by regulation establish limitations and conditions . . . under which an alien shall be ineligible for asylum." 8 U.S.C. § 1158(b)(2)(C); *see also id.* § 1158(d)(5)(B).

Specifically, the Rule provides that "[a] rebuttable presumption of ineligibility for asylum applies to an alien who" "enters the United States from Mexico at the southwest land border or adjacent coastal borders without documents sufficient for lawful admission" "and whose entry was[:]" (1) "[b]etween May 11, 2023, and May 11, 2025," (2) "[s]ubsequent to the end of implementation of the Title 42 public health Order," and (3) "[a]fter the alien traveled through a country other than the alien's country of citizenship [or] nationality." 8 C.F.R. §§ 208.33(a)(1), 1208.33(a)(1). The presumption does not apply to unaccompanied children (UCs) or to those who used certain orderly pathways or processes for entry into the United States or meaningfully sought protection in a third country—namely, those who were "provided appropriate authorization to travel to the United States to seek parole, pursuant to a DHS-approved parole process"; "[p]resented at a port of entry, pursuant to a pre-scheduled time and place"; "presented at a port of entry without a pre-scheduled time and place" but who can "demonstrate[] by a preponderance of the evidence that it was not possible to access or use the DHS scheduling system"; or "[s]ought asylum or other protection in a country through which the noncitizen traveled and received a final decision denying that application." *Id.* §§ 208.33(a)(2), 1208.33(a)(2). Migrants who are subject to the presumption of asylum ineligibility may rebut the presumption by demonstrating by a preponderance of the evidence that "exceptionally compelling circumstances exist," including "an acute medical emergency";

"an imminent and extreme threat to life or safety, such as an imminent threat of rape, kidnapping, torture, or murder"; or that the noncitizen or accompanying family member was a "victim of a severe form of trafficking in persons" under 8 C.F.R. § 214.11. *Id.* §§ 208.33(a)(3), 1208.33(a)(3). Noncitizens who are subject to presumptive ineligibility and unable to overcome the presumption are still considered for statutory withholding of removal and CAT protection. *See* 8 U.S.C. §§ 208.33(b)(2), 1208.33(b)(2)(ii), (4); 88 Fed. Reg. at 31,318.

In short, the Rule encourages migrants to seek protection in other countries or take advantage of lawful, safe, and orderly migration pathways to enter the United States—and thus discourages irregular entry or presenting without an appointment at a southwest-border POE— by generally conditioning the discretionary grant of asylum on noncitizens' availing themselves of such pathways (or demonstrating exceptionally compelling circumstances). It aims to reduce irregular migration, including through human smuggling, and to correspondingly decrease crowding in border facilities, lessen projected severe strains on DHS border resources, and facilitate safe, humane processing. *See, e.g.*, 88 Fed. Reg. at 31,324, 31,235.

Although the Rule thus provides incentives to use various pathways for lawful and orderly entry, those pathways were not created by the Rule and exist independently of it. The currently existing lawful pathways include refugee processing abroad under 8 U.S.C. § 1157, certain country-specific processes to obtain authorization to travel by air to the United States and to seek parole upon arrival—currently, the Uniting for Ukraine process ("U4U") and similar processes for nationals from Cuba, Haiti, Nicaragua, and Venezuela ("CHNV")—and expanded seasonal employment opportunities. 88 Fed. Reg. at 31,317. The CHNV processes were coupled with the Government of Mexico's independent agreement to accept the return or removal of nationals of these countries, because these individuals often cannot be removed to

their countries of nationality. *Id.*; *see also, e.g.*, Implementation of a Parole Process for Cubans, 88 Fed. Reg. 1266, 1267 (Jan. 9, 2023). These processes generally allow for an applicant with financial support in the United States who passes national security and public safety vetting to "fly at their own expense to an interior POE, rather than entering at a land POE" to be considered for "case-by-case determination of parole." *E.g.*, 88 Fed. Reg. at 1243.

Those migrants who have already traveled to Mexico with the intent of entering the United States can also avoid the presumption by pre-scheduling an appointment to present at a POE (rather than irregularly entering between POEs or waiting in long lines at a POE). 8 C.F.R. §§ 208.33(a)(1), 1208.33(a)(1). Currently, the United States uses the existing, multi-function CBP One app to allow noncitizens to schedule a time to arrive at POEs for orderly processing. 88 Fed. Reg. at 31,317. For this purpose, CBP One allows "noncitizens located in Central or Northern Mexico who seek to travel to the United States . . . to submit information in advance and schedule an appointment to present themselves at" eight southwest-border POEs. Advance Submission and Appointment Scheduling, https://www.cbp.gov/about/mobile-apps-directory/cbpone (last visited Aug. 21, 2023); Compl. ¶¶ 26, 28-29, 31-35; Declaration of Blas Nuñez-Neto (DHS Decl.) ¶ 21 (attached hereto). Use of these appointments allows POEs to manage the flow into the POE of noncitizens without documents sufficient for admission, efficiently allocate border enforcement resources, and streamline processing, thus reducing overall burdens on immigration enforcement at the border. 88 Fed. Reg. at 31,318. The Rule does not dictate processing or detention outcomes for those that pre-schedule an appointment; all the Rule provides is that its presumption of asylum ineligibility will not apply to such noncitizens. *See generally* 8 C.F.R. §§ 208.33(a), 1208.33(a).

In July, a U.S. District Court in California vacated the Rule based on claims brought by

immigration legal services organizations, *East Bay Sanctuary Covenant v. Biden*, 2023 WL 4729278 (N.D. Cal. July 25, 2023), but that order has been stayed pending appeal. *See East Bay Sanctuary Covenant*, No. 23-16032 (9th Cir. Aug. 3, 2023).

<u>This Lawsuit.</u> On May 23, 2023, Plaintiff, the State of Texas, filed this lawsuit seeking to enjoin the Rule in its entirety. Compl. ¶ 53 & Prayer for Relief. Plaintiff asserts two counts under the APA, alleging that the Rule exceeds the Departments' authority, is not in accordance with law, and is arbitrary and capricious. Plaintiff contends that the appointment system noted in the Rule invites noncitizens to enter the United States and will allegedly result in increased noncitizens in Texas who will in turn cause increased public expenditures and economic harms.

## LEGAL STANDARDS

"A case is properly dismissed for lack of subject matter jurisdiction when the court lacks the statutory or constitutional power to adjudicate the case." *Home Builders Ass'n of Miss., Inc. v. City of Madison, Miss.*, 143 F.3d 1006, 1010 (5th Cir. 1998). "In applying Rule 12(b)(1), the district court has the power to dismiss for lack of subject matter jurisdiction on any one of three separate bases: (1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *Willoughby v. U.S. ex rel. U.S. Dept. of the Army*, 730 F.3d 476, 479 (5th Cir. 2013). In a "factual attack" on jurisdiction "no presumptive truthfulness attaches to plaintiff's allegations," *Williamson v. Tucker*, 645 F.2d 404, 413 (5th Cir. 1981), and the plaintiff has the burden of proving, by a preponderance of the evidence, that the court has subject-matter jurisdiction, *Paterson v. Weinberger*, 644 F.2d 521, 523 (5th Cir. 1981).

Claims are subject to dismissal pursuant to Rule 12(b)(6) if the complaint does not "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A Rule 12(b)(6) motion should be granted if "it appears certain that the plaintiff cannot prove any set of facts that would entitle it to the relief it seeks." *Test Masters Educ. Servs., Inc. v. Singh*, 428 F.3d 559, 570 (5th Cir. 2005).

## ARGUMENT

**I.      The Complaint Must Be Dismissed for Lack of Jurisdiction Because Plaintiff Lacks Article III Standing.**

Plaintiff's asserted injuries are all based on its unsupported speculation that the Rule, through its reliance on the use of CBP One to schedule appointments as an exception to the presumption of asylum ineligibility, encourages migration and thus may "increase the amount of illegal immigration." *See* Compl. ¶ 46. Such attenuated speculation is insufficient to establish standing, even at the pleading stage. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-62, 570 n.5 (1992); *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). And data demonstrates that Plaintiff's speculation is unfounded: since the Rule was enacted, there has been both a decrease in irregular entries and an overall decrease in the number of noncitizens without documents sufficient for admission entering at the southwest border, both between and at POEs. DHS Decl. ¶¶ 11-13; https://www.cbp.gov/newsroom/stats/southwest-land-border-encounters. Further, Texas has "no judicially cognizable interest in procuring enforcement of the immigration laws," *Sure-Tan v. NLRB*, 467 U.S. 883, 897 (1984), *quoted in United States v. Texas*, 143 S. Ct. 1964, 1970 (2023), and incidental financial burdens on a state allegedly resulting from immigration policy are in any event insufficient to support state standing. Finally, because the Rule does not create or authorize use of the CBP One app, an injunction or vacatur of the Rule would not redress Texas's claimed harms. Such action would only remove the incentive for migrants to pursue orderly processing rather than entering irregularly, and would likely cause the very harm Plaintiff complains of.

<u>Texas Cannot Establish Actual Injury Caused by the Rule.</u> To establish standing, Texas must show that as of the filing of the Complaint they have suffered or will imminently suffer an "injury in fact" "caused" by the Rule that a favorable decision would "redress." *Lujan*, 504 U.S. at 560-62, 570 n.5. "Injury in fact" means "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not 'conjectural' or 'hypothetical.'" *Duarte ex rel. Duarte v. City of Lewisville, Tex.*, 759 F.3d 514, 517 (5th Cir. 2014) (quoting *Lujan*, 504 U.S. at 560). It is "substantially more difficult" to establish standing when a plaintiff challenges the defendant's actions with respect to third parties (here, noncitizens impacted by the Rule). *Lujan*, 504 U.S. at 562. "When 'a plaintiff's asserted injury arises from the government's allegedly unlawful regulation (or lack of regulation) of someone else, much more is needed' to establish standing." *Texas*, 143 S. Ct. at 1971 (quoting *Lujan*, 504 U.S. at 562). Here, even if Plaintiff's claimed injuries were cognizable (they are not, *see infra* at 17-18), its "purely speculative" theory of injury cannot establish Article III standing. *See Crane v. Johnson*, 783 F.3d 244, 252 (5th Cir. 2015).

Plaintiff alleges that, by "inviting illegal aliens to Texas," the Rule will result in "additional migrants entering and remaining in Texas," and thus hypothetically inflict increased costs on the State for "public education, law enforcement and incarceration, unreimbursed health care, and other public services for illegal aliens." *See* Compl. ¶¶ 45-52. Yet the Rule does not invite anyone to Texas or any other State. Instead, the Rule imposes a rebuttable presumption of *in*eligibility for asylum for certain noncitizens who do not avail themselves of lawful, safe, and orderly pathways for entry into the United States. Plaintiff's speculative theory of injury relies on an "attenuated chain of inferences," *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 & n.5 (2013), namely, first, that the Rule will result in an increased number of inadmissible noncitizens entering the United

States, as compared to the status quo; second, that those additional noncitizens will enter Texas or be released into Texas and remain there; and third, that those additional noncitizens will cause the claimed harms by taking particular actions such as seeking benefits, not obtaining health insurance, and committing crimes. *See Crane*, 783 F.3d at 252 (finding no standing where state could not trace claimed increased costs directly to challenged policy). Texas cannot even establish the first step in this attenuated chain, as the Complaint contains no allegations to show that the Rule will contribute to *increased* migration.

In fact, contrary to Plaintiff's unsupported assertions, recent data have borne out the Departments' expectation that the Rule would "reduce irregular migration, not increase it." 88 Fed. Reg. at 31,438; *see also id.* at 31,316; 88 Fed. Reg. at 11,705-06. As of April 2023, border encounters had risen dramatically, reaching historic levels in the days leading up to the end of Title 42 on May 11. DHS Decl. ¶¶ 9-10. Then, from May 12 to July 31, 2023, encounters between POEs at the southwest border decreased by 61% compared to the immediately-preceding one-week period. *Id.* ¶ 11.

Plaintiff may contend that the data showing a reduction in irregular entries between POEs do not defeat its claim of injury because it is claiming the Rule (or the use of CBP One) will still increase the number of unlawfully-present noncitizens who are released into Texas. Plaintiff appears to theorize that any noncitizen who lacks documents sufficient for admission, including one who intends to seek protection from persecution or torture but may not ultimately successfully defend against removal on this ground, is an "illegal alien." *See* Compl. ¶¶ 41, 43, 46. This characterization is incorrect. Persons who are paroled are authorized by statute to be in the United States and those found to have a credible fear are allowed to remain in the United States for adjudication of their claims. 8 U.S.C. § 1182(d)(5)(A) (allowing for parole of noncitizens "on a

case-by-case basis for urgent humanitarian reasons or significant public benefit"); *id.* § 1182(a)(9)(B)(ii), (iii)(II); *id.* § 1225(b)(1)(B) (noncitizens who have established a credible fear may remain in the United States for consideration of their application). But even on Plaintiff's own terms, its theory fails. Plaintiff has made no showing that the Rule will increase the total number of noncitizens living in Texas, regardless of whether those noncitizens are characterized as "illegal." Since the Rule's enactment, the percentage of noncitizens in expedited removal who receive positive credible fear determinations and are thus screened in for adjudication of their asylum claims has decreased, and DHS has been able to expeditiously remove those without meritorious claims. DHS Decl. ¶¶ 13-19. Further, the monthly *overall* number of southwest-border encounters with noncitizens without documents sufficient for admission (both at POEs and between POEs) has also declined since the end of Title 42, despite the increase in the average number of noncitizens processed at POEs. *See* Southwest Land Border Encounters, https://www.cbp.gov/newsroom/stats/southwest-land-border-encounters (showing monthly data for total CBP encounters) (last visited Aug. 19, 2023). These data indicate that because overall entries have decreased and the availability of expedited removal has increased, there will be fewer inadmissible noncitizens released into the United States (and into Texas) with the Rule in place than without. *See also, e.g.*, DHS Decl. ¶¶ 4, 28. Indeed, since Rule took effect, total releases at the southwest border have decreased by 10% compared to the preceding six-month period when the Title 42 Orders were in effect. DHS Decl. ¶ 12 n. 4.

The Complaint's allegations of increased migration into Texas appear to be based entirely on the allegation that the CBP One app will "significantly increase the number of individuals, including those who *may* be seeking asylum, that CBP can process at land border ports of entry." Compl. ¶ 42; *see also id.* ¶¶ 60, 76. Yet an ability to more efficiently process noncitizens at POEs—

even if it increases the total number of noncitizens processed at POEs per day—does not equate to an increase in the overall number of migrants living in Texas. First, as already noted, the Rule is expected to reduce, and has reduced, the *overall* number of migrants entering the United States by reducing irregular entries. *See* DHS Decl. ¶ 11. And the overall number of migrants remaining in the United States should also be reduced, because the Rule has reduced the percentage of noncitizens in expedited removal who establish credible fear, and DHS has "significantly increase[d] its use of expedited removal," repatriating approximately 126,000 noncitizens between May 12 and July 31, 2023. DHS Decl. ¶¶ 14, 16-17, 19. Second, the number of inadmissible noncitizens processed at POEs is not the same as the number of inadmissible noncitizens released. Those who present at POEs, with or without a CBP One appointment, are inspected, processed, and placed into removal proceedings, including, as appropriate, expedited removal. The Rule does not change the fact that inadmissible noncitizens who are processed for expedited removal and who *do not* seek asylum or claim fear remain subject to removal without referral to an asylum officer. 8 U.S.C. § 1225(b)(1)(A). And the Rule does not change the fact that noncitizens who enter through a POE with a CBP One appointment and who *do* seek asylum or claim fear may not receive a positive fear determination sufficient to warrant adjudication of their asylum or related protection claims. *See* 8 C.F.R. § 208.33(b).

Nor does the use of appointments or the Rule itself suggest there will be an increased number of "parolees" who are eligible for driver's licenses under current Texas law. *See* Compl. ¶ 45 & n.10. Nothing in the Rule dictates processing outcomes or requires the use of parole for those who schedule appointments using the CBP One app, and individual determinations to parole noncitizens are outside the scope of the Rule. The Rule does not "set any policy regarding DHS's discretionary authority to make parole determinations for those who use the CBP One app."

Compl. ¶ 42 (citing 88 Fed. Reg. at 31,331). Further, given that Texas charges $33 for each limited-term driver's license, it is unlikely that the issuance of drivers' licenses to parolees results in net costs to Plaintiff. *See* http://www.dps.texas.gov/section/driver-license/driver-license-fees (last visited Aug. 19, 2023); *Texas v. United States*, 809 F.3d 134, 155 (5th Cir. 2015) (noting that the law requires consideration of offsetting benefits arising from the same transaction as the costs). In any event, any alleged harms based on benefits that the Texas legislature has agreed to provide to certain noncitizens (such as drivers licenses) are self-inflicted and not traceable to the government's actions, *see Pennsylvania v. New Jersey*, 426 U.S. 660, 664 (1976) (per curiam) (rejecting standing where "[t]he injuries to the plaintiffs' fiscs were self-inflicted, resulting from decisions by their respective state legislatures"), and the Supreme Court recently cautioned against recognizing similar claims of indirect injury by States, *see Texas*, 143 S. Ct. at 1972 n.3.[1]

Accordingly, Plaintiff has not pleaded and cannot show that the Rule will actually increase the number of noncitizens without documents sufficient for admission entering and remaining in Texas. Accordingly, Plaintiff cannot plausibly claim increased costs to its public fisc or economic harm as a result of the Rule, and cannot possibly demonstrate Article III standing. And holding Plaintiff to its burden under Article III to show some concrete harm before permitting an individual State to try to impose its policy preferences on the entire nation is particularly important in the context of immigration, which is inherently a subject of national concern. *See Arizona v. United*

---

[1] To the extent Plaintiff argues it has no choice but to extend benefits to noncitizens due to the Equal Protection Clause, that injury is not inflicted by the Rule, but instead by the Constitution's constraints on discrimination. *See De Leon v. Perry*, 975 F. Supp. 2d 632, 661 (W.D. Tex. 2014) ("Congress does not have the power to authorize the individual States to violate the Equal Protection Clause.") (quoting *Graham v. Richardson*, 403 U.S. 365, 382 (1971)). Notably, Texas does not claim an interest in reducing its number of residents overall or in reducing its overall costs—instead, it isolates as injury only those costs allegedly imposed by those who it claims are "illegal," regardless of whether they have work authorization or pay state or local taxes.

*States*, 567 U.S. 387, 394-95 (2012); *Hines v. Davidowitz*, 312 U.S. 52, 62-63 (1941).

<u>The Claimed Injuries Are Not Cognizable.</u> Even if its theory of injury were not entirely speculative, Plaintiff's claimed injuries would not be cognizable for Article III standing purposes.

*First*, at base, Texas's claimed harm stems from its assertion that the Rule allows more so-called "illegal aliens" into the country. As explained, however, that is not what the Rule or CBP One does. Regardless, the Supreme Court recently held that a complaint by Texas and Louisiana asserting a similar interest must be dismissed for lack of standing, because third parties like Texas have "no judicially cognizable interest in procuring enforcement of the immigration laws." *Sure-Tan, Inc.*, 467 U.S. at 897 (citing *Linda R.S. v. Richard D.*, 410 U.S. 614, 619 (1973)), *quoted in Texas*, 143 S. Ct. at 1970. And just as the States had no standing to challenge the Executive Branch's "enforcement discretion over arrests and prosecutions" based on allegations of indirect effects on revenue and spending, *id.* at 1972-74 & n.3, here, Texas is not entitled to challenge a Rule that governs the circumstances in which the Executive Branch will confer the discretionary benefit of asylum. And Texas likewise cannot justify judicial intrusion into the Executive's decisions as to how to process noncitizens, including whether to release certain noncitizens using discretionary parole authority (which, as noted above, is not directly addressed by this Rule in any event). *See also United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 542 (1950) (decision to exclude or admit noncitizens is an inherent power of the national executive); *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 210 (1953).

*Second*, regardless of whether the Rule will contribute to increased migrants in Texas (which Plaintiff cannot establish), its claimed incidental, indirect injury to public expenditures and its economy cannot support Article III standing as a matter of law. There are "bedrock Article III constraints in cases brought by States against an executive agency or officer." *Texas*, 143 S. Ct. at

1975 n.3. And "[c]ontingent injuries, especially those arising from the impact of regulations on third parties not before the Court, rarely create cognizable cases or controversies." *Arizona v. Biden*, 40 F.4th 375, 383 (6th Cir. 2022). Federal policies routinely have incidental effects on States' expenditures, revenues, and other activities. Yet such effects have historically not been viewed as judicially cognizable injuries, and the Supreme Court recently cautioned against recognition of such "attenuated" claims by States in a very similar context. *See Texas*, 143 S. Ct. at 1972 n.3. Generally, a State may sue the United States only if it has suffered a "direct injury" at the hands of the federal government. *Florida v. Mellon*, 273 U.S. 12, 18 (1927) (holding that Florida lacked standing to challenge a federal inheritance tax because its claimed injury of "withdrawal of property" and resulting diminishment of tax base was "at most, only remote and indirect"); *see also Wyoming v. Oklahoma*, 502 U.S. 437, 448 (1992) (no standing "where the claim was that actions taken by [federal] agencies had injured a State's economy and thereby caused a decline in general tax revenues"). And the Supreme Court did not negate this principle in *Massachusetts v. EPA*, 549 U.S. 497 (2007). In that case, the Supreme Court held that a State had standing to challenge the denial of a rulemaking petition when the denial threatened to physically diminish its proprietary and "sovereign territory" and the underlying statute vested it with specific procedural rights. *Id.* at 519; *see also Texas*, 143 S. Ct. at 1975 n.6 (rejecting states' reliance on special solicitude and noting that *Massachusetts v. EPA* involved a statutorily authorized petition for rulemaking). Plaintiff's claimed future injuries are incidental, not direct, and thus do not satisfy this standard. This lawsuit amounts instead to a generalized grievance that "a federal government program is anticipated to produce an increase in that state's population and a concomitant increase in the need for the state's resources," the recognition of which would "permit nearly all state officials to challenge a host of Federal laws." *Arpaio v. Obama*, 27 F. Supp. 3d 185, 202 (D.D.C.

2014), *aff'd*, 797 F.3d 11 (D.C. Cir. 2015).

    <u>Plaintiff's Claimed Injury Would Not be Redressed by the Relief It Seeks.</u> A favorable ruling would also not redress Plaintiff's alleged injury, which is ultimately based on the assertion that CBP One invites noncitizens to enter the United States and increases the pace of processing at POEs, thereby allowing more migrants to enter Texas, imposing costs on the state. Compl. ¶¶ 42, 60, 76. "To establish redressability, a plaintiff must show from the outset of its suit that its injuries are capable of being remedied by a favorable decision." *Texas*, 143 S. Ct. at 1978 (Gorsuch, J., concurring) (cleaned up). The Court's judgment must actually "remedy the plaintiff's harms." *Id.* at 1979. "[R]elief that does not remedy the injury suffered cannot bootstrap a plaintiff into federal court." *Inclusive Cmtys. Project, Inc. v. Dep't of Treasury*, 946 F.3d 649, 655 (5th Cir. 2019). Even if Plaintiff's claimed injury were likely to occur (and as shown, it is not), the relief Plaintiff seeks would not even address it. Enjoining or vacating the Rule as Plaintiff requests would not restrain the use of CBP One to make appointments, because CBP One and the ability to schedule arrival at a POE exist independently of the Rule. An injunction of the Rule thus would not restrain the Executive's discretion to process migrants at the border in the manner it sees fit. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 105-06 (1998) (finding no redressability where specific relief sought would not address the harms suffered); *see also Texas*, 143 S. Ct. at 1979 (Gorsuch, J., concurring) ("Whatever a court may say in an opinion does no more to compel federal officials to change how they exercise their prosecutorial discretion than an order vacating the Guidelines."). Instead, an injunction or vacatur of the Rule would merely remove the negative consequences for failing to use orderly methods of entry. Such an order would more likely contribute to the harms Plaintiff complains of, by taking away the government's carefully calibrated tool to *reduce* irregular migration.

## II.     Texas is Not Within the Zone of Interests of the Relevant Immigration Statute.

Even if Plaintiff could establish Article III standing, its APA claims must be dismissed because Texas is not within the zone of interests protected by the relevant immigration statute. The APA does not "allow suit by every person suffering injury in fact." *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 395 (1987). It provides a cause of action only to a plaintiff "adversely affected or aggrieved by agency action within the meaning of a relevant statute." 5 U.S.C. § 702. To be "aggrieved" in that sense, "the interest sought to be protected by the complainant [must] be arguably within the zone of interests to be protected or regulated by the statute . . . in question." *Clarke*, 479 U.S. at 396 (alteration and citation omitted). When a Plaintiff is not itself the object of the challenged regulatory action, it has no right of review if its "interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit." *Id.* at 399.

The Rule sets a condition on eligibility under the asylum statute, 8 U.S.C. § 1158. *See* 88 Fed. Reg. at 31,323; *supra* at 7; *infra* § IV(A). Nothing in the asylum statute—or the INA generally—evinces any concern with State sovereigns generally or any policy goal of reducing migration specifically. The opposite is true. *See* 8 U.S.C. § 1158(d)(7) ("Nothing in this subsection shall be construed to create any substantive or procedural right or benefit that is legally enforceable by any party against the United States or its agencies or officers or any other person."). Thus, the interests Plaintiff seeks to vindicate do not fall within section 1158's zone of interests. Moreover, the INA carefully prescribes a scheme of judicial review of asylum and removal issues that affords only noncitizens—not States or other third parties—an opportunity to challenge them. *See* 8 U.S.C. § 1252(a)(5), (b)(9), (e), (g). This demonstrates that Congress did not intend for "judicial review of those issues at the behest of other persons" to occur. *Block v. Cmty. Nutrition Inst.*, 467 U.S.

340, 349 (1984). The INA thus precludes Plaintiff's suit. 5 U.S.C. § 701(a)(1).

### III.    Plaintiff Has Not Challenged CBP One, Nor Could It.

Even if Plaintiff could plausibly allege an overall increase of noncitizens in Texas as a result of increased processing at POEs facilitated by the use of CBP One, that increase is not attributable to the Rule because CBP One exists independently of it. Plaintiff's true challenge is to the use of CBP One to schedule appointments, and to the resulting pace of processing at POEs— not to the Rule. Yet Plaintiff has not pleaded any cause of action directly challenging CBP One, and it does not seek to enjoin the use of CBP One. Its claims must thus be dismissed at the threshold because the relief sought would not redress those claims. *See supra* at 19. In any event, a claim challenging the use of CBP One and an increased pace of processing would be unreviewable under the APA and thus futile because the use of CBP One is not a final agency action, and the management of POEs is committed to the agency's discretion.

### A.    The Use of CBP One is Not Final Agency Action.

The APA generally provides judicial review only for a "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704. "Final agency action" is a jurisdictional prerequisite under the APA, and in the absence of final agency action, dismissal under Rule 12(b)(1) is appropriate. *E.g.*, *Qureshi v. Holder*, 663 F.3d 778, 781 (5th Cir. 2011). The APA defines "agency action" to mean "an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." 5 U.S.C. § 551(13); *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 61-62 (2004). To be final, "the action must mark the consummation of the agency's decisionmaking process" and "must be [action] by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (citations and quotation marks omitted).

Here, Plaintiff's underlying grievance is with the use of CBP One to facilitate more expeditious processing, which Plaintiff claims will result in more noncitizens being released into and remaining in Texas. Compl. ¶¶ 41-42, 45. Any express challenge to CBP One would be futile, however, because the use of CBP One is not "final" agency action under *Bennett* as it does not "give[] rise to direct and appreciable legal consequences." *See U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 598 (2016) (quotations omitted). As Plaintiff acknowledges, would-be entrants who are already in Northern or Central Mexico use CBP One to input biographic and biometric information and schedule appointments to present themselves at POEs along the southwest border. Compl. ¶¶ 26, 28-29, 31-37; DHS Decl. ¶ 20. The app does not determine whether someone seeks asylum or assess their claim of fear. *See* Compl. ¶ 37. Instead, CBP One gathers information from those who intend to enter the United States and allows them to pre-schedule an arrival time to increase processing efficiency and allow advance vetting for national security and public safety concerns. *See* DHS Decl. ¶ 22. All determinations of legal significance—i.e., inadmissibility, custody, processing for expedited removal, referral for a credible fear interview, and, if applicable, parole—are made upon inspection at the POE. *See* 8 U.S.C. § 1225(a)(3), (b)(1)(A); DHS Decl. ¶ 24; *see also* Compl. ¶ 40 ("Use of the app alone does not authorize an alien to stay in the country after presenting at the port of entry.").[2] And these determinations occur upon inspection of *any* noncitizen without documents sufficient for admission, regardless of whether the individual pre-scheduled an appointment. *See* DHS Decl. ¶ 24; 88 Fed. Reg. at 31,358 ("CBP's policy is to inspect and process arriving noncitizens at POEs,

---

[2] And Plaintiffs cannot challenge these individual decisions in this forum either, as the INA limits review of admissibility and removal decisions to the noncitizens they affect. *See, e.g.*, 8 U.S.C. § 1252(a)(2)(A), (e)(1)-(3). The exercise of parole authority is similarly unreviewable as a discretionary decision for which review is precluded by 8 U.S.C. § 1252(a)(2)(B)(ii) and the APA, 5 U.S.C. § 701(a); *Heckler v. Chaney*, 470 U.S. 821, 838 (1985).

regardless of whether they have used the CBP One app."); 8 U.S.C. § 1225(a)(1), (3) (providing that immigration officers inspect all applicants for admission); 88 Fed. Reg. at 31,331 (the Rule does not "provide for, prohibit, or otherwise set any policy regarding DHS's discretionary authority to make parole determinations for those who use the CBP One app").

It is true that the Rule (not the CBP One app itself) excepts those that pre-schedule their arrival from the rebuttable presumption of asylum ineligibility. 8 C.F.R. §§ 208.33(a)(2)(ii)(B), 1208.33(a)(2)(ii)(B). But under the Rule, the exception to the presumption would continue to apply—and would likely expand—if the use of CBP One were somehow prohibited. The Rule provides an exception to the rebuttable presumption where a noncitizen "present[s] at a port of entry without a pre-scheduled time and place, if the alien demonstrates by a preponderance of the evidence that it was not possible to access or use the DHS scheduling system due to … [a] ongoing and serious obstacle." 8 C.F.R. §§ 208.33(a)(2)(ii)(B), 1208.33(a)(2)(ii)(B). Moreover, the application of the appointment exception to the presumption only happens *after* each individual noncitizen is processed and any persecution and torture claims are assessed in a credible fear interview or on their merits. *See* 8 C.F.R. §§ 208.33(b)(1), 1208.33(b)(1). Thus, the use of CBP One to schedule appointments at most only affects rights "on the contingency of future administrative action" in an individual case, and its use is thus "nonfinal." *Nat'l Parks Conservation Ass'n v. Norton*, 324 F.3d 1229, 1237 (11th Cir. 2003). Accordingly, the use of CBP One does not "mark the consummation of the agency's decisionmaking process." *Bennett*, 520 U.S. at 178. An agency procedure like this does not become reviewable "final agency action" unless and until it is applied "in a particular situation." *Nat'l Min. Ass'n v. McCarthy*, 758 F.3d 243, 253 (D.C. Cir. 2014) (Kavanaugh, J.).

### B.      Management of Processing at POEs is Committed to Agency Discretion.

Further, the use of CBP One to streamline and facilitate more expeditious processing of migrants once they arrive implicates the "complicated balancing of a number of factors which are peculiarly within [the agency's] expertise," and is therefore committed to agency discretion by law and unreviewable under the APA. 5 U.S.C. § 701(a)(2); *Heckler*, 470 U.S. at 831. Congress has charged DHS and CBP with managing POEs in a safe and orderly manner that balances competing priorities including combatting terrorism, managing individual entry, and ensuring orderly and efficient flow of lawful traffic and commerce. *See* 6 U.S.C. §§ 111(b)(1), 202, 211(c), (g)(3); 8 U.S.C. § 1103(a)(1), (3), (5). Appointments scheduled through CBP One assist CBP in balancing its multiple missions by enabling it to "manage the flows [of migrants] in a safe and efficient manner." 88 Fed. Reg. at 31,318. Such mission-balancing and resource-management is a core matter for executive discretion, *see Heckler*, 470 U.S. at 831, as is the question of how to "adequately guard[] the borders of the United States," *see Chiles v. United States*, 69 F.3d 1094 (11th Cir. 1995). Maintaining executive discretion is especially important in this arena because immigration enforcement and border management implicates the "dynamic nature of relations with other countries," *Arizona*, 567 U.S. at 397, including Mexico and other regional partners with whom the United States is working to address irregular migration. Accordingly, Plaintiff cannot assert an APA claim challenging the use of CBP One, because DHS and CBP's use of scheduling tools to efficiently manage immigration processing at POEs is committed to their discretion.

## IV.    The Complaint Does Not State a Claim.

Even if the Court could entertain Plaintiff's challenge to the Rule, the Complaint should be dismissed under Rule 12(b)(6) because neither of its two claims states a facially sufficient APA claim. On its face, the Rule is a lawful and reasonable exercise of rulemaking authority to address

the end of the Title 42 Order and the anticipated corresponding surge in migration by noncitizens without documents sufficient for admission into the United States. The Rule adopts a balanced and comprehensive approach to border management by pairing an existing expansion of safe, orderly, and lawful pathways to enter the United States with a consequence of presumptive asylum ineligibility for failing to either use those pathways or seek protection in a third country. 88 Fed. Reg. at 31,314-19. The Departments adopted this tailored approach after observing that pairing country-specific parole processes with the ability to expeditiously remove those who failed to use those processes was successful in decreasing irregular entries by nationals of those countries. 88 Fed. Reg. at 31,316-17. The Rule is designed to lower the number of noncitizens who approach the southwest border and to lower the numbers of noncitizens, who, after crossing the border, are allowed to remain in the United States to await adjudication of their asylum applications. Accordingly, Plaintiff's claims that the Rule encourages illegal entry, fails to consider costs to the States, and fails to adequately consider alternative approaches are without merit.

### A.     The Rule is Within the Departments' Statutory Authority and Does not Conflict With DHS's Duty to Guard Against Illegal Entry.

Plaintiff' assertion in Count 1 that the Rule exceeds statutory authority or contravenes the Departments' duties is wrong. The Rule is well within both DHS's and DOJ's authority to regulate eligibility for asylum and the conduct of expedited removal. The asylum statute makes clear, and Plaintiff does not dispute, that DHS and DOJ have the discretion to grant asylum and may establish "limitations and conditions" on asylum eligibility beyond those set out in the statute, so long as they are "consistent with" 8 U.S.C. § 1158. 8 U.S.C. § 1158(b)(2)(C); *see also id.* § 1158(d)(5)(B). Consistent with this authority, the Rule imposes a limitation on asylum eligibility that operates in both removal proceedings before EOIR and in asylum adjudications and credible fear screenings before DHS. *See* 88 Fed. Reg. at 31,321-23, 31,449-52; 8 C.F.R. §§ 208.30, 208.33, 1003.42(d),

1208.30, 1208.33. The INA expressly provides the Departments authority to set conditions for asylum eligibility, and the laws Plaintiff cites do not set any limitations on that authority with which the Rule conflicts.

Plaintiff does not truly challenge the Departments' authority to promulgate the regulations at issue. Instead, it argues that the Rule conflicts with DHS's power and duty under 8 U.S.C. § 1103(a)(5) to "guard the boundaries and borders of the United States against the illegal entry of aliens." Compl. ¶ 56 (citing 8 U.S.C. § 1103(a)(5)); *see also* Compl. ¶¶ 61-62. But Section 1103(a)(5) sets out a broad, discretionary duty that is not reviewable or enforceable under the APA. *Chiles*, 69 F.3d at 1096 ("The overall statutory scheme established for immigration demonstrates that Congress intended whether the Attorney General is adequately guarding the borders of the United States to be 'committed to agency discretion by law.'"). But even if DHS's duty under § 1103(a)(5) were enforceable, the statute does not set out any specific enforcement requirements with which the Rule conflicts.

More fundamentally, the premise of Plaintiff's argument is wrong: neither the Rule nor CBP One in any way "invit[es]" or "incentivizes" "the illegal entry of aliens." *See* Compl. ¶¶ 58, 61. There is nothing "illegal" about presenting at a POE to seek protection. Although Title 8 does not define "illegal entry," the relevant criminal statute defines "improper entry" as (1) entering or attempting to enter the United States at any time or place other than as designated by immigration officers, (2) eluding examination or inspection by immigration officers, or (3) attempting or obtaining entry to the United States through fraud. 8 U.S.C. § 1325(a). And regulations provide that applications "to lawfully enter the United States shall be made in person to an immigration officer at a U.S. port-of-entry when the port is open for inspection." 8 C.F.R. § 235.1. Thus, presenting at a POE for inspection by immigration officers—except to attempt to obtain entry by

fraud under § 1325(a)(3)—is not illegal under this statute. *United States v. Valencia-Mendoza*, 2020 WL 2198169, at *2 (W.D. Tex. May 6, 2020) (under 8 U.S.C. § 1325(a)(1), the government must prove that the defendant "entered at a place other than a designated port of entry"); *C.M. on behalf of D.V. v. United States*, 2023 WL 3261612, at *38 (W.D. Tex. May 4, 2023) (noting that plaintiff "bypassed the normal port of entry and entered the United States illegally"). Thus, the Rule cannot be said to invite "illegal" entries. The Rule (and the use of CBP One) instead *discourages* irregular entries, including unlawful entries, by imposing a rebuttable presumption of asylum ineligibility and by encouraging orderly entry at POEs. It is thus consistent with § 1103(a)(5).

### B.    The Rule is Reasonable and Considers Relevant Factors.

In Count 2, Plaintiffs allege that the Rule is arbitrary and capricious because it will, contrary to its stated purpose, increase the number of "illegal aliens processed at the border" Compl. ¶ 68, does not consider the effects the rule has on Texas, *id.* ¶ 69, and "failed to consider alternative approaches that would disincentivize aliens using cartels or smugglers to cross the border without encouraging other illegal crossings," *id.* ¶ 80. These arguments misconstrue the Rule and the concept of "illegal" immigration and are facially insufficient to state a claim under the APA.

First, Plaintiffs argue that "while the Final Rule purports to reduce illegal immigration, the Final Rule is rife with concessions that this rule will operate to increase the number of illegal aliens processed at the border." Compl. ¶ 68. To support this claim, Plaintiffs quote statements in the Rule that "CBP intends to increase the number of available appointments in the CBP One app and is committed to processing as many noncitizens as is operationally feasible." *Id.* (citing 88 Fed. Reg. at 31,326, 31,396). This argument misconstrues the term "processing." "Processing" does not mean admission to the United States, nor release into the United States. Rather, as a result of

processing, noncitizens may be subject to expedited removal. *See* 8 U.S.C. § 1225(b)(1)(A)(i) (allowing for expedited removal of those who do not claim fear); *id.* § 1225(b)(1)(B)(iii)(I) (requiring officer to order removed a noncitizen after a negative credible fear determination). This argument also appears to be based on the incorrect premise that those who have followed the prescribed process for seeking asylum or humanitarian relief or have received a case-by-case grant of parole are not authorized to remain in the United States. *See supra* at 13-14.

Second, Plaintiff's claim that the Rule failed to consider "Texas's expenses and costs," *see* Compl. ¶¶ 69, 70-75, is belied by the published Rule. The Rule's preamble includes a significant discussion of what a group of State Attorneys General described as "'the increased costs to the States of higher levels of unlawful aliens precipitated by' the NPRM." 88 Fed. Reg. at 31,437-38. The Departments considered those comments and responded by stating that the "rule is expected to reduce irregular migration, not increase it." *Id.* at 31,438. In support of that conclusions, the Departments cited to evidence that recent country-specific parole processes that had expanded lawful pathways while also instituting consequences for failing to use them—similar to the approach taken by the Rule—led to dramatic decreases in encounters with noncitizens from those countries. *Id.* And the Departments pointed to data they relied on in stating that in the absence of the Rule, the Departments expected even more irregular migration. *See* 88 Fed. Reg. at 31,316; 88 Fed. Reg. at 11,705-06. At bottom, without this Rule, there would be a greater number of noncitizens entering the United States between POEs. Plaintiff has failed to identify how the Rule leads to an increase in its expenses and costs.

Third, Plaintiff alleges that the Rule is unreasoned because it allegedly "promot[es] one version of illegal immigration over another." Compl. ¶ 79. Plaintiff argues that the exemption for UCs is an example of this because it "incentivizes individuals to employ smugglers to transport

unaccompanied children across the border, contrary to the Final Rule's stated intent*." Id*. Plaintiff does not explain the basis for its speculation, which reflects a basic misunderstanding of how the Rule and Congress's treatment of UCs operate. The presumption's application during credible fear screenings serves to screen out migrants who have not followed one of the lawful or orderly pathways and thus has the crucial effect of and incentivizing orderly entry rather than irregular entry, including reliance on smugglers. But "UCs whom DHS seeks to remove cannot be processed for expedited removal and, thus, are never subject to the credible fear process." 88 Fed. Reg. at 31,417 (citing 8 U.S.C. § 1232(a)(5)(D)). "As UCs are already excluded from expedited removal, the Departments do not expect—based on their experience implementing current law concerning expedited removal and asylum—that this exclusion of UCs from the rebuttable presumption would serve as a significant incentive for families to send their children unaccompanied to the United States." 88 Fed. Reg. at 31,417. Accordingly, the Departments reasonably considered and rejected the contention that exclusion of UCs would incentivize smuggling.

Fourth, and finally, Plaintiff alleges that the Departments "failed to consider alternative approaches that would disincentivize aliens using cartels or smugglers to cross the border without encouraging other illegal crossings." Compl. ¶ 80. But the Complaint does not identify any specific alternative the Departments failed to consider in the Rule's lengthy discussion of alternatives. *See* 88 Fed. Reg. at 31,367-73. Given the expectation of fewer noncitizens entering irregularly under the Rule, it is unclear what "less burdensome or less sweeping means" Plaintiff believes the Departments should have considered. *See* Compl. ¶ 75.

## CONCLUSION

For the foregoing reasons, this Court should dismiss Plaintiffs' Complaint for lack of jurisdiction or, alternatively, for failure to state a claim.

Dated: August 24, 2023                    Respectfully submitted,

                                          BRIAN M. BOYNTON
                                          *Principal Deputy Assistant Attorney General*

                                          WILLIAM C. PEACHEY
                                          *Director*

                                          EREZ REUVENI
                                          *Assistant Director*

                                          By: /s/ *Katherine J. Shinners*
                                          KATHERINE J. SHINNERS
                                          *Senior Litigation Counsel*
                                          D.C. Bar No. 978141
                                          U.S. Department of Justice, Civil Division
                                          Office of Immigration Litigation – DCS
                                          P.O. Box 868, Ben Franklin Station
                                          Washington, DC 20044
                                          Tel: (202) 598-8259
                                          Fax: (202) 305-7000
                                          Email: katherine.j.shinners@usdoj.gov

                                          CHRISTINA P. GREER
                                          *Senior Litigation Counsel*

                                          *Attorneys for Defendants*

**CERTIFICATE OF SERVICE**

I hereby certify that on the 24th day of August, 2023, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to counsel for Plaintiff.

/s/*Katherine J. Shinners*
KATHERINE J. SHINNERS
Senior Litigation Counsel