UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
DEL RIO DIVISION

| | |
|---|---|
| STATE OF TEXAS<br> *Plaintiff*,<br><br>v.<br><br>ALEJANDRO MAYORKAS, in his official<br>capacity as Secretary of Department of<br>Homeland Security; UNITED STATES<br>DEPARTMENT OF HOMELAND<br>SECURITY; MERRICK GARLAND, in his<br>official capacity as Attorney General of the<br>United States, UNITED STATES<br>DEPARTMENT OF JUSTICE,<br> *Defendants.* | No. 2:23-cv-00024 |

---

## STATE OF TEXAS'S FIRST AMENDED COMPLAINT

In a farcical attempt to address the invasion of illegal aliens across the southern border following the end of Title 42, the Biden Administration published a new Final Rule inviting migrants to download an app to schedule a convenient time and place to cross the border illegally. The Biden Administration is inviting these otherwise inadmissible aliens to enter the United States through official ports of entry and funneling them into the country by granting them parole at a rate of nearly 96%. This massive influx of aliens includes thousands of migrants from 24 countries designated as national security concerns. The Biden Administration is inviting hundreds of thousands of aliens into Texas, releasing them into the country, and inflicting serious costs on the State of Texas. The Biden Administration's attempt to manage the southern border by app and parole aliens *en masse* does not meet even the lowest expectation of competency. This scheme runs afoul of the laws Congress passed to regulate immigration, and the Final Rule's exemption from

the presumption of ineligibility for asylum for aliens who use Defendants' scheduling app should be vacated and enjoined.

## I.    PARTIES

1.    The State of Texas is a sovereign State of the United States of America.

2.    Defendant United States Department of Homeland Security is a federal cabinet agency responsible for implementing and enforcing certain immigration-related statutes, policies, and directives. DHS is a Department of the Executive Branch of the United States government. DHS oversees the United States Citizenship and Immigration Services, United States Customs and Border Protection, and United States Immigration and Customs Enforcement.

3.    Defendant Alejandro N. Mayorkas is the Secretary of Homeland Security and the head of DHS. He is sued in his official capacity.

4.    Defendant Merrick Garland is the United States Attorney General. Attorney General Garland oversees the Department of Justice. He is sued in his official capacity.

5.    Defendant the United States Department of Justice is a Department of the Executive Branch of the United States government.

## II.    JURISDICTION & VENUE

6.    The Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, and 2201(a). This action arises under 5 U.S.C. §§ 702–03 and 28 U.S.C. §§ 1331, 1346, and 1361.

7.    Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b)(2) and 1391(e). Defendants are United States agencies and officers sued in their official capacities. The State of Texas is a resident of this judicial district and a substantial part of the events or omissions giving rise to this complaint occurred and continue to occur within the Western District of Texas, Del

*Texas's First Amended Complaint*

Rio Division.

8.      The Court is authorized to award the requested declaratory and injunctive relief under 5 U.S.C. § 706 and 28 U.S.C. §§ 1361, 2201, and 2202, and its inherent equitable powers.

### III.    BACKGROUND

9.      In March 2020, under the Trump Administration, the Centers for Disease Control and Prevention invoked Title 42, to address public health concerns about COVID-19. The Title 42 Order allowed immigration officials to turn arriving aliens away at the border without placing them in immigration proceedings or considering their asylum claims.

10.     On January 30, 2023, the Biden Administration announced it would terminate the Title 42 Order on May 11, 2023.[1]

11.     Since then, Defendants have anticipated a surge in illegal immigration at the Southwest Border of the United States as a result of that termination.[2]

12.     President Biden warned that the Southwest Border is going to be "chaos for a while" after the expiration of the Title 42 Order and he acknowledged there has been "chaos at the border for a number of years."[3]

---

[1] OMB, *Statement of Administration Policy: H.R. 382 and H.J. Res. 7* (Jan. 30, 2023), https://www.whitehouse.gov/wp-content/uploads/2023/01/SAP-H.R.-382-H.J.-Res.-7.pdf (announcing White House plan to let public health emergency expire on May 11).

[2] *See* Press Release, DHS Continues to Prepare for End of Title 42; Announces New Border Enforcement Measures and Additional Safe and Orderly Processes (Jan. 5, 2023), https://www.dhs.gov/news/2023/01/05/dhs-continues-prepare-end-title-42-announces-new-border-enforcement-measures-and.

[3] *Biden quietly admits the border has been in chaos 'for a number of years' ahead of Title 42 expiration*, Fox News (May 11, 2023), https://www.foxnews.com/politics/biden-quietly-admits-border-been-chaos-number-

A.      **Legal Background**

13.      Upon the expiration of the Title 42 Order, the United States returned to normal immigration operations governed by Title 8 of the United States Code.

14.      Section 1225 of Title 8 of the United States Code establishes procedures for DHS to process aliens "present in the United States" and deems them "applicant[s] for admission" to the United States. 8 U.S.C. § 1225(a)(1).[4] Aliens who lack valid entry documents "at the time of application for admission" are "inadmissible" and therefore "removable." *Dep't of Homeland Sec. v. Thuraissigam*, 140 S. Ct. 1959, 1964 (2020) (citing 8 U.S.C. § 1182(a)(7)(A)(i)(I)).

15.      Aliens seeking admission to the United States must be inspected by immigration officers. 8 U.S.C. §1225(a)(3); *see Jennings v. Rodriguez*, 138 S. Ct. 830, 836–37 (2018).

16.      Aliens must be detained until their immigration proceedings are concluded. 8 U.S.C. § 1225(b).

17.      An alien is subject to *expedited* removal when an officer determines that the alien lacks valid entry documents. 8 U.S.C. § 1225(b)(1)(A)(i); *see* 8 U.S.C. § 1182(a)(6)(C), (7).

18.      Aliens may avoid removal by seeking asylum, indicating a fear of persecution, or by being paroled into the United States. 8 U.S.C. § 1182(a)(7)(i); *id.* at (d)(5)(A); 8 U.S.C. § 1225(b)(1)(A)(i); *see* 8 C.F.R. § 235.3(b)(4)

19.      Even if an alien raises an asylum claim, the alien is not entitled to immediate release. Applicants "*shall* be detained pending a final determination of credible fear of persecution and, if

---

years-ahead-title-42-expiration.

[4] Section 1225 refers to the Attorney General, but those functions have been transferred to the Secretary of Homeland Security. *See Dep't of Homeland Sec. v. Thuraissigam*, 140 S. Ct. 1959, 1965 n.3 (2020).

found not to have such a fear, until removed." 8 U.S.C. § 1225(b)(1)(B)(iii)(IV) (emphasis added); *see also* 8 U.S.C. § 1225(b)(2).

20.     "Most asylum claims . . . ultimately fail, and some are fraudulent." *Thuraissigiam*, 140 S. Ct. at 1963.

21.     Aliens may also be allowed to remain in the country by being released on parole, which constitutes "affirmative immigration relief." *DHS v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1906 (2020).

22.     Congress has directed that parole may be granted only "on a case-by-case basis," and even then only for "urgent humanitarian reasons or significant public benefit." 8 U.S.C. § 1182(d)(5)(A).

23.     Congress added those restrictions—the case-by-case basis for urgent humanitarian reasons or significant public benefit—to the parole power in 1996, because:

> The text of section 212(d)(5) is clear that the parole authority was intended to be used on a case-by-case basis to meet specific needs, and not as a supplement to Congressionally-established immigration policy. In recent years, however, **parole has been used increasingly to admit entire categories of aliens who do not qualify for admission under any other category in immigration law, with the intent that they will remain permanently in the United States**. This contravenes the intent of section 212(d)(5), but also illustrates why further, specific limitations on the Attorney General's discretion are necessary.

H.R. Rep. No. 104-469, at 140 (1996) (emphasis added); *see also Cruz-Miguel v. Holder*, 650 F.3d 189, 199 n.15 (2d Cir. 2011) (explaining that "this change was animated by concern that parole under § 1182(d)(5)(A) was being used by the executive to circumvent congressionally established immigration policy").

24.     Congress also emphasized that DHS "may not parole into the United States an alien who

is a refugee unless the Attorney General determines that compelling reasons in the public interest with respect to that particular alien require that the alien be paroled into the United States rather than be admitted as a refugee." 8 U.S.C. § 1182(d)(5)(B).

25.     Defendants cannot use their power to parole aliens *en masse*.

26.     The Biden Administration has a history of paroling aliens *en masse*. The Biden Administration unveiled one such policy in earlier this year[5], which was promptly enjoined.[6]

**B.     The CBP One App and Circumvention of Lawful Pathways Rule**

23.     On October 28, 2020, CBP launched the CBP One mobile application on the Apple App and Google Play stores.

24.     The CBP One app was originally used to provide travelers with access to Form I-94 information, schedule inspection appointments for perishable cargo, and to assist international organizations who sought to help individuals enter the United States.

25.     On January 12, 2023, DHS announced a new scheduling function in the CBP One app.

26.     Effective January 12, 2023, aliens located in Central or Northern Mexico who "[s]ought to travel to the United States" could use the CBP One app "to submit information in advance and schedule an appointment to present themselves at certain Southwest Border land

---

[5] *Biden admin to allow for the release of some migrants into the U.S. with no way to track them*, NBC NEWS, https://www.nbcnews.com/politics/biden-admin-plans-order-release-migrants-us-no-way-trackrcna83704 (May 10, 2023 8:44 a.m. CDT).

[6] *Florida v. Mayorkas, et al.*, case no. 3:23-cv-9962-TKW-ZCB (N.D. Fla.), (Preliminary Injunction, May 16, 2023, Dkt. 30).

ports of entry."[7]

27.    DHS announced that it would expand the use of the CBP One App "[o]nce the Title 42 order eventually lifts," allowing aliens to "use the CBP One application for scheduling an appointment to present themselves for inspection and to initiate a protection claim instead of coming directly to a port of entry to wait."[8]

28.    On February 23, 2023, the Department of Homeland Security (DHS) and the Department of Justice (DOJ) jointly issued a notice of proposed rulemaking previewing the federal government's change in immigration policy after expiration of the Title 42 Order. 88 Fed. Reg. 11,704.

29.    On May 16, 2023, Defendants jointly issued the Final Rule, the Circumvention of Lawful Pathways, with an effective date of May 11, 2023. 88 Fed. Reg. 31,314.

30.    This Final Rule represents a significant change in asylum and border policy. Under the Final Rule, migrants are presumed ineligible for asylum unless they have "presented at a port of entry at a pre-scheduled time using the CBP One app" or satisfy some other exception.[9] *See* 88 Fed. Reg. 31,317, 31,325.

31.    The CBP One app "enables noncitizens without appropriate documents for admission who seek to travel to the United States through certain southwest border land ports of

---

[7] *DHS Scheduling System for Safe, Orderly and Human Border Processing Goes Live on CBP One App*, Dep't of Homeland Security, https://www.dhs.gov/news/2023/01/12/dhs-scheduling-system-safe-orderly-and-humane-border-processing-goes-live-cbp-onetm (Jan. 12, 2023) .

[8] *Id.*

[9] Fact Sheet: Circumvention of Lawful Pathways (May 11, 2023), https://www.dhs.gov/news/2023/05/11/fact-sheet-circumvention-lawful-pathways-final-rule.

entry (POEs) the ability to submit information through a module within the application instead of coming directly to wait at a POE."[10]

32.     Once there, "CBP officers do not determine the validity of any claims for protection." 88 Fed. Reg. 31,358.

33.     DHS described the expansion of the CBP One app to schedule appointments at the border as "a continuation of the Biden administration's expansion of lawful pathways and opportunities to access them."[11]

34.     The CBP One app has "facilitated the largest expansion of migrant processing at ports of entry along the southern border in U.S. history."[12]

35.     The Rule contemplates that the CBP One app will "significantly increase the number of individuals, including those who *may* be seeking asylum, that CBP can process at land border ports of entry." 88 Fed. Reg. 11,719 (emphasis added); *see also* 88 Fed. Reg. 31,331 ("[T]he expanded use of the CBP One app is expected to . . . enable CBP to . . . expand its ability to process noncitizens at POEs, including those who *may* be seeking asylum[.]") (emphasis added).

36.     The CBP One app is "broadly available to migrants in central and northern Mexico." 88 Fed. Reg. 11,707 n.25.

37.     Aliens are invited to download the CBP One app and select a time and place to cross the border.

---

[10] *Id.*

[11] *U.S. plans to admit nearly 40,000 asylum-seekers per month through mobile app*, CBS News, https://www.cbsnews.com/news/asylum-seekers-cbp-one-mobile-app-u-s-plans-admit-nearly-40000-monthly/ (May 31, 2023).

[12] *Id.*

38.     The use of the CBP One app is intended to "streamline[]" illegal aliens' experience at the port of entry. 88 Fed. Reg. 11,727; *see also* 88 Fed. Reg. 31,376.

39.     The CBP One app asks "undocumented travelers" to identify if they are arriving by land, air, or sea. *See* CBP One Mobile Application Traveler User Guide: Submit Advance Information Capability for Non-Citizens (Exh. 1).

40.     It then prompts them to input their names and allow CBP One access to their location. *See* Exh. 1.

41.     The app prompts the user to submit a photo and submit their contact and family information. *See* Exh. 1.

42.     Next, the app prompts the user to select their preferred port of entry to the United States. The user can then request an appointment to cross the border and appear at their preferred port of entry. *See* Exh. 1.

43.     A migrant must be in central or northern Mexico to request an appointment through the CBP One app. Exh. 1 at 19, 25, 32.

44.     The CBP One app allows them to choose between 8 ports of entry, 5 of which are in Texas.[13]

45.     The CBP One app does not ask migrants whether they intend to seek asylum or other form of protection from removal. *See generally* Exh. 1. "The app is not a method of seeking asylum in the United States, and CBP officers do not determine the validity of any claims for protection." 88 Fed. Reg. 31,358.

---

[13] *CBP One Mobile Application*, U.S. Customs & Border Protection, https://www.cbp.gov/about/mobile-apps-directory/cbpone.

46.     The Rule dictates that once the migrants present at the border at their scheduled time and place, they may seek asylum or other forms of protection from removal. 88 Fed. Reg. 31,316.

47.     The Final Rule is intended to "encourage[] migrants to avail themselves" of this method of coming to the United States. 88 Fed. Reg. 31,314. It does so by establishing a rebuttable presumption of asylum ineligibility for illegal aliens who cross the border *without* using the CBP One app. 88 Fed. Reg. 31,314.[14]

48.     To be allowed to remain in the United States after crossing the border, users of the CBP One app are supposed to satisfy some exception from removal. *See* 88 Fed. Reg. 31,318 ("Once present in the United States, those who use [the CBP One app] can make claims for asylum and other forms of protection" from removal.).

49.     Through the Final Rule and the expanded use of the CBP One app, Defendants are encouraging aliens to illegally cross the border without establishing that they meet some exception from removal or have a legal basis to remain in the country.

50.     The Final Rule works in conjunction with the Administration's expanded parole policies and processes to expedite and streamline the processing of aliens at the border and move them into the country more quickly. *See, e.g.*, 88 Fed. Reg. 31,317 (listing the use of the CBP One app as part of the Biden Administration's "expand[ed] safe and orderly options for migrants to enter the United States").

51.     The Rule confers a legal benefit on aliens who use the CBP One app: "Once present in the United States, those who use this mechanism [CBP One app] can make claims for asylum

---

[14] This presumption does not apply to unaccompanied children. 88 Fed. Reg. 31,318.

and other forms of protection and are exempted from this rule's rebuttable presumption on asylum eligibility." 88 Fed. Reg. 31,318.

52.     The Biden Administration is using executive authority to circumvent statutory law. By using the pre-scheduling feature of the CBP One app, the Biden Administration exempts these aliens from the presumption of ineligibility for asylum and considers these otherwise inadmissible aliens to have entered "lawfully."

53.     In an interview with NPR, DHS Assistant Secretary for Border and Immigration Policy, Blas Nunez-Neto, said "You know, what we have done is really oversee a historic increase in lawful pathways to the U.S., including at our port of entry through the CBP One application. . . . And what we are really trying to do here is incentivize migrants to use safe, lawful and orderly pathways that, again, we have expanded dramatically over the last two years."[15]

54.     The aliens who use the CBP One app are overwhelmingly released into the country on parole.

55.     Together, the CBP One app and the Final Rule function as another Biden Administration parole program and an extension of the Biden Administration's lax border policies.

56.     Defendants have continued to announce expansions on the number of available appointments on the CBP One app.

57.     Initially, Defendants distributed approximately 740 CBP One appointments per

---

[15] *Title 42 ended. How is the Department of Homeland Security handling the situation?*, NPR, https://www.npr.org/2023/05/12/1175711841/title-42-ended-how-is-the-department-of-homeland-security-handling-the-situation.

day.[16] Defendants then increased the number of daily appointments to 1,000 per day, following the expiration of the Title 42 order.[17] Most recently, CBP announced that available appointments would increase to 1,450 per day.[18]

58.     According to information received from DHS by the House Committee on Homeland Security, between January 12, 2023 and September 30, 2023, 95.8% of all inadmissible aliens who scheduled appointments through the CBP One app were ultimately issued a "Notice to Appear" and released into the United States on parole.[19] The data reveals that 278,431 appointments were scheduled on the CBP One app, and 266,846 migrants were released into the interior.[20]

59.     Among those aliens who scheduled appointments through the CBP One app and released on parole were approximately 7,332 Special Interest Aliens (SIA) from 24 countries designated as a national security concern because of their Islamic terrorist activities.[21] These aliens

---

[16] *CBP One Appointments Increased to 1,450 Per Day*, U.S. Customs & Border Protection, https://www.cbp.gov/newsroom/national-media-release/cbp-one-appointments-increased-1450-day (June 30, 2023).

[17] *Id.*; *see also CBP Makes Changes to CBP One App*, U.S. Customs & Border Protection, https://www.cbp.gov/newsroom/national-media-release/cbp-makes-changes-cbp-one-app (May 5, 2023).

[18] *Supra* n.15.

[19] *New Documents Obtained by Homeland Majority Detail Shocking Abuse of CBP One App*, U.S. House of Representatives, https://homeland.house.gov/2023/10/23/new-documents-obtained-by-homeland-majority-detail-shocking-abuse-of-cbp-one-app/ (Oct. 23, 2023).

[20] *Id.*

[21] Letter from Senator Grassley to Secretary Mayorkas (Oct. 26, 2023), https://www.grassley.senate.gov/imo/media/doc/grassley_to_dhs_mayorkas_cpb_miller_ice_lechleitner_-_cbp_one.pdf.

were inadmissible but Defendants allowed them entry under parole via the CBP One app.

60.     While DHS has parole authority, "[i]mportantly, the authority is not unbounded." *Biden v. Texas*, 142 S. Ct. 2528, 2543 (2022).

61.     "And under the APA, DHS's exercise of discretion within that statutory framework must be reasonable and reasonably explained." *Id.*

## C.     Effects of the Final Rule on Texas

44.     The Biden Administration's reckless and unlawful open border policies are overwhelming Texas's border communities. Texas contains more than half of the border between the United States and Mexico, and a large share of aliens crossing into the United States arrive through the Texas-Mexico border. Through the CBP One app, the Biden Administration is inviting illegal aliens to cross the border at five ports of entry in the State of Texas: Brownsville, El Paso, Eagle Pass, Hidalgo, and Laredo.

45.     By inviting illegal aliens into Texas, Defendants will inflict costs on the State for public education, law enforcement and incarceration, unreimbursed health care, and other public services for illegal aliens. For example, the Final Rule will cause Texas to "incur significant costs in issuing driver's licenses." *Texas v. United States (DAPA)*, 809 F.3d 134, 155 (5th Cir. 2015). Texas law subsidizes driver's licenses, including for noncitizens who have "documentation issued by the appropriate United States agency that authorizes [them] to be in the United States." *Id.* (quoting Tex. Transp. Code § 521.142(a)). Aliens paroled into the United States will be eligible for subsidized driver's licenses.[22] By enabling more aliens to secure subsidized licenses, the Final Rule

---

[22]     Tex.  Dep't  of  Pub.  Safety,  *Verifying  Lawful  Presence*, https://www.dps.texas.gov/sites/default/files/documents/driverlicense/documents/verifyinglawfulpresence.pdf (listing "Parolees" as eligible for driver's licenses).

will impose significant financial harm on the State of Texas. *See DAPA*, 809 F.3d at 155.

46.     By expanding the number of aliens released into the country, Defendants are pressuring Texas to change its laws in order not to incur expenses related to services provided to noncitizens. This constitutes a sovereign injury. *See, e.g.*, *Texas v. Becerra*, 577 F. Supp. 3d 527 (N.D. Tex. 2021).

47.     Defendants acknowledge that "a substantial proportion of migrants who cross the [southern] border ultimately are not found to have a valid asylum claim." 88 Fed. Reg. 11,729. Yet, Defendants are encouraging the influx of migrants with meritless—if any—claims of asylum that will result in additional migrants entering and remaining in Texas, thus forcing the State to expend taxpayer resources on health care, education, social services, and similar services for such migrants. The Final Rule creates incentives to invite inadmissible aliens to United States, including to Texas.

48.     CBP has published data showing a dramatic increase in the number of inadmissible aliens at the southwest border. Indeed, the number of inadmissible aliens entering the United States at the southwest border is at an all-time high.[23]

49.      This increase facilitates, for example, the depression of wages resulting from adding tens of thousands of new persons to the workforce per month. These harms will be substantial, both to Texas's sovereignty and to the public fisc, and cannot be undone through monetary remedies and thus they constitute irreparable harm to the State of Texas and its taxpayers.

---

[23]     *Nationwide Encounters*, U.S. Customs & Border Patrol, https://www.cbp.gov/newsroom/stats/nationwide-encounters.

50.     The State funds multiple healthcare programs that cover illegal aliens. The provision of these services—utilized by illegal aliens—results in millions of dollars of expenditures per year. These services include the Emergency Medicaid program, the Texas Family Violence Program, and the Texas Children's Health Insurance Program.

51.     The Emergency Medicaid program provides health coverage for low-income children, families, seniors, and the disabled. Federal law requires Texas to include illegal aliens in its Emergency Medicaid program. The program costs the State tens of millions of dollars annually.

52.     The Texas Family Violence Program provides emergency shelter and supportive services to victims and their children in the State of Texas. Texas spends over a million dollars per year on the Texas Family Violence Program for services to illegal aliens.

53.     The Texas Children's Health Insurance Program offers low-cost health coverage for children from birth through age 18. Texas spends tens of millions of dollars each year on CHIP expenditures for illegal aliens.

54.     Further, Texas faces the costs of uncompensated care provided by state public hospital districts to illegal aliens which results in expenditures of hundreds of millions of dollars per year.

55.     Aliens and the children of those aliens receive education benefits from the State at significant taxpayer expense. Defendants' parole of aliens increases education expenditures by the State of Texas each year for children of those aliens.

56.     Because the Final Rule's exception of aliens who pre-schedule their entry at a United States port of entry through a DHS scheduling system, including the CBP One app, from the presumption of ineligibility for asylum is invalid and unlawful, it must be vacated and enjoined.

*See, e.g.*, *United Steel v. Mine Safety & Health Admin.*, 925 F.3d 1279, 1287 (D.C. Cir. 2019) ("The ordinary practice is to vacate unlawful agency action."); *Nat'l Min. Ass'n v. U.S. Army Corps of Engineers*, 145 F.3d 1399, 1409 (D.C. Cir. 1998) (unlawful agency regulations are vacated); *Gen Chem. Corp. v. United States*, 817 F.2d 844, 848 (D.C. Cir. 1987) ("The APA requires us to vacate the agency's decision if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]'").

## IV.   CLAIMS FOR RELIEF

### COUNT 1
### The Final Rule's Exception from the Presumption of Ineligibility for Asylum Exceeds Statutory Authority and Is Not in Accordance with Law
### (5 U.S.C. § 706(2)(A), (C))

54.     The APA prohibits agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (C).

55.     "[A]n agency literally has no power to act . . . unless and until Congress confers power upon it." *La. Pub. Serv. Comm'n v. F.C.C.*, 476 U.S. 355, 374 (1986).

56.     An agency acts unlawfully when it exercises power beyond the bounds of its statutory authority. *See, e.g.*, *SAS Inst., Inc. v Iancu*, 138 S. Ct. 1348, 1359 (2018).

57.     The Rule excludes from the presumption of ineligibility for asylum those aliens who "[p]resent[] at a port of entry, pursuant to a pre-scheduled time and place, or present[] at a port of entry without a pre-scheduled time and place if the alien demonstrates by a preponderance of the evidence that it was not possible to access or use the DHS scheduling system due to language barrier, illiteracy, significant technical failure, or other ongoing and serious obstacle." 88 Fed. Reg. 31, 450; 8 C.F.R. § 208.33(2)(ii)(B).

58.     Defendants lack statutory authority to exclude from the Rule's presumption of ineligibility for asylum aliens who "use the DHS scheduling system," including the CBP One app, to pre-schedule a time and place to enter a United States port of entry.

59.     Secretary Mayorkas is charged with overseeing all functions of the Border Patrol program and the detention and removal program. 6 U.S.C. § 251.

56.     Under Section 1103, Secretary Mayorkas is required to "guard the boundaries and borders of the United States against the illegal entry of aliens." 8 U.S.C. § 1103(a)(5).

57.     In the Final Rule, Defendants invoke 8 U.S.C. § 1103(g)(2) as the basis for the Attorney General's authority to promulgate the rule. Under that statute, the Attorney General is authorized to "establish such regulations, issue such instructions, . . . and perform such other acts as the Attorney General determines to be necessary for carrying out this section." 8 U.S.C. § 1103(g)(2); *see also* 88 Fed. Reg. 31,323 (citing 8 U.S.C. § 1103(g)(2) as a basis for the Attorney General's authority to promulgate the Final Rule).

58.     Nothing in Title 8 authorizes either the Attorney General or the Secretary of Homeland Security to encourage and incentivize aliens without documents sufficient for lawful admission to enter a United States port of entry. 8 U.S.C. § 1103(g)(2).

59.     Yet, the Final Rule acknowledges that otherwise inadmissible aliens "are ***encouraged and incentivized*** . . . to make an appointment using the CBP One app to present themselves at a POE for inspection." 88 Fed. Reg. 31342 (emphasis added).

60.     Defendants expect that use of the CBP One app will increase immigration at these ports of entry and allow them to "process significantly more" aliens into the United States. 88 Fed. Reg. 31,326.

61.     Far from guarding against the illegal entry of aliens, through the Final Rule, Secretary Mayorkas is proactively inviting and encouraging otherwise inadmissible aliens to present at ports of entry without consideration of whether they have a legitimate claim for protection from removal.

62.     The Rule "incentivizes [aliens without documents sufficient for lawful admission] to use . . . orderly means . . . to enter the United States to seek asylum and other forms of protection" by exempting them from the Rule's presumption of ineligibility for asylum. 88 Fed. Reg. 31,316. This exceeds—and is contrary to— Secretary Mayorkas's statutory authority.

63.     The Attorney General's authority under 8 U.S.C. § 1103 is limited to establishing regulations that are necessary to carrying out the requirements of that section—one of which is to guard against the illegal entry of aliens. *Compare* 8 U.S.C. § 1103(g)(2), *with* 8 U.S.C. § 1103(a)(5). By promulgating the Final Rule, the Attorney General is undermining the purposes of section 1103.

64.     Defendants lack statutory authority to encourage and incentivize aliens to enter a United States port of entry without a legal basis to be in the United States.

65.     Defendants rely on 8 U.S.C. § 1103(a)(1), (3) and 6 U.S.C. § 202 for their statutory authority to promulgate the Rule. But Defendants cannot rely on these general grants of discretion to establish enforcement policies to award aliens who use the CBP One app an "exempt[ion] from the [R]ule." 88 Fed. Reg. 31,339; *see Texas v. United States*, 86 F. Supp. 3d 591, 660 (S.D. Tex. 2015).

66.     Defendants lack statutory authority to exclude an alien from the presumption of ineligibility for asylum on the basis that the alien pre-scheduled a time and place to present at a port of entry through a DHS scheduling system, including through the CBP One app.

67.     Defendants lack statutory authority to confer the legal benefit of being exempt from the Rule's presumption of ineligibility for asylum on aliens who do not have documents sufficient for lawful entry on the basis that they pre-scheduled a time and place to present a port of entry, including through the CBP One app.

68.     Moreover, the government's policy of releasing on parole nearly 96% of otherwise inadmissible aliens who use the CBP One app is contrary to the requirements of the parole statute, 8 U.S.C. § 1182(d)(5)(A), and the mandatory detention provisions in 8 U.S.C. § 1225(b)(1)–(2).

69.     By paroling *en masse* aliens who pre-schedule their arrival at a port of entry, including through the CBP One app, Defendants are giving these aliens access to a legal process they would not otherwise have but for their use of the DHS scheduling system (CBP One).

70.     The government cannot parole aliens *en masse*. The practice of paroling *en masse* aliens who use the CBP One app is not a valid exercise of the government's § 1182 power, and it violates the mandatory detention provisions in § 1225.

71.     Defendants have "gone beyond what Congress has permitted [them] to do." *City of Arlington v. FCC*, 569 U.S. 290, 298 (2013). They have no "power to act unless and until Congress" gives it to them. *Nat. Res. Def. Council v. Nat'l Highway Traffic Safety Admin.*, 894 F.3d 95, 112 (2d Cir. 2018). They are equally powerless to disregard express statutory commands. *League of Women Voters v. Newby*, 838 F.3d 1, 9–12 (D.C. Cir. 2016).

72.     Accordingly, Defendants have exceeded their authority by promulgating the Final Rule.

## COUNT 2
## The Final Rule's Exception is Arbitrary and Capricious
### (5 U.S.C. § 706(2)(A))

73.     "Federal administrative agencies are required to engage in reasoned decisionmaking." *Michigan v. EPA*, 576 U.S. 743, 750 (2015) (internal quotation marks omitted). "Not only must an agency's decreed result be within the scope of its lawful authority, but the process by which it reaches that result must logical and rational." *Id.*

74.     Although agencies are entitled to deference, "the arbitrary and capricious standard of review . . . is by no means a rubber stamp." *Texas v. United States*, 524 F. Supp. 3d 598, 653 (S.D. Tex. 2021) (quoting *United States v. Garner*, 767 F.2d 104, 116 (5th Cir. 1985)).

75.     The Final Rule is arbitrary and capricious for multiple reasons.

76.     First, while the Final Rule purports to reduce illegal immigration, the Final Rule is rife with concessions that this rule will operate to increase the number of illegal aliens processed at the border. *E.g.*, 88 Fed. Reg. 31,326 & 31,396 ("CBP intends to increase the number of available appointments in the CBP One app and is committed to processing as many noncitizens as is operationally feasible.").

77.     Second, the Final Rule fails to consider the effects of this rule on Texas. While the rule says the "Departments expect that this rule will result in decreased strain on border states, local communities, and NGOs," the Rule cites no data supporting this assertion and includes no analysis of costs to Texas as a result of this Final Rule—even though Texas is home to 5 of the 8 ports of entry at which aliens can pre-schedule an appointment. 88 Fed. Reg. 31,325. The Rule ignores costs to Texas and asserts that "[t]he direct costs of the rule are borne by migrants and the Departments." 88 Fed. Reg. 31,447.

78.     States "bear[] many of the consequences of unlawful immigration," and "[t]he problems posed to the State by illegal immigration must not be underestimated." *Arizona v. United States*, 567 U.S. 387, 397, 398 (2012).

79.     Defendants have a "clear and obvious responsibility to consider . . . Texas's expenses and costs," *Texas*, 524 F. Supp. at 655, and they failed to do so.

80.     Defendants' failure to consider this factor is independently sufficient to set aside the Final Rule. *See, e.g.*, *Regents of the Univ. of Cal.*, 140 S. Ct. at 1913.

81.     Courts "must set aside agency action where there are shortcomings in the agency's explanations." *Alliance for Hippocratic Medicine v. FDA*, 78 F.4th 210, 245 (5th Cir. 2023) (internal quotation marks omitted).

82.     For this additional reason, the Final Rule does not "rest[] on a consideration of the relevant factors." *Michigan*, 576 U.S. at 750 (internal quotation marks omitted). Because the Final Rule reflects no consideration of the costs to Texas as a result of excepting aliens who pre-schedule their arrival at a port of entry from the presumption against eligibility for asylum, it is arbitrary and capricious.

83.     But even if the Administration had considered Texas's costs as well—and it did not—it failed to consider whether it could achieve its goals through a less-burdensome or less-sweeping means. This too renders its resulting decision arbitrary and capricious.

84.     The Rule's intent to "decrease irregular migration" by putting a "condition on asylum eligibility" is arbitrary and capricious because nothing in the Rule requires aliens who benefit from the Rule to demonstrate any previous intention to have crossed the border between ports of entry or without authorization. 88 Fed. Reg. 31,331; 88 Fed. Reg. 31,344.

85.     The Rule is arbitrary and capricious because it conveys a benefit on aliens without documents sufficient for admission who pre-schedule their entry at a United States port of entry through a DHS scheduling system, including the CBP One app. 88 Fed. Reg. 31,340.

86.     By paroling *en masse* aliens who pre-schedule their arrival at a port of entry, including through the CBP One app, Defendants are giving these aliens access to a legal process they would not otherwise have but for their use of the DHS scheduling system (CBP One). For these reasons, the Final Rule is arbitrary and capricious should be set aside.

## COUNT 3
### Defendants' Use and Implementation
### of the "DHS Scheduling System" is *ultra vires*.

87.     In this Count, Texas asserts both a common law *ultra vires* claim and an *ultra vires* claim under 5 U.S.C. § 702. *See Apter v. Dep't of Health & Human Servs.*, 80 F.4th 579 (5th Cir. 2023).

88.     "[A]n agency literally has no power to act . . . unless and until Congress confers power upon it." *La. Pub. Serv. Comm'n v. F.C.C.*, 476 U.S. 355, 374 (1986).

89.     An agency acts unlawfully when it exercises power beyond the bounds of its statutory authority. *See, e.g.*, *SAS Inst., Inc. v Iancu*, 584 U.S. --, 138 S. Ct. 1348, 1359 (2018).

90.     The Rule excepts from the presumption of ineligibility for asylum aliens who pre-schedule a time and place to present at a port of entry through "the DHS scheduling system," which is currently the CBP One app. 88 Fed. Reg. 31,317; 88 Fed. Reg. 31,450.

91.     While the Rule posits that it "does not provide for, prohibit, or otherwise set any policy regarding DHS's discretionary authority to make parole determinations for those who use the CBP One app," 88 Fed. Reg. 31,331, this statement is belied by data released by DHS and the

House.

92.     According to information received from DHS by the House Committee on Homeland Security, between January 12, 2023, and September 30, 2023, 95.8% of all inadmissible aliens who scheduled appointments through the CBP One app were ultimately issued a "Notice to Appear" and released into the United States on parole.[24]

93.     That nearly 96% of aliens who use the CBP One app are paroled into the country indicates Defendants are not conducting a "case-by-case" evaluation of whether an alien qualifies for parole, contrary to statutory authority.

94.     Defendants are granting parole *en masse* to aliens who use the CBP One app, in violation of the INA. 8 U.S.C. § 1182(d)(5)(A).

95.     A release for anything other than "urgent humanitarian reasons" or "significant public benefit"—that is, something more than a mere preference not to detain—is an illegal use of the parole authority under the INA. Absent a proper invocation of 8 U.S.C. § 1182, which must be done on a case-by-case basis, any premature release of an alien claiming asylum is illegal under section 1225.

96.     Defendants may only act pursuant to express statutory authority.

97.     Defendants do not have statutory authority to operate a mass parole program.

98.     On information and belief, when an alien uses the CBP One app "to schedule a time and place to present at a [Southwest Border] [port of entry]," Defendants presume the alien satisfies the criteria necessary to be paroled into the United States.

---

[24] *New Documents Obtained by Homeland Majority Detail Shocking Abuse of CBP One App*, U.S. House of Representatives, https://homeland.house.gov/2023/10/23/new-documents-obtained-by-homeland-majority-detail-shocking-abuse-of-cbp-one-app/ (Oct. 23, 2023).

99.     Defendants do not have statutory authority to presume aliens who use the CBP One app to schedule a time and place to present at the border satisfy the criteria for parole.

100.    Nor does the Final Rule authorize Defendants to presume aliens who use the CBP One app to schedule a time and place to present at the border satisfy the criteria for parole.

101.    On information and belief, when an alien uses the CBP One app "to schedule a time and place to present at a [Southwest Border] [port of entry]," the alien is presumed to satisfy the criteria necessary to be granted asylum or other form of protection from removal.

102.    Defendants are using the CBP One app, whose expanded use is memorialized in the Rule, to incentivize otherwise inadmissible aliens to schedule appointments to enter at a port of entry, regardless of whether they ever intended to enter the United States illegally or have a legitimate asylum claim or satisfy the criteria for parole.

103.    The major questions doctrine applies. The exception from the presumption of asylum ineligibility for aliens who use the "DHS Scheduling System," including the CBP One app, and paroling these aliens *en masse*, presents an issue of vast economic and political significance.

### DECLARATORY JUDGMENT

The Declaratory Judgment Act authorizes federal courts to declare the rights of litigants. 28 U.S.C. § 2201. The issuance of a declaratory judgment can serve as the basis for an injunction to give effect to the declaratory judgment. *Steffel v. Thompson*, 415 U.S. 452, 461 n.11 (1974).

### V.     CONCLUSION

For the reasons described above, the State of Texas is entitled to a declaration that Defendants are violating the law and the Final Rule's exception from the presumption of ineligibility for asylum for aliens who pre-schedule a time and place to present at a port of entry is

unlawful, unconstitutional, and unenforceable, and Defendants' expanded use and implementation of the CBP One App is unlawful, unconstitutional, and unenforceable.

## VI.    DEMAND FOR RELIEF

The State of Texas respectfully requests that the Court:

a.   Hold unlawful and set aside (*i.e.,* vacate) the Final Rule's exception from the presumption of ineligibility for asylum aliens who pre-schedule a time and place to present a port of entry using a DHS scheduling system, including the CBP One app;

b.   Declare Defendants' actions unlawful;

c.   Issue a permanent injunction prohibiting Defendants from implementing the Final Rule's exception from the presumption of ineligibility for asylum aliens who pre-schedule a time and place to present at a port of entry using a DHS scheduling system, including the CBP One app;

d.   Issue a permanent injunction prohibiting Defendants from paroling aliens who pre-schedule a time and place to present at a port of entry using a DHS scheduling system, including the CBP One app in excess of statutory authority;

e.   Award the State of Texas costs and reasonable attorneys' fees;

f.   Award such other relief as the Court deems equitable and just.

Dated Nov. 10, 2023.                    Respectfully submitted.

**KEN PAXTON**                          **RYAN D. WALTERS**
Attorney General of Texas               Chief, Special Litigation Division

**BRENT WEBSTER**
First Assistant Attorney General

                                        _/s/ Amy Snow Hilton_
**GRANT DORFMAN**                       **AMY SNOW HILTON**
Deputy First Assistant Attorney General Special Counsel
                                        Texas Bar No. 24097834
**RALPH MOLINA**                        Amy.Hilton@oag.texas.gov
Deputy Attorney General for Legal Strategy   **COUNSEL FOR THE STATE OF TEXAS**

Office of the Attorney General of Texas
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
(512) 463-2100

_Texas's First Amended Complaint_                                              26