UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
DEL RIO DIVISION

| | |
|---|---|
| STATE OF TEXAS<br>　　　*Plaintiff,*<br><br>v.<br><br>ALEJANDRO MAYORKAS, in his official capacity as Secretary of Department of Homeland Security; UNITED STATES DEPARTMENT OF HOMELAND SECURITY; MERRICK GARLAND, in his official capacity as Attorney General of the United States, UNITED STATES DEPARTMENT OF JUSTICE,<br>　　　*Defendants.* | No. 2:23-CV-00024 |

## RESPONSE TO DEFENDANTS' MOTION TO DISMISS

In defending the legality of the Final Rule and its implementation, Defendants invoke the "parole" authority under 8 U.S.C. § 1182(d)(5)(A) of the Immigration and Nationality Act (INA). *See, e.g.*, Dkt. 34 at 3. But that statute only permits the federal government to parole aliens without a legal right to be in the United States "on a case-by-case basis for urgent humanitarian reasons or significant public benefit." 8 U.S.C. § 1182(d)(5)(A). Defendants are abusing this parole authority by paroling virtually everyone who uses the CBP One app, in contravention of Congress's directive.

Defendants' authority is not unbounded. Congress limited the parole power to prohibit the federal government from "admit[ting] entire categories of aliens who do not qualify for admission under any other category in immigration law." H.R. Rep. No. 104–469, at 140 (1996). It is not to be used "as a supplement to Congressionally-established immigration policy." *Id.* Texas has alleged facts sufficient to reasonably infer that Defendants are acting in excess of their statutory authority and in violation of the Administrative Procedure Act (APA), and Defendants' Motion to Dismiss should be denied.

## I.    STANDARD OF REVIEW

When reviewing a motion to dismiss under Rule 12(b)(1), a court need only "look to the sufficiency of the allegations in the complaint because they are presumed to be true. If those jurisdictional allegations are sufficient the complaint stands." *Paterson v. Weinberger*, 644 F.2d 521, 523 (5th Cir. 1981). "For standing purposes, [the court must] accept as valid the merits of [plaintiff's] legal claims." *Fed. Election Comm'n v. Cruz*, 142 S. Ct. 1638, 1647 (2022). "A motion under 12(b)(1) should be granted only if it appears certain that the plaintiff cannot prove *any* set of facts in support of his claim that would entitle him to relief." *Home Builders Ass'n of Miss., Inc. v. City of Madison, Miss.*, 143 F.3d 1006, 1010 (5th Cir. 1998) (emphasis added).

When considering a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a court must accept "all well-pleaded facts as true" and view "those facts in the light most favorable to the plaintiff." *See True v. Robles*, 571 F.3d 412, 417 (5th Cir. 2009). To survive a 12(b)(6) motion, a complaint need only "contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 663, 678 (2009) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 at 570). This standard is met where "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the Defendant is liable for the misconduct alleged." *Id.* at 678 (citing *Twombly*, 550 U.S. at 556).

"A motion to dismiss under 12(b)(6) 'is viewed with disfavor and is rarely granted.'" *Hernandez v. Baylor Univ.*, 274 F. Supp. 3d 602, 609 (W.D. Tex. 2017) (citing *Turner v. Pleasant*, 663 F.3d 770, 775 (5th Cir. 2011); *see also, e.g.*, *Lormand v. U.S. Unwired, Inc.*, 565 F.3d 228, 232 (5th Cir. 2009). "To survive a Rule 12(b)(6) motion to dismiss, a complaint 'does not need detailed factual allegations,' but must provide the plaintiff's grounds for entitlement to relief—including factual allegations that when assumed to be true 'raise a right to relief above the speculative level.'" *Cavillier v. Taylor*, 503 F.3d 397, 401 (5th Cir. 2007) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)). As the Supreme

Court explained in *Ashcroft v. Iqbal*, "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." 556 U.S. 662, 679 (2009). Significantly, a court should not evaluate the merits of the allegations, but it must satisfy itself only that a plaintiff adequately pleads a legally cognizable claim. *United States ex rel. Riley v. St. Luke's Episcopal Hosp.*, 355 F.3d 370, 376 (5th Cir. 2004). Texas's pleadings in this case easily survive Defendants' challenge.

## II.    ARGUMENT

### A.  Texas has standing.

Standing requires a plaintiff to "prove that he has suffered a concrete and particularized [injury in fact] that is fairly traceable to the challenged conduct[] and is likely to be redressed by a favorable judicial decision." *Hollingsworth v. Perry*, 570 U.S. 693, 704 (2013) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)). At the motion to dismiss stage, a plaintiff need only "allege facts that give rise to a plausible claim of standing." *Barilla v. City of Houston, Texas*, 13 F.4th 427, 431 (5th Cir. 2009)). "At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we 'presum[e] that general allegations embrace those specific facts that are necessary to support the claim.'" *Lujan*, 504 U.S. at 561 (quoting *Lujan v. National Wildlife Federation*, 497 U.S. 871, 889 (1990)). If the plaintiff is "an object of the action" challenged, there is ordinarily little question that the action [] caused him injury, and that a judgment preventing [] the action will redress it." *Id.* at 561–62. Texas clearly alleges facts demonstrating each element of Article III standing. *See Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). To survive a motion to dismiss an *ultra vires* claim, Texas need only identify some agency action that adversely affects the State. *See, e.g.*, *Apter v. Dep't of Health & Hum. Servs.*, 80 F.4th 579, 589 (5th Cir. 2023) (reversing and remanding the district court's granting of a motion to dismiss when plaintiff alleged sufficient facts demonstrating that some agency action was without statutory authority).

1.    **Texas suffers significant cognizable injuries.**

To start, the Final Rule satisfies the first prong of standing and imposes judicially cognizable injuries on Texas because it incentivizes and increases immigration to ports of entry in Texas, thereby imposing costs for health care, education, and law enforcement. Such a "pocketbook injury" is "a prototypical form of injury in fact," *Collins v. Yellen*, 141 S. Ct. 1761, 1779 (2021), and it does not have to be large because, "[f]or standing purposes, a loss of even a small amount of money is ordinarily an 'injury.'" *Czyzewski v. Jevic Holding Corp.*, 580 U.S. 451, 465 (2017). "Texas incurs costs from increased illegal immigration into the State in three areas: health care, education, and law enforcement." *Texas v. Garland*, No. 5:23-CV-034-H, 2024 WL 967838, at *11 (N.D. Tex. Feb. 27, 2024). And under the Fifth Circuit's precedents in particular, "such financial harms are readily cognizable and well-established." *Gen. Land Off. v. Biden*, 71 F.4th 264, 272 (5th Cir. 2023); *see also, e.g.*, *Texas v. Biden (MPP I)*, 10 F.4th 538, 547–48 (5th Cir. 2021); *Texas v. Biden (MPP II)*, 20 F.4th 928, 969–72 (5th Cir. 2021); *Texas v. United States (DACA)*, 50 F.4th 498, 517–19 (5th Cir. 2022).

*First*, consider Texas's healthcare costs. Texas roughly spent $72.2 million in 2022 to provide Emergency Medicaid coverage to illegal aliens, and it roughly spent $30.9 million in 2022 to provide Texas Children's Health Insurance Program (CHIP) Perinatal Coverage to such aliens. *Texas v. Garland*, No. 5:23-CV-034-H, 2024 WL 967838, at *11 (N.D. Tex. Feb. 27, 2024). Because "[f]ederal law requires all States to provide Emergency Medicaid coverage to aliens, which is jointly funded by the federal government and the States," "Texas is legally obligated to bear part of the cost of those services" "when qualifying aliens obtain health care services in Texas [that are] covered by Emergency Medicaid." *Id.* (citing 8 U.S.C. § 1611(b)(1)(A)). Both Medicare and Medicaid also require the provision of emergency services as a condition of participation, regardless of a recipient's lawful-presence status. *See* 42 U.S.C. § 1395dd; 42 C.F.R. § 440.255. Similarly, Texas law requires local governments to provide healthcare for the indigent, *see* Tex.

Health & Safety Code §§ 61.001 *et seq.*, and it requires nonprofit hospitals to provide unreimbursed care for the indigent as a condition of maintaining their nonprofit status. *See id.* § 311.043. Therefore, these healthcare costs are not merely speculative; they are mandatory.

*Second*, consider Texas's education costs. Texas spends millions of dollars per year on educating illegal aliens and their children. According to estimates from the Texas Education Agency, "the average funding entitlement from state and local sources for fiscal year 2023 will be $9,564 per student in attendance for an entire school year," and "[t]o provide additional bilingual education, which Texas does for most alien children, Texas must spend $11,781 to educate each student." *Texas v. Garland*, 2024 WL 967838, at *11. Importantly, "Texas's education costs rise with an increase in alien children," and historically, Texas has "encountered a sizeable number of such alien children in its schools." *Id.* Indeed, "from October 2021 to September 2022, 19,071 alien children were released to sponsors in Texas," and "Texas spent $224.67 million to educate those newly arriving children for one year." *Id.* "Such costs from these children continue so long as they are enrolled in Texas schools," *id.*, and like healthcare costs, these education costs are unavoidable because the Supreme Court has held that States like Texas are constitutionally obligated to provide free education to children of unlawfully present aliens, *Plyler v. Doe*, 457 U.S. 202 (1982).

*Third*, consider Texas's law enforcement costs. The Texas Department of Criminal Justice ("TDCJ") spends a daily amount of $77.49 systemwide for an individual inmate. *Texas v. Garland*, 2024 WL 967838, at *11. And "[t]he TDCJ held 6,914 undocumented criminal aliens with at least one felony or two misdemeanor convictions for violations of state or local law for a total of 2,019,635 days of incarceration for these aliens" for fiscal year 2022. *Id.* And "[b]ased on the number of aliens and the number of days each was held, TDCJ spent $156,501,516 incarcerating these aliens." *Id.* What's more, "reimbursement of these costs from the federal government is minimal." *Id.* In fact, "[f]or fiscal year 2021,

TDCJ spent $153,786,422 in incarceration costs for criminal aliens but received only $14,883,040 in federal reimbursement." *Id.* And on top of these incarceration costs, Texas incurs costs of approximately $4.69 a day for those criminal aliens released on parole or mandatory supervision. *Id.* Thus, it is undisputed that "Texas incurs costs from incarcerating [aliens]," and "to the extent the number of aliens in TDCJ custody increases, TDCJ's unreimbursed expenses will increase as well." *Id.*

Defendants rely on *United States v. Texas (Enforcement Priorities)*, 599 U.S. 670 (2023), to argue that Texas's injuries are "too speculative" and "historically and categorically not cognizable injuries for the purposes of Article III standing" because they only amount to "indirect financial harm allegedly resulting from immigration enforcement policy." Dkt. 34 at 10. According to Defendants, *Enforcement Priorities* "stands for the principle that third parties like Texas lack a judicially cognizable interest in whether or how the Executive exercises its immigration enforcement discretion against someone else." *Id.* at 11.

But Defendants' arguments are mistaken and misplaced. To start, *Enforcement Priorities* addressed Texas's and Louisiana's challenge to the Department of Homeland Security's guidelines, which stated that DHS would not arrest certain criminal aliens whom Congress provided "shall" be arrested. *Enforcement Priorities*, 599 U.S. at 674. In reaching its holding, the majority in *Enforcement Priorities* emphasized that "[t]he discrete standing question raised by this case rarely arises because federal statutes that purport to *require* the Executive Branch to make arrests or bring prosecutions are rare." *Id.* at 684. And because that case "involve[d] both a highly unusual provision of federal law and a highly unusual lawsuit," it "should in no way be read to suggest or imply that the Executive possesses some freestanding or general constitutional authority to disregard statutes requiring or prohibiting executive action." *Id. Enforcement Priorities* was thus "categorically different" from other standing decisions "because it implicate[d] only one discrete aspect of the executive power—namely, the Executive Branch's traditional discretion over whether to

take enforcement actions against violators of federal law." *Id.* Indeed, the majority described the case as an "extraordinarily unusual lawsuit" because the States "want[ed] a federal court to order the Executive Branch to alter its arrest policies so as to make more arrests." *Id.* at 686. Put simply, that case concerned "*only* arrest and prosecution policies, and [the majority] therefore address[ed] *only* that issue." *Id.* at 683 n.5 (emphases added).

Unlike *Enforcement Priorities*, however, Texas's claims here do not involve any attempt to compel the arrest or prosecution of anyone, and they do not amount to an "extraordinarily unusual lawsuit" that seeks to alter any arrest policy. Texas is not challenging any individual parole evaluations that take place on a case-by-case basis. Rather, Texas's claims seek to prevent the Final Rule from categorically granting parole and affirmative immigration relief to aliens simply because they pre-scheduled an appointment through the CBP One app. Even under *Enforcement Priorities*, "[m]onetary costs are of course an injury." *Id.* at 676. *Enforcement Priorities* thus does not undermine standing here because Texas's injuries are judicially cognizable.

### 2. Texas's injuries are fairly traceable to the Final Rule.

In addition to satisfying the injury-in-fact prong of standing, Texas has met the second prong because its injuries are fairly traceable to the Final Rule and the Defendant's implementation and enforcement of the Final Rule. In general, satisfying the traceability element of standing requires "no more than *de facto* causality." *Dep't of Commerce v. New York*, 139 S.Ct. 2551, 2566 (2019) (quoting *Block v. Meese*, 793 F.2d 1303, 1309 (D.C. Cir. 1986) (Scalia, J.)). And "where a causal relation between injury and the challenged action depends on the decision of an independent third party," the plaintiff must show that such third parties "will likely react in predictable ways." *California v. Texas*, 593 U.S. 659, 675 (2021). But traceability does not require Texas to demonstrate that the Defendants' actions are "the very last step in the chain of causation." *Bennett v. Spear*, 520 U.S. 154, 169–170 (1997). Indeed, Texas need only show that the Final Rule "exacerbate[s]" or "contribute[s]" to its injuries. *See DACA*, 50 F.4th at 519; *see also Massachusetts v. EPA*,

549 U.S. 497, 523 (2007) (determining that it was enough that the EPA's decision "contribute[d] to Massachusetts' injuries").

Here, Texas has more than met that standard. For starters, Texas has demonstrated that the Final Rule's CBP One provision leads to increased immigration in Texas. Specifically, because the Final Rule exempts aliens who use the CBP One app from the presumption of ineligibility for asylum, Circumvention of Lawful Pathways, 88 Fed. Reg. 31,314, 31,317–18, 31,322, (May 16, 2023), it is a mechanism Defendants use to release overwhelming numbers of aliens into the country on parole—particularly, in Texas.[1]

The CBP One app has already facilitated the entry of hundreds of thousands of aliens. Three months ago, "nearly 450,000 migrants have been allowed into the U.S. under the [CBP One app] process."[2] Contrary to Defendants' contention that the Final Rule and its use of the CBP One app are "meant to curtail illegal immigration," it "has resulted in more than a quarter of a million immigrants being released into the United States, according to new federal data."[3] That is because "[t]he Department of Homeland Security's Customs and Border Protection agency granted admission to immigrants who were not

---

[1]    *See* Sophie Carson, *What's going on at the US-Mexico border, and what are asylum and parole?*, Austin American-Statesman (Feb. 19, 2024, 5:01 AM CST), https://www.statesman.com/story/news/politics/politifact/2024/02/19/whats-going-on-at-the-us-mexico-border-and-what-are-asylum-and-parole/72642022007/ (stating that "migrants who make appointments through the CBP One phone app and are processed at official ports of entry" are "being admitted into the U.S. through the parole authority"); *CBP One Mobile Application*, U.S. Customs & Border Protection, https://www.cbp.gov/about/mobile-apps-directory/cbpone (stating that five of the eight ports of entry that the CBP One app uses are located in Texas).

[2]    *See* Camilo Montoya-Galvez, *Migrants in Mexico have used CBP One app 64 million times to request entry into U.S.*, CBS News (Feb. 12, 2024, 5:36 PM EST), https://www.cbsnews.com/news/immigration-cbp-one-app-migrants-mexico-64-million/; *see also id.* ("As of Feb. 8, U.S. officials at ports of entry along the southern border had allowed 448,701 migrants with CBP One appointments to enter the country, giving them notices to appear in immigration court to plead their cases, according to the internal government documents.").

[3]    Anna Giaritelli, *Biden's CBP One app allowed 266,000 immigrants into US through 'smokescreen' process*, The Washington Examiner (Oct. 24, 2023, 9:14 PM), https://www.washingtonexaminer.com/news/2443241/bidens-cbp-one-app-allowed-266000-immigrants-into-us-through-smokescreen-process/.

refugees in 95% of cases."[4]

Moreover, documents from DHS "show 278,431 appointments scheduled through the CBP One app between Jan. 12, 2023, and Sept. 30, 2023, with 266,846 inadmissible aliens released into the interior," and "Russian and Venezuelan nationals who made appointments . . . were released on parole at a rate of 94 percent 97 percent respectively."[5] And data as recent as March 2024 shows that "[a]nother 50,000 migrants were processed at ports of entry, where the Biden administration is admitting those who use a government mobile app to secure an appointment to enter the U.S."[6]

The Final Rule and its use of the CBP One app are operating as "a smokescreen for the mass release of individuals into this country who would otherwise have zero claim to be admitted."[7] And this increased immigration resulting from the CBP One app's categorical grant of parole is especially harmful to Texas because five of the eight ports of entry from which aliens may enter under the CBP One app are located in Texas.[8] Because it is undisputed that "[a]n increased number of illegal aliens in Texas that use its social services leads to increased State costs," *Texas v. Garland*, No. 5:23-CV-034-H, 2024 WL 967838, at *10–11 (N.D. Tex. Feb. 27, 2024), Texas has completed the causal chain by alleging facts sufficient to allow the reasonable inference that the Final Rule and its implementation leads to increased immigration—and thereby, increased costs—for Texas.

---

[4]  *Id.*

[5]  *What They are Saying on Shocking New CBP One App Documents Obtained by Homeland Republicans Showing Mayorkas' "Smokescreen for the Mass Release of Individuals"*, Committee on Homeland Security (Oct. 25, 2023), https://homeland.house.gov/2023/10/25/what-they-are-saying-on-shocking-new-cbp-one-app-documents-obtained-by-homeland-republicans-showing-mayorkas-smokescreen-for-the-mass-release-of-individuals/.

[6]  Camilo Montoya-Galvez, *Migrant crossings along the southern border increase as officials prepare for larger spike*, CBS News (Mar. 5, 2024, 3:18 PM EST), https://www.cbsnews.com/news/us-mexico-border-migrant-crossings-increase-texas-spring-spike/.

[7]  *New Documents Obtained by Homeland Majority Detail Shocking Abuse of CBP One App*, Committee on Homeland Security (Oct. 23, 2023), https://homeland.house.gov/2023/10/23/new-documents-obtained-by-homeland-majority-detail-shocking-abuse-of-cbp-one-app/.

[8]  *CBP One Mobile Application*, U.S. Customs & Border Protection, https://www.cbp.gov/about/mobile-apps-directory/cbpone.

In response, Defendants cite *California v. Texas*, 593 U.S. 659 (2021) for the proposition that Texas's claimed harms are not fairly traceable to the Final Rule because Texas cannot "rely on generalized allegations about the economic effects of immigration . . . to particular noncitizens who are granted parole after their arrival at a POE with a CBP One appointment." Dkt. 34 at 13–14.

But Defendants' arguments misconstrue Texas's claims and misunderstand the law. Texas's claims do not hinge on "particular noncitizens who are granted parole;" they are based on Defendants' capacious grant of parole through the Final Rule's appointment exception. Texas need not identify each "particular noncitizen[] who [was] granted parole after their arrival at a POE with a CBP One appointment." Dkt. 34 at 14. "Texas's standing [can be] robustly supported by . . . big-picture evidence" because the Final Rule's CBP One provision "is precisely the sort of large-scale policy that's amenable to challenge using large-scale statistics and figures, rather than highly specific individualized documents." *Texas (MPP II)*, 20 F. 4th at 971. Texas "can show standing even if there is *some possibility* that any given person would inflict such costs even without the challenged action." *Texas v. Garland*, No. 5:23-CV-034-H, 2024 WL 967838, at *23 (N.D. Tex. Feb. 27, 2024) (emphasis added).

Even so, "[a]t the pleading stage, *general* factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presum[e] that general allegations embrace those specific facts that are necessary to support the claim." *Lujan*, 504 U.S. at 561 (emphasis added) (alterations in original) (internal quotations omitted). What's more, Defendants' argument amounts to a factual merits attack that the Fifth Circuit has previously rejected. *See, e.g.*, *Gen. Land Off.*, 71 F.4th at 272–73 (explaining that Defendants' argument that Texas's alleged failure to show a net increase in the number of illegal aliens who enter the United States "raises a factual merits defense, not a response cognizable on a motion to dismiss where allegations in Texas's complaint must be taken as true").

In sum, Defendants' contentions are simply insufficient to avoid discovery in this case. The causal chain supporting Texas's standing here is much more direct than the one the Supreme Court accepted in *Massachusetts v. EPA. See Massachusetts v. EPA*, 549 U.S. 497, 521–23 (2007) (holding that traceability was satisfied because EPA's refusal to regulate contributed to motor-vehicle emissions, which may in turn contribute to a rise in sea levels, which may in turn erode state coastal property). Moreover, it is of "considerable relevance that the party seeking review here is a sovereign State," because states are not "normal litigants for the purposes of invoking federal jurisdiction." *Id.* at 518, 526. States should be given "special solicitude" in the standing analysis where, as here, the State seeks to obtain judicial recourse for illegal agency action under the APA.

### 3. Texas's injuries are redressable by this Court.

Texas has further established the final redressability prong of standing because it has shown that an order from this Court that vacates, enjoins, and declares the Final Rule's exception unlawful would decrease the costs Texas must pay for the resulting increased illegal immigration. Generally, for the redressability prong of standing, a plaintiff must show that "it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000). "The relief sought needn't completely cure the injury, however; it's enough if the desired relief would lessen it." *Inclusive Communities Project, Inc. v. Dep't of Treasury*, 946 F.3d 649, 655 (5th Cir. 2019) (citing *Sanchez v. R.G.L.*, 761 F.3d 495, 506 (5th Cir. 2014)).

Here, Texas's injuries are redressable because an order from this Court that grants Texas its requested relief would at least reduce the additional costs it must pay for the increased unlawful immigration incentivized by and resulting from the Final Rule's CBP One exception. Should this Court enjoin and vacate the Final Rule's CBP One provision and declare it unlawful, aliens who use the CBP One app would no longer be presumed eligible for asylum but would instead be presumed *in*eligible—as the INA contemplates for

all aliens. *See* 88 Fed. Reg. 31,314, 31,317–18, 31,322. Likewise, such an order from this Court would remove or reduce the actual impact and harmful effects caused by the CBP One provision of the Final Rule because aliens who use the CBP One app would no longer receive the legal benefit of parole that is provided to virtually every alien that pre-schedules an appointment through the app. And by reducing the number of aliens granted parole— and consequently, the number the aliens using Texas's social services—Texas would not be obligated to spend as much money on healthcare, public education, or law enforcement. Thus, Texas's injuries would be lessened and redressable by this Court.

Defendants, of course, disagree and maintain that Texas's injuries are not redressable because "[r]elief against the Rule either would do nothing to alleviate the claim harms stemming from the parole of noncitizens or is unavailable under the INA." Dkt. 34 at 14. Specifically, Defendants allege that "[e]njoining, vacating, or declaring unlawful the appointment exception would not restrain the use of appointments or the exercise of parole authority" because (1) "CBP One and the ability to pre-schedule arrival at a POE were not created by the Rule and exist independently of it," and (2) "removing the appointment exception would have no impact on the availability of parole under 8 U.S.C. § 1182(d)(5)(A)." Dkt. 34 at 15. Defendants also argue that an injunction and a vacatur "would not prevent immigration officers from exercising discretion to grant parole, if appropriate on a case-by-case basis, to noncitizens who are subject to the presumption of asylum ineligibility." Dkt. 34 at 15. In sum, Defendants argue that Texas's requested relief "would at most remove the incentive to use orderly methods of entry and would more likely contribute to the very harms that Plaintiff purportedly seeks to prevent, by taking away the Executive's carefully calibrated tool to reduce irregular migration." Dkt. 34 at 15 (emphasis omitted).

But Defendants' arguments fail for a few reasons. *First*, while Texas agrees that the Final Rule did not create CBP One and the ability to pre-schedule arrival at a lawful port of entry, Texas is not merely challenging the use of the CBP One app alone or the ability to

pre-schedule an appointment at a lawful port of entry. Instead, Texas is challenging the special treatment that the Final Rule grants to aliens who utilize those two mechanisms. Texas specifically challenges the Final Rule's *exception* to the presumption of ineligibility for asylum because *that* is the unlawful portion of the Final Rule that imposes significant harms on Texas by releasing hundreds of thousands of aliens into Texas's borders, and *that* is the portion that Defendants use to grant affirmative immigration relief to aliens.

*Second*, while the INA allows for parole, it is available "*only* on a case-by-case basis" and *only* "for urgent humanitarian reasons or significant public benefit." 8 U.S.C. § 1182(d)(5)(A) (emphasis added). Texas is *not* challenging the fact that the Defendants may grant parole "on a case-by-case basis;" Texas is challenging the Defendants' authority to grant parole on a *categorical* basis in violation of the INA and the APA. And because Texas challenges the programmatic and categorical granting of this affirmative immigration relief at a rate of 96% rather than the individual "case-by-case" determinations, Defendants' contention is unpersuasive.

*Third*, and finally, while Defendants maintain that Texas's tailored relief would "remove the incentive to use orderly methods of entry," Dkt. 34 at 15, the primary "incentive" under the Final Rule is its imposition of "a rebuttable presumption of ineligibility for asylum upon certain noncitizens who enter the United States from Mexico at the southwest land border or adjacent coastal borders without documents sufficient for lawful admission," *see* 88 Fed. Reg. 31,314, 31,317–18, 31,322. But Texas is not challenging that statutorily imposed incentive. Indeed, Texas is not challenging this rebuttable presumption *at all*; Texas is instead challenging an unlawfully created *exception* to this presumption that, in practice, categorically grants a legal benefit in the form of parole to hundreds of thousands of aliens that would otherwise not have received such affirmative immigration relief. Defendants' arguments confuse the issues, misunderstand Texas's claims, and distract from what really is at issue here.

**B.  No statute precludes Texas's requested relief.**

In another attempt to avoid this Court's review of their unlawful actions, Defendants argue that (1) an injunction or vacatur of the appointment exception is precluded under the INA; (2) the APA does not permit universal vacatur of the Final Rule or portions of it; and (3) Texas's requested injunction against the categorical banning of parole is prohibited under the INA. *See* Dkt. 34 at 15–18. Defendants are wrong on all counts.

**1.  Section 1252(f)(1) of the INA does not preclude Texas's requested relief.**

In the teeth of Fifth Circuit precedent, Defendants maintain that 8 U.S.C. § 1252(f)(1) bars both vacatur and the injunctive relief sought here.[9] *See* Dkt. 34 at 15–17. They are wrong as to both vacatur and injunctive relief. Section 1252(f)(1) states:

> In general, regardless of the nature of the action or claim or of the identity of the party or parties bringing the action, no court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation of the provisions of [8 U.S.C. §§ 1221–32], other than with respect to the application of such provisions to an individual alien against whom proceedings under such part have been initiated.

By looking at the text of section 1252(f)(1) and the case law, it is clear that Texas's requested vacatur and requested injunctive relief are not precluded. *First*, contrary to Defendants' allegations, section 1252(f)(1) does not bar vacatur in this case. Section 1252(f)(1)'s "[l]imit on injunctive relief" provides that "no court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation of" sections 1221–1232 of Title 8. 8 U.S.C. § 1252(f)(1). "By its plain terms, and even by its title," section 1252(f)(1) "is nothing more or less than a limit on injunctive relief." *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 481 (1999).

The Fifth Circuit has repeatedly held that vacatur is not precluded by Section 1252(f)(1) *See DACA*, 50 F.4th at 528 ("As an initial matter, § 1252(f)(1) does not apply to

---

[9]    Defendants fail to make any claim or allegation that declaratory relief is barred by this provision. Defendants thus waive any such argument.

vacatur."); *Texas v. United States*, 40 F.4th 205, 219 (5th Cir. 2022) (rejecting DHS argument that "vacatur 'prohibits' DHS from implementing the [challenged agency action] and *de facto* 'enjoin[s] or restrain[s]' the agency's enforcement decisions," and was therefore barred by Section 1252(f)(1)).

Vacatur also does not resemble an injunction. "[A]n injunction is a judicial process or mandate operating *in personam* by which, upon certain established principles of equity, a party is required to do or refrain from doing a particular thing." *Black's Law Dictionary* 937 (11th ed. 2019) (quoting 1 Howard C. Joyce, *A Treatise on the Law Relating to Injunctions* § 1, at 2-3 (1909)). Vacatur does not operate *in personam*, and it does not involve coercion. Instead, vacatur operates against a challenged action, is self-executing, and is accomplished through the court's order. It operates "in the same way that an appellate court formally revokes an erroneous trial-court judgment." Jonathan F. Mitchell, *The Writ-of-Erasure Fallacy*, 104 Va. L. Rev. 933, 1012 (2018). Nor does vacatur compel officials to do or refrain from anything. *Garland v. Aleman Gonzalez*, 596 U.S. 543, 550 (2022). Like the revocation of a court order, judicial annulment of administrative action may alter a party's conduct, but it does not order anyone to do anything. Vacatur thus does not involve coercion. Moreover, "[a]n injunction is a[n] . . . extraordinary remedy," *Monsanto*, 561 U.S. at 165, but vacatur is a "less drastic remedy," *id.*, and "the ordinary result," *Harmon v. Thornburgh*, 878 F.2d 484, 495 n.21 (D.C. Cir. 1989). Injunctions "should not be granted as a matter of course," *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010), but vacatur is the "default," *Data Mktg. P'ship, LP*, 45 F.4th at 859. And while injunctions require showing "an irreparable injury," and both "the public interest" and "the balance of hardships between the plaintiff and defendant" must favor injunctive relief, *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006), vacatur's requires none of those showings. Therefore, in line with the statutory text and Fifth Circuit precedent, section 1252(f)(1) does not apply to vacatur.

*Second*, section 1252(f)(1) does not bar the injunctive relief Texas seeks here.

Defendants contend that "[t]he Rule's rebuttable presumption of asylum ineligibility is applicable in three contexts: affirmative asylum applications under § 1158, credible fear interviews under § 1225(b)(1), and removal proceedings under § 1229a." Dkt. 34 at 16. But Defendants confuse what Section 1252(f)(1) forbids. Section 1252(f)(1) does not preclude injunctive relief whenever any provision within 8 U.S.C. §§ 1221–1232 is *relevant*; it forbids any injunctions that "order federal officials to take or refrain from taking actions to enforce, implement, or otherwise carry out" authority granted under those sections. *Garland v. Aleman Gonzalez*, 596 U.S. 543, 550 (2022)

Here, Texas's requested injunction does not violate section 1252(f)(1) because it in no way requires Defendants to *take* any action pursuant to 8 U.S.C. §§ 1221–1232. Nor does it force Defendants to "*refrain* from taking" actions to implement any part of those statutory provisions.

Texas' injuries are based on costs incurred as a result of Defendants' "affirmative immigration relief." *See DHS v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1906 (2020). Texas is not asking the Court to compel Defendants to take any sort of enforcement action against aliens or to deport any aliens who Defendants may consider exempt from the presumption of ineligibility for asylum. An affirmative program authorizing otherwise inadmissible aliens to pre-schedule a time to present at the border and conferring the affirmative immigration relief of parole is not mere refusal to enforce the law; instead, it constitutes judicially cognizable injury and leads to *direct* injuries to Texas.

Moreover, nothing in §§ 1221–1232 authorizes DHS to broaden the categories of aliens who are entitled to asylum or parole in the United States. Likewise, in support of their statutory authority for the Final Rule and its exception for aliens who use the CBP One app, Defendants rely on 6 U.S.C § 202, 8 U.S.C. § 1103, and 8 U.S.C. § 1182. But none of those statutory provisions fall within §§ 1221–1232, which is the range of statutes covered by §§ 1252(f)(1). Thus, while the Final Rule conflicts with many parts of the INA, they are not within §§ 1221–1232 and thus fall outside the scope of Section 1252(f)(1).

Accordingly, section 1252(f)(1) does not preclude any of the relief against the Final Rule sought in this action.

### 2. The APA does not preclude Texas's requested relief.

Defendants further assert that the APA (and specifically, 5 U.S.C. § 706(2)) does not permit universal vacatur of the Final Rule or portions of it. Dkt. 34 at 17. But the Fifth Circuit recently affirmed this remedy, finding it "was well within its discretion to order vacatur" of the DACA Memorandum, *DACA*, 50 F.4th at 530. And when reviewing the prior termination of MPP, the Fifth Circuit did the same, *MPP*, 20 F.4th at 1000–01, making the availability of this remedy the law of the case.

While Defendants contend that interpreting "section 706 to require universal vacatur of a regulation would allow a broad expansion of available remedies, upsetting the 'bedrock practice of case-by-case judgments with respect to the parties in each case,'" Dkt. 34 at 17 (quoting *Arizona v. Biden*, 31 F.4th 469, 484 (6th Cir. 2022) (Sutton, J., concurring)), "vacatur of an agency action is the default rule in this Circuit." *Cargill v. Garland*, 57 F.4th 447, 472 (5th Cir. 2023) (en banc). Indeed, "[v]acatur is the only statutorily prescribed remedy for a successful APA challenge to a regulation." *Franciscan Alliance, Inc. v. Becerra*, 47 F.4th 368, 374–75 (5th Cir. 2022); *see also R.J. Reynolds Tobacco Co. v. U.S. Food & Drug Admin.*, No. 6:20-cv-00176, 2022 WL 17489170, at *21 (E.D. Tex. Dec. 7, 2022) (Barker, J.) (rejecting Federal Defendants' arguments against availability of vacatur under the APA); *Texas Med. Ass'n v. United States Dep't of Health & Hum. Servs.*, No. 6:22-cv-372, 2023 WL 1781801, at *13 (E.D. Tex. Feb. 6, 2023) (Kernodle, J.) (same).

Tellingly, courts have long relied on the "set aside" authority to vacate unlawful agency actions. For more than 30 years, vacatur has been "the ordinary result" when the D.C. Circuit "determines that agency regulations are unlawful." *Harmon v. Thornburgh*, 878 F.2d 484, 495 n.21 (D.C. Cir. 1989). In the Fifth Circuit, vacatur is the "default rule." *Data Mktg. P'ship, LP v. U.S. Dep't of Labor*, 45 F.4th 846, 859 (5th Cir. 2022). And the Supreme Court has affirmed lower court decisions vacating administrative action. *See, e.g.,*

*Regents of the Univ. of California*, 140 S. Ct. at 1901 & 1916 n.7.

The text of the APA confirms this understanding. The APA provides that a "reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be" "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Under that text, "'[s]et aside' usually means 'vacate.'" *V.I. Tel. Corp. v. FCC*, 444 F.3d 666, 671 (D.C. Cir. 2006). In fact, when Congress adopted the APA, "set aside" meant "to cancel, annul, or revoke." *Black's Law Dictionary* 1612 (3d ed. 1933). The APA "reflected a consensus that judicial review of agency action should be modeled on appellate review of trial court judgments." Nicholas Bagley, *Remedial Restraint in Administrative Law*, 117 Colum. L. Rev. 253, 258 (2017). Just five years after the APA's enactment, the Third Circuit explained that section 706(2) "affirmatively provides for vacation of agency action." *Cream Wipt Food Prods. Co. v. Fed. Sec. Adm'r*, 187 F.2d 789, 790 (3d Cir. 1951).

This interpretation harmonizes the "set aside" authority with the rest of the APA. After all, it would be illogical for the APA to allow a court to "postpone the effective date of an agency action" during litigation, 5 U.S.C. § 705, but be powerless to terminate that action if the court concludes the action is "unlawful," *id.* § 706(2). Likewise, section 706(1) suggests that section 706(2) authorizes vacatur. The former allows courts to "compel" agency action while the latter authorizes the inverse. 5 U.S.C. § 706.

If agency actions are vacated, vacatur cannot be limited only to the parties. "[H]ow could this Court vacate the Rule with respect to the . . . plaintiffs in this case without vacating the Rule writ large? What would it mean to 'vacate' a rule as to some but not other members of the public?" *O.A. v. Trump*, 404 F. Supp. 3d 109, 153 (D.D.C. 2019). Such a result would clash with *Lujan v. National Wildlife Federation*, 497 U.S. 871 (1990). *See generally Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1409 (D.C. Cir. 1998) (discussing *Lujan* during its analysis of the scope of relief to be awarded). *Lujan*'s five-Justice majority observed that an "entire" agency program is "affected" by a

successful "challenge[] under the APA." *Lujan*, 497 U.S. at 890 n.2. Similarly, *Lujan*'s four-Justice dissent explained that when a "plaintiff prevails" in APA litigation, "the result is that the rule is invalidated, not simply that the court forbids its application to a particular individual." *Id.* at 913 (Blackmun, J., dissenting).

Nationwide vacatur is also the only possibility, and relief applying to Texas alone would not provide Texas any relief, because "there is a substantial likelihood that a geographically-limited injunction would be ineffective because [alien] beneficiaries would be free to move among states." *Texas v. United States (DAPA)*, 809 F.3d 134, 188 (5th Cir. 2015); *see also Biden*, 2022 WL 17718634, at *18 ("'There is a substantial likelihood that a geographically-limited [remedy] would be ineffective,' as aliens would simply enter the United States through a non-party State." (quoting *Texas*, 40 F.4th at 229 n.18) (brackets omitted)). "In the context of immigration law, broad relief is appropriate to ensure uniformity and consistency in enforcement." *Texas*, 40 F.4th at 229 n.18.

That this incidentally benefits other States as well is not unusual. While "'as a general rule, American courts of equity did not provide relief beyond the parties to the case[,]' [a]s with all general rules, of course, this one was subject to exceptions—the most important of which was that an injunction *could* benefit non-parties as long as 'that benefit was merely incidental.'" *Feds for Med. Freedom v. Biden*, 63 F.4th 366, 387 (5th Cir. 2023) (en banc) (citations omitted). This principle applies equally to vacatur.

Because "[t]he Constitution requires 'an *uniform* Rule of Naturalization,'" *DAPA*, 809 F.3d at 187 (quoting U.S. Const. art. I, § 8, cl. 4) (emphasis in original), "Congress has instructed that 'the immigration laws of the United States should be enforced vigorously and *uniformly*,'" *id.* at 187–88 (quoting Immigration Reform and Control Act of 1986, Pub. L. No. 99–603, § 115(1), 100 Stat. 3359, 3384) (emphasis in original), "and the Supreme Court has described immigration policy as 'a comprehensive and *unified* system,'" *id.* at 188 (quoting *Arizona v. United States*, 567 U.S. 387, 401 (2012)). Thus, "[p]artial implementation of [the challenged immigration policy] would "detract[] from the

'integrated scheme of regulation' created by Congress." *Id.* (quoting *Arizona*, 567 U.S. at 401). Accordingly, the Court should continue to interpret the APA as authorizing the remedy of vacatur and recognize that it nullifies the agency action universally rather than precludes its application to any particular parties.

### 3. Section 1252(a)(2)(B)(ii) does not preclude Texas's requested relief.

Defendants argue that the decision of whether to grant parole is "in [the] discretion" of the Secretary under 8 U.S.C. § 1182(d)(5)(A), and they assert that Texas's claims essentially amount to "an amalgamation of thousands of individual parole decisions made pursuant to the Executive's discretionary parole authority at 8 U.S.C. § 1182(d)(5)(A)." Dkt. 34 at 18. Defendants maintain that 8 U.S.C. § 1252(a)(2)(B)(ii) precludes this Court's review of Texas's claims. Dkt. 34 at 18. But Defendants are mistaken.

Section 1252(a)(2)(B)(ii), for starters, does not even apply to this case. That statute only bars judicial review of a "decision or action" by the Attorney General or Secretary, not the creation of an entire program. And as discussed above, Texas is not challenging a particular "decision or action" by the Attorney General or Secretary; it is instead challenging Defendants' creation of an enormous program that broadly and categorically grants affirmative immigration relief to large swaths of aliens.

Worse, Defendants' "amalgamation" argument lacks a textual basis in the statute. When section 1252(a)(2)(B)(ii) references any "decision or action" of the Attorney General or Secretary, it explicitly uses those words in the singular form. But in support of their "amalgamation" argument, Defendants quote section 1252(a)(2)(B)(ii) and explicitly add an "s" to the word "decision" and the word "action," respectively. *See* Dkt. 34 at 18 (stating that courts may not review the "decision[s] or action[s]" of DHS under 8 U.S.C. § 1252(a)(2)(B)(ii)). Defendants make plural what Congress wrote in the singular. Only by adding an "s" to those words can Defendants construe the statute as prohibiting Texas's

claims. Dkt. 34 at 18. Taking the statute as written, Defendants' arguments fall apart. After all, it is impossible to amalgamate a singular "decision" or a singular "action." Defendants' citation to *Flores v. Garland*, 72 F.4th 85, 91–92 (5th Cir. 2023) and *Loa-Herrera v. Trominski*, 231 F.4th 984 (5th Cir. 2000) for the proposition that Texas's *ultra vires* claims are unreviewable fare no better. *See* Dkt. 34 at 32. *Garland* considered whether a district court had jurisdiction to review DHS's denial of an immigrant's I-485 application, 72 F.4th at 88, and *Trominski* considered only whether a district court could review an individual parole decision. *Trominski*, 231 F.4th at 991. Neither of these cases bear on this court's jurisdiction to review Defendants' operation of a mass parole program. Defendants' self-serving changes to section 1252(a)(2)(B)(ii) must be rejected.

But even if the text, structure, and purpose of the statute did not conclusively determine jurisdiction, the *Thunder Basin* factors demonstrate that jurisdiction is proper. *See Feds for Medical Freedom v. Biden*, 63 F.4th 366, 379–81 (5th Cir. 2023); *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200 (1994). These factors are (1) whether "a finding of preclusion could foreclose all meaningful judicial review;" (2) whether the claims are "wholly collateral" to the statutory scheme; and (3) whether the claims are "outside the agency's expertise." *Axon Enter., Inc. v. FTC*, 598 U.S. 175, 186 (2023) (quoting *Thunder Basin*, 510 U.S. at 212–13).

*First*, finding the Plaintiffs' claims precluded "could foreclose all meaningful judicial review." *Axon Enter., Inc.*, 598 U.S. at 190. The INA does not provide a process to challenge the process. That is the function of the APA. If a statute that denies review of a singular decision to remove an alien is construed to prohibit review of a challenge to the agency's decision-making process entirely, then there is no judicial review left.

*Second*, the Plaintiffs' claims are "wholly collateral" to the statutory scheme because "[t]he challenges to the [Secretary's] authority have nothing to do with" individual determinations of removal or parole. *Id.* at 193. A claim is wholly collateral if, as here, it is "challenging the [agency's] power to proceed at all, rather than actions taking in

the agency proceedings." *Id.* at 192.

*Third*, and finally, an APA challenge is outside the Department of Homeland Security's expertise. Claims fall outside an agency's expertise when they "raise 'standard questions of administrative' and constitutional law, detached from 'considerations of agency policy.'" *Id.* at 194. Although the "standard questions of administrative and constitutional law" Plaintiffs raise here are about the parole authority, no expertise in immigration law or policy is needed to resolve them. Accordingly, section 1252(a)(2)(B)(ii) does not strip this Court of jurisdiction.

## C. The Final Rule is reviewable under the APA.

The APA makes "agency action presumptively reviewable." *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 226 (quotation marks omitted). While Defendants contend that "Texas is not within the zone of interests protected by the relevant immigration statutes," Dkt. 34 at 19, the zone-of-interest inquiry is "not especially demanding." *See, e.g., Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 130 (2014) (quotation omitted).

To fall within the zone of interests, a plaintiff need only show that its interest is "arguably within the zone of interests to be protected or regulated by" the statutes that it claims to have been violated. *Patchak*, 567 U.S. at 224–25; *Association of Data Processing Service Orgs., Inc. v. Camp*, 397 U.S. 150, 153 (1970). The Supreme Court has "always conspicuously included the word 'arguably' in the test to indicate that the benefit of any doubt goes to the plaintiff." *Patchak*, 567 U.S. at 225. A plaintiff need not point to "any indication of congressional purpose to benefit" it. *Id.* at 225. Instead, "[t]he test forecloses suit only when a plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit." *Id.* (quoting *Clarke v. Security Industry Ass'n*, 479 U.S. 388, 399 (1987)).

Texas easily satisfies this test. The INA provides "a comprehensive federal

statutory scheme for regulation of immigration and naturalization" and "set[s] the terms and conditions of admission to the country and the subsequent treatment of aliens lawfully in the country." *DACA*, 50 F.4th at 521 (internal quotations omitted) (quoting *Chamber of Com. v. Whiting*, 563 U.S. 582, 587 (2011)). States "bear[] many of the consequences of unlawful immigration," and "[t]he problems posed to the State by illegal immigration must not be underestimated." *Arizona v. United States*, 567 U.S. 387, 397, 398 (2012). Moreover, the Fifth Circuit has recognized that the INA is intended to protect against imminent and actual harm to the State's fisc, and fiscal harms to the State fall within the INA's zone of interest. *Texas (MPP II)*, 20 F.4th at 975 (citing *Demore v. Kim*, 538 U.S. 510, 517–22 (2003)); *see, e.g.*, *DAPA*, 809 F.3d at 163.

Defendants counter that Texas's interests do not fall within the zone of interests of specific statutory provisions—namely, "the asylum statute" or "the parole statute." Dkt. 34 at 19–20. But Defendants are wrong. By focusing only on the zone of interest of the so-called "asylum statute" and the "parole statute," in particular, Defendants misapply the zone-of-interest test because they are focusing on the interests of specific portions of the INA rather than the INA generally. Both the Fifth Circuit and the Supreme Court have rejected such "jiu-jitsu" arguments. *See MPP II*, 20 F.4th at 975–76 (explaining that the Federal Government's argument was constituted a "particular form of jiu-jitsu" that was "at odds with both Fifth Circuit and Supreme Court precedent" because the Federal Government "focused on the zone of interests of two subparagraphs in [a specific statutory section] rather than that of the INA . . . as a whole" (emphasis in original)); *see also DAPA*, 809 F.3d at 163 (analyzing the INA's zone of interests, not the zone of one particular provision); *Clarke,* 479 U.S. at 401 ("In considering whether the 'zone of interest' test provides or denies standing in these cases, we first observe that the Comptroller's argument focuses too narrowly on 12 U.S.C. § 36, and does not adequately place § 36 in the overall context of the National Bank Act."). Texas's claims against the Final Rule fall within the INA's zone of interests.

**D.  The Final Rule Exceeds the Statutory Limits of the INA.**

Defendants contend that the Final Rule is consistent with the INA, and even if it were not, that the INA forecloses the Court's jurisdiction over Texas's claims. Defendants' arguments are misplaced.

Texas has alleged facts sufficient to support the reasonable inference that the Final Rule and its implementation exceed Defendants' statutory authority. A federal agency cannot act absent congressional authorization. *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986). It cannot confer power upon itself. *Id.* "To permit an agency to expand its power in the face of a congressional limitation on its jurisdiction would be to grant to the agency power to override Congress." *Id.* at 374–75. Put simply, "[a]gencies may play the sorcerer's apprentice but not the sorcerer himself." *Alexander v. Sandoval*, 532 U.S. 275, 291 (2001).

The Immigration and Nationality Act (INA) provides a comprehensive statutory scheme to govern immigration into the United States. *See* 8 U.S.C. § 1157, *et seq.* For individuals who are not otherwise admissible, the INA allows the federal government to parole them "only on a case-by-case basis for urgent humanitarian reasons or significant public benefit." *See* 8 U.S.C § 1182(d)(5)(A); *see also Texas (MPP II)*, 20 F.4th at 947. The INA does not, however, allow the use of the parole authority to create categorical admissions programs. *See Texas v. Biden*, 646 F. Supp. 3d 753, 776 (N.D. Tex. 2022) ("Section 1182(d)(5)(A)'s historical context confirms DHS cannot exercise its parole authority to parole *categories* of aliens, rather than individuals." (emphasis added)).

Defendants' contention that the Final Rule "limits the circumstances in which noncitizens can obtain asylum" fundamentally mischaracterizes both the text and the effect of the Rule. *See* Dkt. 34 at 3. The Final Rule presumes that aliens "who enter the United States from Mexico at the southwest land border or adjacent coastal borders without documents sufficient for lawful admission" are ineligible for asylum. 88 Fed. Reg. 31,450 (8 C.F.R. § 208.33(a)). But the Final Rule excepts from this presumption aliens who

"[p]resent[] at a port of entry, pursuant to a pre-scheduled time and place" through the CBP One app. 88 Fed. Reg. 31,450 (8 C.F.R. § 208.33(a)(2)(B)). The statutory framework governing asylum, however, demonstrates that all aliens are presumed ineligible for asylum because they must satisfy the statutory requirements to be granted that relief. By excepting CBP One app users from the presumption, the Final Rule changes the burden of proof to establish eligibility for asylum in a way that renders it inconsistent with the INA.

While the INA allows aliens to *apply* for asylum, it does not *presume* that any are eligible. Rather, the burden to demonstrate eligibility for asylum is always on the applicant. *See, e.g.*, *East Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 758 (9th Cir. 2018) (recognizing that the INA requires an asylum applicant to establish refugee status and the applicant bears the burden of supporting such a finding); *Hasan-Nayem v. U.S. Att'y Gen.*, 55 F.4th 831, 843 (11th Cir. 2022) ("To establish eligibility for asylum, the applicant bears the burden of proving his statutory 'refugee' status.'"). The Final Rule's exception for CBP One users from the presumption of ineligibility for asylum necessarily lessens the asylum applicant's burden of proof, even though the INA directly places the burden of proof on the applicant. *See* 8 U.S.C. § 1158(b)(1)(B) ("The burden of proof is on *the applicant* . . . ." (emphasis added)). The INA and the Final Rule also conflict because "[a]n applicant [for asylum] is not entitled to a presumption of credibility." *East Bay Sanctuary Covenant*, 932 F.3d at 758. Indeed, there are entire "classes of aliens [who are] categorically ineligible to apply for asylum." *Id.* Because the INA presumes that all aliens are ineligible for asylum by placing the burden of proof on the applicant to sustain relief, the Final Rule's exception from the presumption of ineligibility for asylum is inconsistent with the INA.

While the Attorney General "may provide by regulation for any other conditions or limitations on the consideration of an application for asylum *not inconsistent with* [the INA]," any such condition cannot alter the statutory framework imposed by Congress. 8 U.S.C. § 1158(d)(5)(B) (emphasis added). Defendants may impose additional "limitations," but they cannot impose incentives. *See* 8 U.S.C. § 1158(d)(5)(B).

*Response to Defendants' Motion to Dismiss*                                                    25

Under the INA, aliens without documents sufficient for lawful admission are deemed "inadmissible." 8 U.S.C. § 1182(a)(7). These inadmissible aliens are the same aliens to whom the Final Rule and its exception apply. *See, e.g.*, 88 Fed. Reg. 31,321. But Defendants cite no statutory authority supporting the proposition that Defendants may except *any* inadmissible aliens from the INA's built-in presumption of ineligibility for asylum—much less inadmissible aliens whose exception from the presumption is based on their pre-scheduling a time to present themselves at a port of entry. *See generally* Dkt. 34. Although the INA allows inadmissible aliens to seek asylum, it also preserves the public's interest in requiring inadmissible aliens to demonstrate their entitlement to affirmative immigration relief. By excepting certain inadmissible aliens from this general framework, the Final Rule upsets this statutory balance.

Defendants cite *State of Tex. v. United States*, 106 F.3d 661, 667 (5th Cir. 1997) for the proposition that Defendants' obligation under 8 U.S.C. § 1103(a)(5) to "guard the boundaries and borders of the United States against the illegal entry of aliens" has "no substantive limits on the [Executive]." Dkt. 34 at 24–25 (internal quotation marks omitted). But while that statute may not include a standalone cause of action like that at issue in *State of Tex.*, 106 F.3d at 667, its terms demonstrate that Congress did not intend that executive agencies would encourage, incentivize, or invite inadmissible aliens to present at ports of entry at the southwestern border, as the Final Rule expressly contemplates. *See* 88 Fed. Reg. 31,342 (stipulating that aliens without documents sufficient for lawful admission "are encouraged and incentivized" through the Final Rule's exception "to make an appointment using the CBP One app to present themselves at a [port of entry] for inspection"); *see also* 88 Fed. Reg. 31,399 (stipulating that "[n]oncitizens who are not eligible for [other parole programs] can schedule an appointment to present at a southwest land border POE through the CBP One app and be exempted from the rule").

Defendants cite 8 U.S.C. § 1103(g)(2) for their authority to promulgate the Final Rule. *See* Fed. Reg. 31,323. But that statute limits the Attorney General's authority under

the INA to establishing regulations that are necessary to carrying out its requirements. *Compare* 8 U.S.C. § 1103(g)(2), *with* 8 U.S.C. § 1103(a)(5). Defendants fail to cite *any* provision of the INA whose requirements necessitate that Defendants incentivize and encourage aliens without documents sufficient for lawful admission to travel to and gather at a United States port of entry when they have not demonstrated any entitlement to protection from removal or any preexisting intention to travel to the United States. The Final Rule is facially inconsistent with the INA, and Defendants lack statutory authority to implement it.

### E.  The Final Rule is Arbitrary and Capricious.

Under the APA, a court must "hold unlawful and set aside agency action" that is "arbitrary and capricious." *See* 5 U.S.C. § 706(2)(A). An agency action is arbitrary or capricious if it fails to "articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983).

The Final Rule allows otherwise inadmissible aliens who pre-schedule a time to cross the border to receive a legal benefit that is not available to other applicants. Defendants aver that they are merely "manag[ing] the flow" of illegal immigrants by excepting certain aliens from the INA's general statutory provisions. Dkt. 34 at 26 (citing 88 Fed. Reg. at 31,318). But the exception for users of the CBP One app is wholly arbitrary. For instance, while the pre-scheduling feature of the CBP One app is only available in northern and central Mexico, the Rule's exception for CBP One users "does not apply to Mexican citizens." Dkt. 34 at 26 n.5; 88 Fed. Reg. 31,399. Rather, it applies only to aliens who have traveled to Mexico from their home country. *Id.* The Final Rule expressly "encourage[s]" aliens "outside northern and central Mexico . . . to use various pathways available to lawfully travel to the United States, and they will be able to use the app once they are in the geofenced area and thus closer to the United States." 88 Fed. Reg. 31,399.

In sum, the Final Rule incentives aliens who have migrated to Mexico to continue to a United States port of entry even though Defendants acknowledge they do not have documents sufficient for lawful admission. *See also* Dkt. 34 at 23 (acknowledging that the Final Rule is intended to assist "[aliens] without documents sufficient for admission into the United States"). Defendants concede that the migrants who are the object of this rule lack a visa and "are generally inadmissible." 88 Fed. Reg. 31,343. But despite that fact, the Final Rule's exception does not require any showing that migrants who traveled to Mexico had any intention of continuing to the United States.

Defendants also had an obligation "to consider *Texas's* expenses and costs when contemplating" the effect of changes to the federal immigration scheme in Texas. *Texas v. United States*, 524 F. Supp. 3d 598, 655 (S.D. Tex. 2021) (emphasis added). Defendants do not come close to having satisfied this obligation. Defendants point to 88 Fed. Reg. 31,437–38 as the sum of their consideration of the effects on states. Dkt. 34 at 28. In response to State Attorneys General who lodged concerns that states would bear the costs of "higher levels of unlawful aliens," Defendants asserted that they "disagree[d] with the characterization of the rule as precipitating higher levels of irregular migration." 88 Fed. Reg. 31,438. But decreasing "irregular migration" between ports of entry is a separate issue from an overall increase in "unlawful aliens" who lack documents sufficient for lawful admission and who have no underlying legal right to be in the United States. "Admission and status are fundamentally distinct concepts. . . . An individual who presents himself at an immigration checkpoint . . . and is given permission to enter has been admitted regardless of whether he had any underlying legal right to do so. . . . Status, by contrast, usually describes the type of permission to be present in the United States that an individual has." *Gomez v. Lynch*, 831 F.3d 652, 658 (5th Cir. 2016).

Even so, decreasing unlawful immigration is expressly *not* the goal. *See, e.g.*, Dkt. 34 at 8–9 (contending that "[a] reduction in *irregular migration* will correspondingly decrease crowding in border facilities . . ." (emphasis added)). Rather, Defendants intend to

decrease "*irregular migration*" between ports of entry; they do not intend to decrease the number of aliens who have no underlying legal right to be in the United States. *See id.* And in fact, Defendants intend to pass on the costs of this Final Rule to Texas. The Final Rule expressly contemplates that "border states," like Texas, and "local communities" will "absorb releases from CBP border facilities and provide support to the migrant community." 88 Fed. Reg. 31,325. Coupled with Defendants' intent to "process significantly more individuals" at ports of entry, Defendants failure to consider the effect of this Final Rule on Texas is itself enough to deny Defendants' Motion to Dismiss. *See* 88 Fed. Reg. 31,325.

Defendants wholly failed to engage with the concern that the Final Rule's exception would operate to increase the number of unlawful aliens in the United States, the majority of which are funneled through ports of entry in Texas. "Stating that a factor was considered . . . is not a substitute for considering it." *Getty v. Fed. Sav. & Loan Ins. Corp.*, 805 F.2d 1050, 1055 (D.C. Cir. 1986); *see also Corrosion Proof Fittings v. EPA*, 947 F. 2d 1201, 1226 (5th Cir. 1991) ("The EPA's failure to consider the regulatory alternatives, however, cannot be substantiated by conclusory statements."). Where, as here, "the agency has failed to provide even that minimal level of analysis, its action is arbitrary and capricious and so cannot carry the force of law." *Encinco Motorcars, LLC v. Navarro*, 579 U.S. 211, 136 S. Ct. 2117, 2125 (2016). Courts "do not defer to the agency's conclusory or unsupported suppositions," *United Techs. Corp. v. U.S. Dep't of Def.*, 601 F.3d 557, 562 (D.C. Cir. 2010), nor are agency actions "involving an issue of deep economic and political significance" entitled to deference, *City & Cnty. Of San Francisco v. Trump*, 897 F.3d 1225, 1242 (9th Cir. 2018) (cleaned up).

## F.  Defendants' actions are ultra vires.

Texas brings both a common law and statutory *ultra vires* cause of action. Dkt. 30 at 22. Relevant to this Court's resolution of a motion to dismiss, "[w]hen faced with such a 'difficult question' of the reviewability of certain executive actions, the Supreme Court

has in recent years adopted the practice of 'assum[ing] without deciding' justiciability." *Murphy Co. v. Biden*, 65 F.4th 1122, 1130 (quoting *Trump v. Hawaii*, 138 S. Ct. 2392, 2407 (2018)). *Ultra vires* causes of action do not require the plaintiff to identify a "final agency action." *See Apter*, 80 F.4th at 587. Instead, plaintiffs can assert *ultra vires* causes of action challenging an official's actions that exceed his statutory authority. *Id.* Likewise, "for agencies charged with administering congressional statutes," "[b]oth their power to act and how they are to act is authoritatively prescribed by Congress, so that when they act improperly . . . what they do is ultra vires. . . . [T]he question . . . is always whether the agency has gone beyond what Congress has permitted it to do." *City of Arlington, Tex. v. F.C.C.*, 569 U.S. 290, 297–98 (2013). While conclusory assertions are insufficient to survive a motion to dismiss, a plaintiff need only plead facts which, taken as true, demonstrate that an official is acting beyond his authority. *See Twombly*, 550 U.S. 544 at 570. Texas's allegations easily meet that standard here.

While DHS has "discretion to parole applicants 'only on a case-by-case basis for urgent humanitarian reasons or significant public benefit,'" "under the APA, DHS's exercise of discretion [to grant parole] within that statutory framework must be reasonable and reasonably explained." *Biden v. Texas*, 597 U.S. 785, 807 (2022). Defendants' own data demonstrates that 95.8% of all inadmissible aliens who scheduled appointments through the CBP One app were ultimately released into the United States on parole.[10] Taken as true—which this Court must for purposes of ruling on a motion to dismiss—Defendants' data shows that Defendants are exercising their parole authority on a categorical basis in violation of the statutory provision authorizing them to confer such affirmative relief. *See Twombly*, 550 U.S. at 555 ("Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are

---

[10] *New Documents Obtained by Homeland Majority Detail Shocking Abuse of CBP One App*, U.S. House of Representatives, https://homeland.house.gov/2023/10/23/new-documents-obtained-by-homeland-majority-detail-shocking-abuse-of-cbp-one-app/ (Oct. 23, 2023).

true (even if doubtful in fact)." (quotation marks, citations, and footnote omitted)). Defendants wholly fail to explain how a 96% rate of admission on parole is "reasonable," and they fail to "reasonably explain[]" how a 96% rate of admission into the United States on parole satisfies the Congressional mandate that parole be granted in only limited circumstances. *See generally* Dkt. 34.

At this stage, Defendants "ha[ve] not offered even a 'colorable basis' for rejecting [Texas's] argument." *Apter*, 80 F.4th at 588. Indeed, Defendants acknowledge that "many noncitizens who are encountered at the border and released pending their immigration proceedings will spend *years* in the United States regardless of the outcomes of their cases." 88 Fed. Reg. 31,337 (emphasis added). Defendants cannot point to any statutory authority that allows them to parole aliens *en masse*. Paroling nearly all aliens who use the CBP One app is not a "case-by-case" determination; it is a blanket approval. The 4.2% difference between the app users who were granted parole and those who were not is so infinitesimal it could be explained by aliens who never showed up to their appointment or who crossed between ports of entry. That an overwhelming number of CBP One app users were granted parole supports the reasonable inference that the Final Rule's exception and the implementation of the CBP One app are functioning as an illegal parole program, and Defendants' Motion to Dismiss Texas's *ultra vires* claims should be denied.

Moreover, Defendants contend that the near 96% rate at which CBP One app users are granted parole is a result of Defendants' exercise in "ensuring orderly and efficient flow of lawful traffic and commerce." *See* Dkt. 34 at 26, 29. Defendants' capacious interpretation of this authority requires the application of the Major Questions Doctrine.

The Supreme Court's guidance in *West Virginia v. EPA* should form the lodestar of the Court's analysis. 597 U.S. 697 (2022). In that case, the Court considered whether an EPA regulation that required shifting electricity generation from coal-fired plants to natural gas and renewables was "within the power granted to it by the Clean Air Act." *Id.* at 706. While noting that "generation shifting" (i.e., moving electricity production from coal to

less carbon-intensive sources) could be described as a "system" as a matter of "definitional possibilities," the Court emphasized that "almost anything" could be a "system" under the Government's expansive interpretation and that "shorn of all context, the word is an empty vessel." *Id.* at 732. Thus, the Court held that "[s]uch a vague statutory grant is not close to the sort of clear authorization required by our precedents." *Id.* The Court distinguished this from other uses of "system" in the Clean Air Act, because "[i]t is one thing for Congress to authorize regulated sources to use trading to comply with a preset cap. . . . It is quite another to simply authorize EPA to set the cap itself wherever the Agency sees fit." *Id.* at 733.

Much as it was impermissible for the EPA to set a cap on coal-fired carbon emissions "wherever the Agency [saw] fit" based on the vague and long-enacted statutory provision at issue, it is likewise impermissible for Defendants to "manage the flow" of people at ports of entry by simply granting them parole in wholesale fashion.

The Final Rule's presumption of ineligibility mirrors the INA's statutory scheme, which also presumes that aliens are inadmissible unless they satisfy one of the exceptions from removal. But Defendants' use and implementation of the Final Rule's carve-out for aliens who use the CBP One app is without authority. The Final Rule's general presumption of ineligibility restates the law; the exception from the presumption alters the statutory framework. Defendants cannot do that which Congress has not clearly delegated to it; they cannot alter the INA's statutory scheme by exempting *any* aliens from the INA's requirement that the burden to establish eligibility for asylum remains on the applicant.

Defendants' contention that the Final Rule is based on their authority to "manag[e] [ports of entry] in a safe and orderly manner" fares no better. Dkt. 34 at 28. By that logic, Defendants could keep ports of entry "safe and orderly" by directing aliens to cross the border between ports of entry instead of through the ports of entry. Even Defendants seem to recognize that the INA would not go so far as to allow that. *See* Dkt. 34 at 25.

Defendants cite 8 U.S.C. § 1158 to support the proposition that the Final Rule

"establishes limitations on and conditions to the grant of asylum." Dkt. 34 at 18. While Defendants may establish *limitations*, they do not have Congressional authority to grant exceptions to those limitations. *See* section II(D) *supra*. But even if the Final Rule's exception were lawful, none of the statutes Defendants cite contemplate *increasing* the number of aliens admitted at the southwestern border who have no underlying legal right to remain in the United States. *See generally* Dkt. 34.

Defendants seek to evade meaningful judicial review of the Rule by describing their authority as "broad." Dkt. 34 at 4. But if Defendants are correct—that they can "make a 'radical or fundamental change' to a statutory scheme" to make the ports more "orderly"—that that certainly would present non-delegation concerns. *West Virginia v. EPA*, 597 U.S. 697, 723 (2022); *see also Kentucky v. Biden*, 23 F.4th 585, 607 n.14 (6th Cir. 2022). Quite simply, the "breadth of authority" Defendants have asserted under this purportedly broad grant of authority and the "economic and political significance" of this assertion require a *clear* congressional authorization before concluding that Congress meant to confer such authority. *West Virginia*, 597 U.S. at 723. The vast economic and political significance of this issue and the breadth of authority claimed by Defendants demand application of the Major Questions Doctrine.

## III.    PRAYER

For all these reasons, the State of Texas respectfully requests that the Court deny Defendants' Motion to Dismiss.

Dated May 9, 2024.

Respectfully submitted.

**KEN PAXTON**
Attorney General of Texas

*/s/ Amy Snow Hilton*
**AMY SNOW HILTON**
Special Counsel
Tex. State Bar No. 24097834
Amy.Hilton@oag.texas.gov

**BRENT WEBSTER**
First Assistant Attorney General

**RALPH MOLINA**
Deputy Attorney General for Legal
Strategy

**ETHAN SZUMANSKI**
Special Counsel
Tex. State Bar No. 24123966
Ethan.Szumanski@oag.texas.gov

**RYAN D. WALTERS**
Chief, Special Litigation Division

**COUNSEL FOR THE STATE OF TEXAS**

Office of the Attorney General of Texas
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
(512) 463-4139

### CERTIFICATE OF SERVICE

I certify that a true and accurate copy of the foregoing document was filed electronically (via CM/ECF) on May 9, 2024, and that all counsel of record were served by CM/ECF.

*/s/ Amy Snow Hilton*
**AMY SNOW HILTON**